PENAP, WDREF

## U.S. Bankruptcy Court
## Southern District of New York (White Plains)
## Adversary Proceeding #: 07-08276-ash

*Assigned to:* Judge Adlai S. Hardin Jr.                    *Date Filed:* 07/10/07
*Related BK Case:* 05-27041
*Related BK Title:* CIMA Group Inc.
*Related BK Chapter:* 11
*Demand:*
*Nature[s] of Suit:* 11 Recovery of money/property - 542 turnover of property
                14 Recovery of money/property - other

**Plaintiff**
-----------------------

**CIMA Group Inc.**                    represented by **Rosemarie E. Matera**
450 Manville Road                                      Kurtzman Matera, PC
Pleasantville, NY 10570                                664 Chestnut Ridge Road
Tax id: 13-3505128                                     Spring Valley, NY 10977
                                                       (845) 352-8800
                                                       Fax : (845) 352-8865
                                                       Email: law@kmpclaw.com

V.

**Defendant**
-----------------------

**Nicholas Pasalides**                    represented by **Jeffery A. Reich**
18 Hilltop Road                                          Reich Reich & Reich, P.C.
Katonah, NY 10536                                        175 Main Street
                                                         Ste 300
                                                         White Plains, NY 10601
                                                         (914)949-2126
                                                         Fax : (914)949-1604
                                                         Email: reichlaw@aol.com

**Joseph L. Woods**                    represented by **Jeffery A. Reich**
218 Grapehollow Road                                    (See above for address)
Homes, NY 12531

**Mark Velzy**                    represented by **Jeffery A. Reich**
3740 Wildwood Street                                   (See above for address)
Yorktown Heights, NY 10598

**Michiel Boender**                    represented by **Jeffery A. Reich**
163 North Main Street                                   (See above for address)
Port Chester, NY 10573

**Edgewater Design, Inc.**                    represented by
163 N. Main Street                                       **Jeffery A. Reich**
Suite 202                                                (See above for address)
Port Chester, NY

**Edgewater Group Architects a/k/a Edgewater**    represented by
**Group**
163 N. Main Street                                       **Jeffery A. Reich**
Suite 202                                                (See above for address)
Port Chester, NY

| Filing Date | # | Docket Text |
|---|---|---|

| 07/10/2007 | 1 | Adversary case 07-08276. Complaint against Nicholas Pasalides, Joseph L. Woods, Mark Velzy, Michiel Boender, Edgewater Design, Inc., Edgewater Group Architects a/k/a Edgewater Group . Nature(s) of Suit: (11 (Recovery of money/property - 542 turnover of property)), (14 (Recovery of money/property - other)) Filed by Rosemarie E Matera, Rosemarie E. Matera on behalf of CIMA Group Inc.. (Matera, Rosemarie) (Entered: 07/10/2007) |
| --- | --- | --- |
| 07/11/2007 | | Receipt of Complaint(07-08276-ash) [cmp,cmp] ( 250.00) Filing Fee. Receipt number 4329804. Fee amount 250.00. (U.S. Treasury) (Entered: 07/11/2007) |
| 07/16/2007 | 2 | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 8/22/2007 at 09:40 AM at Courtroom 520, White Plains Office, Answer due by 8/15/2007, (Webb, Lonnie) (Entered: 07/16/2007) |
| 07/17/2007 | 3 | Certificate of Service *of Summons, Notice of Pre-Trial Conference and Complaint upon Defendants, Nicholas Pasalides, Joseph Woods, Mark Velzy, Michiel Boender, Edgewater Design, Inc., and Edgewater Group Architects a/k/a Edgewater Group* (related document(s)1, 2) filed by Rosemarie E. Matera on behalf of CIMA Group Inc.. (Matera, Rosemarie) (Entered: 07/17/2007) |
| 07/17/2007 | 4 | Amended Certificate of Service *of Summons and Notice of Pretrial Conference Upon Officer, Director or Managing Agent of Edgewater Design, Inc. and Officer, Director or Managing Agent of Edgewater Group Architects a/k/a Edgewater Group* (related document(s)1, 2) filed by Rosemarie E. Matera on behalf of CIMA Group Inc.. (Matera, Rosemarie) (Entered: 07/17/2007) |
| 08/23/2007 | 5 | Scheduling Order signed on 8/22/2007 (see order). A Final Pretrial conference will be held on 1/23/2008 at 09:40 AM at Courtroom 520, White Plains Office (Webb, Lonnie) (Entered: 08/23/2007) |
| 09/11/2007 | 6 | Answer to Complaint (Related Doc # 1) filed by Jeffery A. Reich on behalf of Michiel Boender, Edgewater Design, Inc., Edgewater Group Architects a/k/a Edgewater Group, Nicholas Pasalides, Mark Velzy, Joseph L. Woods. (Attachments: # 1 Nicholas Pasalides Verification# 2 Joseph Woods Verification# 3 Mark Velzy Verification# 4 Michiel Boender Verification# 5 Affidavit of Service)(Reich, Jeffery) (Entered: 09/11/2007) |
| 03/25/2008 | 7 | Memorandum of Law filed by Rosemarie E. Matera on behalf of CIMA Group Inc.. (Attachments: # 1 AOS Pretrial Brief) (Matera, Rosemarie) (Entered: 03/25/2008) |
| 05/12/2008 | 8 | Motion for Summary Judgment *(Partial)* filed by Rosemarie E. Matera on behalf of CIMA Group Inc.. with hearing to be held on 6/26/2008 at 10:00 AM at Courtroom 520, White Plains Office Responses due by 6/6/2008, (Attachments: # 1 Certification# 2 Exhibit A-C# 3 Exhibit D-G# 4 Exhibit H-L# 5 Memorandum of Law# 6 Statement of Undisputed Facts# 7 AOS Motion for Summary Judgment) (Matera, Rosemarie) (Entered: 05/12/2008) |
| 05/15/2008 | 9 | Motion to Withdraw the Reference *And Approval of the Stipulation Withdrawing The Reference* filed by Rosemarie E. Matera on behalf of CIMA Group Inc.. (Attachments: # 1 Application For Withdrawal of Reference# 2 Exhibit A# 3 AOS Motion to Withdraw Reference) (Matera, Rosemarie) (Entered: 05/15/2008) |
| 05/15/2008 | | Receipt of Motion to Withdraw the Reference (fee)(07-08276-ash) [motion,205] ( 150.00) Filing Fee. Receipt number 4791002. Fee amount 150.00. (U.S. Treasury) (Entered: 05/15/2008) |
| 06/04/2008 | 12 | Civil Cover Sheet from U.S. District Court, Case Number: 0805143 Judge Brieant *Re: Motion to Withdraw the Reference filed by Rosemarie E. Matera on behalf of the CIMA Group, Inc* (related document(s)9) filed by Clerk's Office of the U.S. Bankruptcy Court. (Correa, Mimi) (Entered: 06/12/2008) |
| 06/06/2008 | 10 | Memorandum of Law *in Opposition to Motion for Summary Judgment* (related document(s)8) filed by Jeffery A. Reich on behalf of Michiel Boender, Edgewater Design, Inc., Edgewater Group Architects a/k/a Edgewater Group, Nicholas Pasalides, Mark Velzy, Joseph L. Woods. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E) (Reich, Jeffery) (Entered: 06/06/2008) |

| 06/06/2008 | 🔘11 | Affidavit of Service (related document(s)10) filed by Jeffery A. Reich on behalf of Michiel Boender, Edgewater Design, Inc., Edgewater Group Architects a/k/a Edgewater Group, Nicholas Pasalides, Mark Velzy, Joseph L. Woods. (Reich, Jeffery) (Entered: 06/06/2008) |
| 06/20/2008 | 🔘13 | Response to Motion - *Statement of Debtor in Response to Opposition to Motion for Summary Judgment* (related document(s)8) filed by Rosemarie E. Matera on behalf of CIMA Group Inc.. with hearing to be held on 6/26/2008 (check with court for location) (Attachments: # 1 AOS Response to Opposition) (Matera, Rosemarie) (Entered: 06/20/2008) |
| 07/08/2008 | 🔘14 | Order signed on 6/27/2008 by U.S. District Court Judge Colleen McMahon granting the motion to withdraw the reference . (related document(s)9) (Correa, Mimi) (Entered: 07/08/2008) |

Rosemarie E. Matera (REM-0999)
Kurtzman Matera Gurock & Scuderi, LLP
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                              Chapter 11
                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                            Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                            Plaintiff,

            - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                            Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>VERIFIED COMPLAINT</u>

CIMA Group, Inc., the Debtor and Debtor in possession herein (hereafter "CIMA")

and plaintiff in this proceeding, by and through its attorneys, Kurtzman  Matera Gurock &

Scuderi, LLP, as and for its complaint against Nicholas Pasalides ("Pasalides"), Joseph

Woods ("Woods"), Mark Velzy ("Velzy"), Michiel Boender ("Boender"),  Edgewater Design,

Inc. ("Edgewater") and Edgewater Group Architects a/k/a Edgewater Group ("Edgewater

Group") (collectively referred to as the "Defendants") hereby alleges and sets forth as follows:

1.     CIMA is a New York Corporation with an address at 450 Manville Road, Pleasantville, New York 10573.

2.     CIMA is in the business of providing architectural and design services.

3.     CIMA filed a voluntary petition for relief under Chapter 11 of the United States

Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern District of New York, White Plains.

4.     Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

5.     Woods is a person residing at 218 Grapehollow Road, Homes, NY 12531,

6.     Velzy is a person residing at 3740 Wildwood Street, Yorktown Heights, NY 10598.

7.     Boender is a person residing at 163 North Main Street, Port Chester, New York 10573.

8.     Edgewater is a New York Corporation with an address at 163 N. Main Street, Suite 202, Port Chester, New York.

9.     Edgewater Group is located at 163 N. Main Street, Suite 202, Port Chester, New York.

10.    Boender is a principal of Edgewater Group.

11.    Kathryn C. French is a person residing at 185 Duck Hole Road, Madison, CT. 06443.

12.    Wael Saleh (a/k/a Wael Alesawy) is a person residing at 66 Sky Top Drive, Pleasantville, New York 10570.

13.     Jessica Ruggeri is a person residing at Wildwood Street, Yorktown Heights, New York   10598.

14.     Lee Pavone is a person residing at 111-113 Park Hill Avenue, Apt. 2D, Yonkers, New York 10701.

15.     Arthur Jettelson is a person residing at 331 Nutley Circle, Yorktown Heights, New York 10598.

16.     Alfredo Vajello is a person residing at 4 Kim Lane, Norwalk, CT.  06850.

### CIMA

17.     CIMA was formed in 1986.  William Bujarski ("Bujarski"), current principal of CIMA merged his firm, William C. Bujarski AIA Architect with CIMA in March, 1990.

18.     Pasalides was hired by CIMA as an architectural project manager on or about

December 1, 1993.

19.     Velzy was hired as a mechanical engineer for CIMA on February 18, 1997.

20.     Woods was hired as an electrical designer/project manager for CIMA on or about February 18, 1998.

21.     Gross receipts for CIMA were, as follows:

| | | |
|---|---|---|
| (i) | 1992 | $1,326,451.00 |
| (ii) | 1993 | $1,059,535.00 |
| (iii) | 1994 | $1,057,130.00 |
| (iv) | 1995 | $1,019,986.00 |
| (v) | 1996 | $1,126,635.00 |
| (vi) | 1997 | $1,391,943.00 |
| (vii) | 1998 | $2,198,107.00 |
| (viii) | 1999 | $4,004,261.00 |
| (ix) | 2000 | $5,490,556.00 |
| (x) | 2001 | $6,622,400.00 |

|       |      |                |
|-------|------|----------------|
| (xi)  | 2002 | $4,096,864.00  |
| (xii) | 2003 | $2,351,500.00  |

22.     In the Spring of 2004, or earlier, Pasalides while still employed by CIMA, commenced doing residential work for his own enrichment using CIMA staff.  CIMA was not reimbursed for staff time or materials.

23.     In the Spring of 2004, or earlier, Velzy or DBK Engineering, Inc., while still employed by CIMA,  commenced doing work for his own enrichment using CIMA staff. CIMA was not reimbursed for staff time or materials.

24.     In the Spring of 2004, or earlier, Woods while still employed by CIMA, commenced doing work for his own enrichment using CIMA staff.  CIMA was not reimbursed for staff time or materials.

25.     On or about April 1, 2004, Velzy, Woods and Pasalides stopped completing their timesheets at CIMA.

26.     In May, 2004 or sooner, Velzy, Woods and Pasalides commenced providing professional services to Edgewater.

27.     Continuing during June, July, August, September, October and November, 2004, Velzy, Woods and Pasalides performed professional services for Edgewater.

28.     On May 21, 2004, at 10:37 a.m., Pasalides sent an e-mail to Velzy and Woods downloaded from a CIMA computer, with architectural questions regarding an Arch Capital project in White Plains, New York ("Arch Capital").

29.     Arch Capital became an Edgewater project.

30.     On May 24, 2004, a professional services proposal was sent from Velzy to

Arch Capital was downloaded from a CIMA computer.  The proposal was for the work to be performed as an Edgewater project.

31.    On June 24, 2004, at 10:21 a.m., an e-mail was sent by Woods to Velzy and Pasalides, downloaded from a CIMA computer, concerning design questions regarding Arch Capital.

32.    On May 24, 2004, at 7:53 p.m., an e-mail was sent by Boender to Pasalides downloaded from a CIMA computer, responding to questions regarding Arch Capital plus forwarding messages.

33.    On May 25, 2004, Boender of Edgewater Group created a proposal for Arch Capital for a fee of approximately $55,000.00.

34.    Edgewater Group had previously utilized the services of CIMA.

35.    Edgewater Group utilized CIMA employees to create the proposal for Arch Capital.

36.    The Arch Capital proposal was in a CIMA format.

37.    On July 7, 2004, a proposal was sent by Velzy to Wetmore, downloaded from a CIMA computer, for a project at Grace Plaza, Brookfield, CT.   The Grace Plaza project was proposed from CBK Engineering, Inc.

38.    CBK Engineering, Inc.  is a corporation of which Velzy is the principal.

39.    On July 23, 2004, at 12:04 p.m., Woods forwarded to Velzy and Pasalides downloaded from a CIMA computer, e-mail messages from Boender with project questions concerning Arch Capital, including information about conference calls and furniture.

40.    On July 27, 2004, at 8:09 a.m., an e-mail was sent from Ruggeri to Velzy at

CIMA with project questions regarding Arch Capital. Ruggeri was, at that time, an independent CADD drafter.

41.     On July 30, 2004, at 7:58 a.m., an e-mail was sent by Ruggeri to Velzy at CIMA consisting of drawings for Arch Capital.

42.     On or about August 1, 2004, there was a verbal communication from Velzy to Bujarski tendering Velzy's resignation from CIMA.

43.     On August 9, 2004, at 2:54 p.m., Pasalides forwarded to Woods and Velzy, downloaded from a CIMA computer an e-mail from Boender to Pasalides and Saleh with project directions for Arch Capital consisting of a ceiling plan.

44.     On August 10, 2004, at 4:00 p.m., an e-mail was sent from French to Velzy downloaded from a CIMA computer, with a proposal for a project in New Haven, Ct. for the benefit of Correll Tech and Velzy.

45.     On August 10, 2004 at 8:22 p.m., an e-mail was sent from French to Velzy downloaded from a CIMA computer. with a proposal for a windows project in New Haven, Ct. for the benefit of Correll Tech and Velzy.

46.     On August 20, 2004, at 3:39 p.m., an e-mail was sent from Saleh to Woods, downloaded from a CIMA computer, consisting of drawings for Arch Capital. Included therein was forwarded mail from Boender to Pasalides and from Pasalides to Saleh with a Saleh time record, not shown on CIMA's records.

47.     On August 24, 2004, at 3:43 p.m., an e-mail was sent from Saleh to Pasalides, downloaded from a CIMA computer, specifying a drawing file location for a Pasalides project.

48.     On August 29, 2004, at 9:49 a.m., an e-mail was sent from Pasalides to Boender, downloaded from a CIMA computer, consisting of two proposals, for his signature, for the benefit of and as Edgewater projects to Victoria Home and New York Presbyterian Hospital, then current clients of CIMA.

49.     On August 30, 2004 at 10:50 a.m., Saleh e-mailed to tsilfidis@aol.com, from a CIMA computer, floor plans for Mr. Tsilifidis' new residence.  Pasalides was referenced in the e-mail.

50.     Mr. Tsilifidis was not a client of CIMA.

51.     On August 30, 2004 at 3:54 p.m., an e-mail was sent from Saleh to Boender, downloaded from a CIMA computer, consisting of drawings for Arch Capital.

52.     On August 30, 2004 at 6:06 p.m., an e-mail was sent from Saleh to Pasalides, downloaded from a CIMA computer, consisting of drawings for Arch Capital. Included therein was forwarded e-mail from Boender to Saleh and Saleh to Boender, with a Saleh time record

53.     On September 3, 2004, at 9:45 a.m., an e-mail was sent from Saleh to Boender, downloaded from a CIMA computer, consisting of drawing questions for Arch Capital.

54.     On September 1, 2004, at 11:40 a.m., an e-mail was sent from Saleh to Boender, downloaded from a CIMA computer, regarding Arch Capital.  Pasalides was copied on the e-mail.

55.     On September 3, 2004, at 9:45 a.m., an e-mail was sent by Saleh to Boender, downloaded from a CIMA computer, regarding various drawings for Arch Capital.

56.     On September 3, 2004, at 10:44 a.m., an e-mail was sent from Saleh to Boender, downloaded from a CIMA computer, consisting of drawings for Arch Capital. Included therein were various e-mails between Saleh and Boender concerning Arch Capital plus copies of drawings.

57.     On September 3, 2004, at 12:03 p.m., an e-mail was sent from Woods to Velzy, downloaded from a CIMA computer, consisting of drawings for an unidentified project that was not for the benefit of CIMA.

58.     On September 16, 2004 at 10:26 a.m., an e-mail was sent from Saleh to Ruggeri ,downloaded from a CIMA computer,  consisting of drawings for Arch Capital. Time records and plans were attached.

59.     In or about October, 2004, a site visit occurred involving Pasalides, Velzy and Pavone consisting of a project review for Victoria Home in Ossining, New York, an Edgewater project proposal.

60.     On October 6, 2004 at 10:31 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, with furniture drawings for Arch Capital.

61.     On October 7, 2004, at 6:04 p.m., an e-mail was sent from Woods to Len Salavador of GHS Architects ("GHS") and Velzy, downloaded from a CIMA computer, consisting of electrical options for the US Mint, West Point, New York, a CBK Engineering project.

62.     The US Mint, West Point, New York was and was to continue to have been a CIMA project with GHS.

63.     On October 20, 2004, at 10:31 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting of minutes from a meeting regarding Arch Capital.

64.     On October 21, 2004 at 10:31 p.m., an e-mail was sent by Woods to Boender with a copy to Pasalides, downloaded from a CIMA computer, regarding a meeting with Arch Capital on October 20, 2004.

65.     On October 21, 2004, at 7:35 p.m., an e-mail was sent from Woods to Moore, downloaded from a CIMA computer, consisting of acceptance and testing of a project for the NYC Department of Housing.

66.     The NYC Department of Housing project proposal was not for the benefit of CIMA.

67.     The NYC Department of Housing was not invoiced or documented as a CIMA project.

68.     On October 21, 2004, at 7:34 p.m., an e-mail was sent from Woods to Lamonica, downloaded from a CIMA computer, consisting of acceptance and testing for the NYC Department of Housing.

69.     On October 22, 2004 at 2:27 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting of calculations for Arch Capital.

70.     On October 25, 2004, at 1:12 p.m., an e-mail was sent from Woods to Shor, downloaded from a CIMA computer, consisting of drawings for Arch Capital.

71.     On November 1, 2004, at 4:31 p.m., an e-mail was sent from Woods to

Nicholas Fazio, upon information and belief, an Arch Capital employee with copies to Boender and Pasalides, downloaded from a CIMA computer, consisting of electrical comments for Arch Capital.

72.    On November 3, 2004, at 10:47 a.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting of drawings for Arch Capital.

73.    On November 3, 2004, at 12:49 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, indicating a revised drawing for Arch Capital.

74.    On November 9, 2004, at 4:43 p.m., an e-mail was sent from Woods to Jettelson, downloaded from a CIMA computer, consisting of electrical specifications for Arch Capital

75.    On November 9, 2004 at 4:45 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting of hardware specifications for Arch Capital.

76.    On November 10, 2004, at 12:23 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting hardware specifications for Arch Capital.

77.    On November 10, 2004 at 11:58 a.m., an e-mail was sent from Boender to Woods, Velzy and Pasalides, downloaded from a CIMA computer, consisting of drawings for, upon information and belief, Arch Capital in Greenwich, CT (referred to as "One Soundshore Drive").

78.    On November 12, 2004, at 11:30 a.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting of lighting comments for One Soundshore Drive.

79    On November 17, 2004 at 12:06 p.m., an e-mail was sent from Woods to Woods and Boender, downloaded from a CIMA computer, consisting of electrical comments for an unspecified Edgewater project.

80.    On November 24, 2004 at 1:02 p.m., an e-mail was sent from Woods to Boender and Pasalides, downloaded from a CIMA computer, consisting of lighting comments for an unspecified client at a Connecticut office concerning an Edgewater project.

81.    In November, 2004, Pasalides was issued a parking ticket in Port Chester, New York, near the office of Edgewater.

82.    On December 13, 2004 at 11:02 a.m., an e-mail was sent from Woods to Pasalides downloaded from a CIMA computer consisting of drawings for OSS in Greenwich, Ct., an Edgewater project.

83.    On December 13, 2004, at 12:55 p.m., an e-mail was sent by Woods to mabega@optonline.net with copies to Pasalides, downloaded from a CIMA computer, for One Soundshore Drive.

84.    On December 14, 2004 at 11:02 a.m., an e-mail was sent from Woods to Pasalides, downloaded from a CIMA computer, with electrical comments for OSS in Greenwich, Ct., an Edgewater project.

85.    On January 3, 2005, at 3:08 p.m., an e-mail was sent by Woods to

verdino@bellwayelectric.com and copied to Pasalides, downloaded from a CIMA computer, containing drawings for Arch Capital.

86.    On January 28, 2005 at 4:33 p.m., an e-mail was sent from Woods to Pasalides and McCoy, downloaded from a CIMA computer, consisting of electrical specifications for a Cingular project, not undertaken for the benefit of CIMA.

87.    In January, 2005, Pasalides was issued a parking ticket in Port Chester, New York, near the office of Edgewater.

88.    On February 8, 2005, at 12:26 p.m., an e-mail was sent from Woods to Bujarski advising that Woods was tendering his resignation from CIMA with two weeks notice.

89.    On February 28, 2005, at 2:45 p.m., an e-mail was sent from Pasalides to Bujarski advising that Pasalides was tendering his resignation from CIMA with two weeks notice.

90.    On March 1, 2005, at 2:30 p.m., an e-mail was sent from Pasalides to Bujarski consisting of a project cancellation for Cingular at various locations in the United States.

91.    On March 1, 2005, at 3:39 p.m., an e-mail was sent from Jason Black of Reckson to Woods and Pasalides, downloaded from a CIMA computer, concerning a final punchlist for Arch Capital.

92.    On April 5, 2005 at 8:30 a.m., a meeting occurred between John Sheehan,

Anselmo Prontelli and Bujarski wherein Sheehan and Prontelli advised that Woods and Pasalides had been given work by Cingular in Avon, Mass., a CIMA building picked and designed for Cingular (a/k/a ATT Wireless).

93.    On June 20, 2005 at 12:07 p.m., a copy of an e-mail from Victoria Home was sent from Pavone to Bujarski with a copy of an Edgewater proposal for Victoria Home in Ossining, New York, a CIMA client.

94.    On June 20, 2005, a telephone call was received by Alfredo Vallejo, an employee of CIMA, from Turner Construction advising that Edgewater had attended a meeting regarding a CIMA Cingular project in New Hyde Park, New York, a client of CIMA.

## EDGEWATER GROUP & BOENDER

95.    A project directory at CIMA shows Arch Capital with CIMA listed as the HVAC/Electrical/Sprinkler engineer.  No such project existed for or on account of CIMA.

96.    Edgewater Group, by and through its principal, Boender, knew of CIMA since 1993 or 1994.

97.    Edgewater Group did business with CIMA in 1996 or 1997.

98.    Boender knew Pasalides prior to the time he began to work for CIMA.

99.    Boender met Velzy in 2004.

100.    Boender met Velzy when he needed assistance for electrical and mechanical engineering on the Arch Capital project.

101.    Boender met Woods when he met Velzy.

102.    Boender was introduced to Velzy and Woods by Pasalides.

103.    Pasalides represented to Boender that Velzy and Woods were working on

their own.

104.    Boender, as principal of Edgewater Group, hired Velzy, Edgewater Design and/or CBK Engineering  for Arch Capital.

105.    Edgewater Group paid Edgewater approximately $27,000.00 for the work done on Arch Capital.

106.    The address on the 1099 for the $27,000.00 paid by Edgewater Group to Edgewater was that of Pasalides, 18 Hilltop Road, Katonah, NY.

107.    Boender knew that Velzy and Woods used Ruggeri and Saleh as draftsmen.

108.    Boender asked Pasalides to collect receivables for Edgewater Group in 2005.

109.    The work Pasalides does for Edgewater Group is done through Edgewater.

110.    Pasalides referred clients to Edgewater Group.

111.    Invoices of Edgewater Group say payment should be sent to the attention of Pasalides.

112.    An August 16, 2004 proposal by Edgewater Group bears the initials of Velzy in the CIMA proposal format.

113.    The format of the August 16, 2004 proposal was not the standard and customary format used by Edgewater Group.  Edgewater Group used a much simpler format for its proposals.

114.    Proposals for Victoria Home and New York Presbyterian Hospital were sent by Pasalides to Boender in August, 2004.

115.    Services were performed by Woods for Edgewater Group in 2004.

116.    Services were performed by Saleh for Edgewater Group in 2004.

117.    Services were performed by Velzy for Edgewater Group in 2004.

118.    Services were performed by Pasalides for Edgewater Group in 2004.

119.    Velzy performed services on the Arch Capital project in 2004-2005 while employed by CIMA.

120.    Woods performed services on the Arch Capital project in 2004-2005 while employed by CIMA.

121.    Pasalides performed services on the Arch Capital project in 2004-2005 while employed by CIMA.

122.    Saleh performed services on the Arch Capital project in 2004-2005 while employed by CIMA.

123.    Velzy performed services on a project for Victoria Homes in 2004-2005 ("Victoria Homes Project") while employed by CIMA.

124.    Woods performed services on the Victoria Homes Project in 2004-2005 while employed by CIMA.

125.    Pasalides performed services on the Victoria Homes Project  in 2004-2005 while employed by CIMA.

126.    Saleh performed services on the Victoria Homes Project in 2004-2005 while employed by CIMA.

127.    Velzy performed the services on the One Soundshore Drive Project in 2004-2005 while employed by CIMA.

128.    Woods performed services on the One Soundshore Drive Project in 2004-2005 while employed by CIMA.

129. Pasalides performed services on the One Soundshore Drive Project in 2004-2005 while employed by CIMA.

130. Saleh performed services on the One Soundshore Drive Project in 2004-2005 while employed by CIMA.

131. Velzy performed services on a project for New York Presbyterian Hospital in 2004-2005 ("New York Presbyterian Hospital Project") while employed by CIMA.

132. Woods performed services on the New York Presbyterian Hospital Project in 2004-2005 while employed by CIMA.

133. Pasalides performed services on the New York Presbyterian Hospital Project in 2004-2005 while employed by CIMA.

134. Saleh performed services on the New York Presbyterian Hospital Project in 2004-2005 while employed by CIMA.

135. Velzy performed services on a project for Correll Tech in 2004-2005 ("Correll Tech Project") while employed by CIMA.

136. Woods performed services on the Correll Tech Project in 2004-2005 while employed by CIMA.

137. Pasalides performed services on the Correll Tech Project in 2004-2005 while employed by CIMA.

138. Saleh performed services on the Correll Tech Project in 2004-2005 while employed by CIMA.

139. Velzy performed services on a project for Tsilifides in 2004-2005 ("Tsilifides Project") while employed by CIMA.

140.    Woods performed services on the Tsilifides Project  in 2004-2005 while employed by CIMA.

141.    Pasalides performed services on the Tsilifides Project in 2004-2005 while employed by CIMA.

142.    Saleh performed services on the Tsilifides Project in 2004-2005 while employed by CIMA.

143.    Velzy performed services on a project for the US Mint, West Point, New York in 2004-2005 ("US Mint Project") while employed by CIMA.

144.    Woods performed services on the US Mint Project in 2004-2005 while employed by CIMA.

145.    Pasalides performed services on the US Mint Project in 2004-2005 while employed by CIMA.

146.    Saleh performed services on the US Mint Project in 2004-2005 while employed by CIMA.

147.    Velzy performed services on a project for the NYC Department of Housing in 2004-2005 ("NYC DOH Project") while employed by CIMA.

148.    Woods performed services on the NYC DOH Project in 2004-2005 while employed by CIMA.

149.    Pasalides performed services on the NYC DOH Project in 2004-2005 while employed by CIMA.

150.    Saleh performed services on the NYC DOH Project in 2004-2005 while employed by CIMA.

151.    Velzy performed services on a project for OSS in Greenwich, CT in 2004-2005 ("OSS Project") while employed by CIMA.

152.    Woods performed services on the OSS Project in 2004-2005 while employed by CIMA.

153.    Pasalides performed services on the OSS Project in 2004-2005 while employed by CIMA.

154.    Saleh performed services on the OSS Project in 2004-2005 while employed by CIMA.

155.    Velzy performed services on a project for Cingular in 2004-2005 (Cingular Project) while employed by CIMA.

156.    Woods performed services on the Cingular Project in 2004-2005 while employed by CIMA.

157.    Pasalides performed services on the Cingular Project in 2004-2005 while employed by CIMA.

158.    Saleh performed services on the Cingular Project in 2004-2005 while employed by CIMA.

159.    The Arch Capital Project was not a project of CIMA.

160.    The Victoria Homes Project was not a project of CIMA.

161.    The One Soundshore Drive Project was not a project of CIMA.

162.     The New York Presbyterian Hospital Project was not a project of CIMA.

163.    The Correll Tech Project was not a project of CIMA.

164.    The Tsilifidis Project was not a project of CIMA.

165.    The US Mint Project was not a project of CIMA.

166.    The NYC DOH Project was not a project of CIMA.

167.    The OSS Project was not a project of CIMA.

168.    The Cingular Project was not a project of CIMA.

169.    CIMA received no revenue from the Arch Capital Project.

170.    CIMA received no revenue from the Victoria Homes Project.

171    CIMA received no revenue from the One Soundshore Drive Project.

172.    CIMA received no revenue from the NY Presbyterian Hospital Project.

173.    CIMA received no revenue from the Correll Tech Project.

174.    CIMA received no revenue from the Tsilifidis Project.

175.    CIMA received no revenue from the US Mint Project.

176.    CIMA received no revenue from the NYC DOH Project.

177.    CIMA received no revenue from the OSS Project.

178.    CIMA received no revenue from the Cingular Project.

## **VELZY**

179.    Edgewater is owned one-third each by Velzy, Woods and Pasalides.

180.    Edgewater was incorporated in July of 2004.

181.    Edgewater was formed while Velzy was employed by CIMA

182.    Edgewater was formed while Woods was employed by CIMA

183.    Edgewater was formed while Pasalides was employed by CIMA.

184.    Velzy was employed by CIMA beginning in or about 1997.

185    Velzy supervised up to five people while employed at CIMA.

186     Velzy's duties at CIMA included the preparation and submission of proposals for work for clients.

187     CIMA billed its clients either by a lump sum amount or on an hourly basis.

188.    Time sheets were filled out at CIMA regardless of how a project was billed.

189.    The requirement that time sheets be filled out at CIMA was a company wide rule.

190.    Velzy, Woods and Pasalides were the three key employees of CIMA.

191.    Discussions were had between Velzy, Woods, Pasalides and Bujarski regarding Velzy, Woods and Pasalides becoming partners in CIMA.

192.    Shareholders Agreement Proposals with revisions and updates requested by Pasalides, Woods, Velzy, Bujarski or their respective counsel, were drafted and/or exchanged on:

        i)         January 9, 2001
        ii)       October 12, 2001
        iii)      July 15, 2003;
        iv)      September 2, 2003;
        v)       February 6, 2004;
        vi)      May 24, 2004;
        vii)     June 21, 2004;
        viii)    December 2, 2004;
        ix)      December 3, 2004 (collectively "Shareholders Agreements")

193     Velzy had access to all financial records of CIMA.

194     Velzy had access to proposals and was aware of the clients of CIMA.

195.    Arch Capital was to have been a CIMA project.

196.    Velzy did work for Regional News Network through CBK Engineering.

197.    Velzy did work for Regional News Network through CBC Engineering while

an employee of CIMA.

198.    CBK Engineering was paid by Regional News Network for the work done by Velzy.

199.    Regional News Network was to have been a CIMA client.

200.    Velzy did work for Bet Am Shalom while employed at CIMA.

201.    Velzy was paid by Bet Am Shalom for the work he did.

202.    CIMA had a proposal on the job for Bet Am Shalom.

203.    Velzy was paid for the work he did for Bet Am Shalom.

## WOODS

204.    Woods was responsible for approximately five employees while employed by CIMA.

205.    Woods, for a large period of time, did not complete his time sheets.

206.    There was a lot of chiding at CIMA for the failure to submit time sheets.

207.    Woods tendered his initial resignation to Bujarski by e-mail sent on October 4, 2004, with three weeks notice.  This resignation was withdrawn.

208.    Woods continued to work for CIMA until at least February 8, 2005.

209.    Woods tendered his final resignation by e-mail to Bujarski, copied to Pasalides, on February 8, 2005.

## PASALIDES

210.    Pasalides is the President of Edgewater.

211.    Velzy is Vice President of Edgewater.

212.    Woods is the Treasurer of Edgewater.

213.    Pasalides sent an e-mail to Bujarski on February 28, 2005, resigning from CIMA.

214.    Pasalides, Woods and Velzy spoke about forming Edgewater in or about May of 2004.

215.    Pasalides was loaned $415,500.00 by CIMA.

216.    The funds were transferred as follows: (i) on July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Nicholas Pasalides in an amount of $350,000.00.

217.    The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00; (ii) on December 31, 2001, an amount of $20,000.00; (Iii) on December 31, 2003, an amount of $20,000.00.

218,    Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

219.    Demand has been made of Pasalides for repayment of the $175,500.00.

220.    No portion of the $175,500.00 has been repaid by Pasalides.

221.    No proof of claim was filed by Pasalides.

222.    No proof of claim was filed by Woods.

223.    No proof of claim was filed by Velzy.

224.    CIMA was left with no choice but to file a petition in bankruptcy.

225.    The Schedules which comprise CIMA's petition reflect $250,662.00 in secured debt and $1,673,395.00 in unsecured deft.

226.    Proofs of Claim, without duplication, reflect a total indebtedness of $744,531.42.

**JURISDICTION AND VENUE**

227.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334.

228.    This is a core proceeding pursuant to 28 U.S.C. §157 (b)(2), (2)(A), (2)(E) and (2)(O) with a final determination to be rendered by the United States Bankruptcy Court.

229.    Venue is proper pursuant to 28 U.S.C. §1409(a).

**AS AND FOR A FIRST CAUSE OF ACTION**
**(EQUITABLE FRAUD) (PASALIDES)**

230.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "229" as if set forth at length herein.

232.    Pasalides' actions were perpetrated based upon an inherent unfairness in that a material misrepresentation was made by Pasalides to CIMA when he claimed he would enter into a shareholders' agreement with Bujarski on behalf of CIMA.

232.    The representation was made by Pasalides knowing of its falsity and was made for the specific and intentional purpose of unjustly obtaining an unfair advantage and benefit, all to the detriment of CIMA.

233.    As a result of Pasalides' conduct, CIMA has been damaged in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(EQUITABLE FRAUD) (VELZY)**

234.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "233" as if set forth at length herein.

235.    Velzy's actions were perpetrated based upon an inherent unfairness in that a material misrepresentation was made by Velzy to CIMA when he claimed he would enter into a shareholders' agreement with Bujarski on behalf of CIMA.

236.    The representation was made by Velzy knowing of its falsity and was made for the specific and intentional purpose of unjustly obtaining an unfair advantage and benefit, all to the detriment of CIMA.

237.    As a result of Velzy's conduct, CIMA has been damaged in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A THIRD CAUSE OF ACTION
## (EQUITABLE FRAUD) (WOODS)

238.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "237" as if set forth at length herein.

239.    Woods' actions were perpetrated based upon an inherent unfairness in that a material misrepresentation was made by Woods to CIMA when he claimed he would enter into a shareholders' agreement with Bujarski on behalf of CIMA.

240.    The representation was made by Woods knowing of its falsity and was made for the specific and intentional purpose of unjustly obtaining an unfair advantage and benefit, all to the detriment of CIMA.

241.    As a result of Woods' conduct, CIMA has been damaged in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A FOURTH CAUSE OF ACTION
## (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)
## (PASALIDES)

242.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "241" as if set forth at length herein.

243.    Pasalides knew at the time of the negotiations and preparation of the Shareholders' Agreement that he was embarking upon such conduct for the purpose of gaining knowledge of CIMA's business and customers so that he could undertake independent and competitive action in the industry.    Pasalides, as a key and trusted employee of CIMA, likewise in such position acted so that he could undertake independent and competitive action in the industry.

244.    Pasalides ceased recording billable time, in whole or in part, utilized CIMA resources, utilized CIMA format and diverted CIMA clients and potential clients, with the knowledge and intent of causing economic harm and disadvantage to CIMA for his own economic benefit and advantage.

245.    As a result of Pasalides' conduct, CIMA has been damaged in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of the action.

## AS AND FOR A FIFTH CAUSE OF ACTION
## (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)
## (VELZY)

246.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "245" as if set forth at length herein.

247.    Velzy knew at the time of the negotiations and preparation of the

Shareholders' Agreement that he was embarking upon such conduct for the purpose of gaining knowledge of CIMA's business and customers so that he could undertake independent and competitive action in the industry.  Velzy, as a key and trusted employee of CIMA, likewise in such position acted so that he could undertake independent and competitive action in the industry.

248.    Velzy ceased recording billable time, in whole or in part, utilized CIMA resources, utilized CIMA format and diverted CIMA clients and potential clients, with the knowledge and intent of causing economic harm and disadvantage to CIMA for his own economic benefit and advantage.

249.    As a result of Velzy's conduct, CIMA has been damaged in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of the action.

<u>**AS AND FOR A SIXTH CAUSE OF ACTION**</u>
<u>**(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)**</u>
<u>**(WOODS)**</u>

250.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "247" as if set forth at length herein.

251.    Woods knew at the time of the negotiations and preparation of the Shareholders' Agreement that he was embarking upon such conduct for the purpose of gaining knowledge of CIMA's business and customers so that he could undertake independent and competitive action in the industry.  Woods, as a key and trusted employee of CIMA, likewise in such position acted so that he could undertake independent and competitive action in the industry.

252.    Woods ceased recording billable time, in whole or in part, utilized CIMA

resources, utilized CIMA format and diverted CIMA clients and potential clients, with the knowledge and intent of causing economic harm and disadvantage to CIMA for his own economic benefit and advantage.

253.    As a result of Woods' conduct, CIMA has been damaged in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of the action.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)
## (PASALIDES)

254.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "253" as if set forth at length herein.

255.    Pasalides, with the intent to interfere with and deprive CIMA of its contractual rights with its clients, did wrongfully interfere with CIMA's contractual relations, causing a loss of revenue through a diversion of clients and opportunity, a diversion of employee and other resources, and incomplete or absent billing records.

256.    As a direct and proximate result of Pasalides' actions, CIMA suffered substantial harm, leading to its filing for bankruptcy protection, in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)
## (VELZY)

257.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "256" as if set forth at length herein.

258.    Velzy, with the intent to interfere with and deprive CIMA of its contractual

rights with its clients, did wrongfully interfere with CIMA's contractual relations, causing a loss of revenue through a diversion of clients and opportunity, a diversion of employee and other resources, and incomplete or absent billing records.

259.    As a direct and proximate result of Velzy's actions, CIMA suffered substantial harm, leading to its filing for bankruptcy protection, in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A NINTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)
## (WOODS)

260.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "259" as if set forth at length herein.

261.    Woods, with the intent to interfere with and deprive CIMA of its contractual rights with its clients, did wrongfully interfere with CIMA's contractual relations, causing a loss of revenue through a diversion of clients and opportunity, a diversion of employee and other resources, and incomplete or absent billing records.

262.    As a direct and proximate result of Woods' actions, CIMA suffered substantial harm, leading to its filing for bankruptcy protection, in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A TENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)
## (BOENDER)

263.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "260" as if set forth at length herein.

264.    Boender, with the intent to interfere with and deprive CIMA of its contractual rights with its clients, did wrongfully interfere with CIMA's contractual relations, causing a loss of revenue through a diversion of clients and opportunity.

265.    As a direct and proximate result of Boender's actions, CIMA suffered substantial harm, leading to its filing for bankruptcy protection, in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)
### (EDGEWATER)

266.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "265" as if set forth at length herein.

267.    Edgewater, with the intent to interfere with and deprive CIMA of its contractual rights with its clients, did wrongfully interfere with CIMA's contractual relations, causing a loss of revenue through a diversion of clients and opportunity.

268.    As a direct and proximate result of Edgewater's actions, CIMA suffered substantial harm, leading to its filing for bankruptcy protection, in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)
### (EDGEWATER GROUP)

269.    CIMA repeats, realleges and reasserts, each and every allegation set forth in paragraphs "1" through "268" as if set forth at length herein.

270.    Edgewater Group, with the intent to interfere with and deprive CIMA of its

contractual rights with its clients, did wrongfully interfere with CIMA's contractual relations, causing a loss of revenue through a diversion of clients and opportunity.

271.   As a direct and proximate result of Edgewater Group's actions, CIMA suffered substantial harm, leading to its filing for bankruptcy protection, in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)
## (PASALIDES)

272.   CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "271" as if set forth at length herein.

273.   Pasalides, in furtherance of and in connection with his scheme to intentionally interfere with CIMA's business, utilized the proprietary information, records and procedure of CIMA and intentionally interfered with CIMA's business relationships with its customers by his failure to bill hours and by soliciting and diverting CIMA clients and the time and effort of CIMA employees and its resources.

274.   The acts and statements of Pasalides were wrongful and made with conscious disregard for the rights of CIMA and to frustrate CIMA's reasonable expectations of continuing its business relationships.

275.   Upon information and belief, Pasalides has continued to interfere with the business of CIMA by [talk about bankruptcy, negative comments].

276.   CIMA was severely damaged in its business relations, goodwill and reputation in the industry by the acts and statements of Pasalides in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)
## (VELZY)

277.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "276" as if set forth at length herein.

278.    Velzy, in furtherance of and in connection with his scheme to intentionally interfere with CIMA's business, utilized the proprietary information, records and procedure of CIMA and intentionally interfered with CIMA's business relationships with its customers by his failure to bill hours and by soliciting and diverting CIMA clients and the time and effort of CIMA employees and its resources.

279.    The acts and statements of Velzy were wrongful and made with conscious disregard for the rights of CIMA and to frustrate CIMA's reasonable expectations of continuing its business relationships.

280.    Upon information and belief, Velzy has continued to interfere with the business of CIMA by [talk about bankruptcy, negative comments].

281.    CIMA was severely damaged in its business relations, goodwill and reputation in the industry by the acts and statements of Velzy in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)
## (WOODS)

282.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "281" as if set forth at length herein.

283.    Woods, in furtherance of and in connection with his scheme to intentionally interfere with CIMA's business, utilized the proprietary information, records and procedure of CIMA and intentionally interfered with CIMA's business relationships with its customers by his failure to bill hours and by soliciting and diverting CIMA clients., the time and effort of CIMA employees and its resources.

284.    The acts and statements of Woods were wrongful and made with conscious disregard for the rights of CIMA and to frustrate CIMA's reasonable expectations of continuing its business relationships.

285.    Upon information and belief, Woods has continued to interfere with the business of CIMA by [talk about bankruptcy, negative comments].

286.    CIMA was severely damaged in its business relations, goodwill and reputation in the industry by the acts and statements of Pasalides in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)
### (EDGEWATER)

287.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "286" as if set forth at length herein.

288.    Edgewater, in furtherance of and in connection with its scheme to intentionally interfere with CIMA's business, utilized the proprietary information, records and procedure of CIMA and intentionally interfered with CIMA's business relationships with its customers by diverting CIMA clients, the time and effort of CIMA employees and its resources.

289.    The acts and statements of Edgewater were wrongful and made with conscious disregard for the rights of CIMA and to frustrate CIMA's reasonable expectations of continuing its business relationships.

290.    Upon information and belief, Edgewater has continued to interfere with the business of CIMA by [talk about bankruptcy, negative comments].

291.    CIMA was severely damaged in its business relations, goodwill and reputation in the industry by the acts and statements of Edgewater in an amount in excess of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
## (UNFAIR COMPETITION)
## (PASALIDES)

292.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "291" as if set forth at length herein.

293.    While employed by CIMA, while having access to CIMA's confidential records and with the use of CIMA proprietary information, employees and other resources, Pasalides diverted CIMA revenues and built a competitive business.

294.    Pasalides continued his employment at CIMA with the intent and purpose of using information, resources and clients for his own use and to the detriment of CIMA.

295.    Pasalides wrongfully secured CIMA proprietary information for his own use to begin a business and unfairly compete with CIMA while still employed at CIMA.

296.    Pasalides was aided in his illegal and improper efforts to direct CIMA's architectural business to himself, Velzy, Woods and Edgewater by the knowledge and information acquired from CIMA under false pretenses.

297.    Pasalides used the confidential disclosures, training and procedures and clients of CIMA and continues to use such information to divert CIMA's business and to develop the business of Edgewater.

298.    The wrongful, intentional and malicious acts of Pasalides in building the business of Edgewater while employed by CIMA, with the diversion of CIMA information and clients and the use of CIMA employees and procedures, constitutes unlawful competition.

299.    As a direct and proximate result of Pasalides' unfair competition, CIMA sustained great damage to its business, leading to its bankruptcy, in an amount of $1,500,000.00, the exact amount to be determined at the trial of this action.

**AS AND FOR AN EIGHTEENTH CAUSE OF ACTION**
**(UNFAIR COMPETITION)**
**(VELZY)**

300.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "299" as if set forth at length herein.

301.    While employed by CIMA, while having access to CIMA's confidential records and with the use of CIMA proprietary information, employees and other resources, Velzy diverted CIMA revenues and built a competitive business.

302.    Velzy continued his employment at CIMA with the intent and purpose of using information, resources and clients for his own use and to the detriment of CIMA.

303.    Velzy wrongfully secured CIMA proprietary information for his own use to begin a business and unfairly compete with CIMA while still employed at CIMA.

304.    Velzy was aided in his illegal and improper efforts to direct CIMA's

architectural business to himself, Pasalides, Woods and Edgewater by the knowledge and information acquired from CIMA under false pretenses.

305.    Woods used the confidential disclosures, training and procedures and clients of CIMA and continues to use such information to divert CIMA's business and to develop the business of Edgewater.

306.    The wrongful, intentional and malicious acts of Woods in building the business of Edgewater while employed by CIMA, with the diversion of CIMA information and clients and the use of CIMA employees and procedures, constitutes unlawful competition.

307.    As a direct and proximate result of Velzy's unfair competition, CIMA sustained great damage to its business, leading to its bankruptcy, in an amount of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### (UNFAIR COMPETITION)
### (WOODS)

308.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "307" as if set forth at length herein.

309.    While employed by CIMA, while having access to CIMA's confidential records and with the use of CIMA proprietary information, employees and other resources, Woods diverted CIMA revenues and built a competitive business.

310.    Woods continued his employment at CIMA with the intent and purpose of using information, resources and clients for his own use and to the detriment of CIMA.

311.    Woods wrongfully secured CIMA proprietary information for his own use

to begin a business and unfairly compete with CIMA while still employed at CIMA.

312.    Woods was aided in his illegal and improper efforts to direct CIMA's architectural business to himself, Pasalides, Velzy and Edgewater by the knowledge and information acquired from CIMA under false pretenses.

313.    Woods used the confidential disclosures, training and procedures and clients of CIMA and continues to use such information to divert CIMA's business and to develop the business of Edgewater.

314.    The wrongful, intentional and malicious acts of Woods in building the business of Edgewater while employed by CIMA, with the diversion of CIMA information and clients and the use of CIMA employees and procedures, constitutes unlawful competition.

315.    As a direct and proximate result of Woods' unfair competition, CIMA sustained great damage to its business, leading to its bankruptcy, in an amount of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### (TURNOVER)
### (PASALIDES)

316.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "315" as if set forth herein at length.

317.    Pasalides is obligated to CIMA in an amount of $175,500.00.

318.    Demand has been made for turnover of $175,500.00 from Pasalides.

319.    Despite due demand, Pasalides has failed and refused to repay the sum of $175,500.00 or any part thereof.

36

320.    The $175,500.00 receivable is an asset of CIMA and is property of CIMA;s

bankruptcy estate.

321.    Pasalides is obligated to pay the sum of $175,500.00 plus interest thereon

pursuant to 11 U.S.C. §§ 541 and 542(b).

WHEREFORE, CIMA seeks judgment as follows:

(A)    Against Pasalides on the First, Fourth, Seventh, Thirteenth and Seventeenth

Causes of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial

plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein,

including attorneys' fees, together with statutory interest.

(B)    Against Velzy on the Second, Fifth, Eighth, Fourteenth and Eighteenth

Causes of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial

plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein,

including attorneys' fees, together with statutory interest.

(C)    Against Woods on the Third, Sixth, Ninth, Fifteenth and Nineteenth Causes

of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial plus

an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein,

including attorneys' fees, together with statutory interest.

(D)    Against Edgewater on the Eleventh and Sixteenth  Causes of Action in an

amount of $1,500,000.00 or such amount as is demonstrated at trial plus an appropriate

multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys'

fees, together with statutory interest.

(E)    Against Boender on the Tenth Cause of Action in an amount of

$1,500,000.00 or such amount as is demonstrated at trial plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys' fees, together with statutory interest.

     (F)    Against Edgewater Group on the Twelfth Cause of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys' fees, together with statutory interest.

     (G)    Against Pasalides on the Twentieth Cause of Action in an amount of $175,500.00 plus interest since at least August, 2005, plus attorneys' fees and costs.

Dated: Spring Valley, New York
      July 10, 2007

                           KURTZMAN MATERA GUROCK & SCUDERI LLP
                           Attorneys for Debtor/Plaintiff


                           _____ **/s/ Rosemarie E. Matera**_____
                           Rosemarie E. Matera (REM-0999)
                           2 Perlman Drive
                           Spring Valley, New York 10977
                           845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                          Chapter 11
                                                Case No. 05-27041(ASH)
CIMA Group, Inc.,


                        Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CIMA Group, Inc.                                Adv. Pro. No. 07-    (ASH)


                    Plaintiff,

        v.

Nicholas Pasalides, Joseph Woods,               **VERIFICATION**
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
State of New York  )
County of Rockland)ss.:


        William C. Bujarski, being duly sworn, deposes and states as follows:

        I am the principal of the Debtor herein; I have read the foregoing Verified Complaint
and know the contents thereof; and assert that the statements contained therein are true
and accurate.


                                        _____/s/ **William C. Bujarski**_____
                                        William C. Bujarski



Sworn to before me this
10th day of July, 2007

_____/s/ **Sherry Kramer**_____
        (Notary Public)

Sherry Kramer
Notary Public, State of New York
No. 4709437
Residing in Rockland County
Commission Expires August 31, 2010

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: CIMA Group Inc.                                    Bankruptcy Case No.: 05–27041–ash

CIMA Group Inc.

Plaintiff,

–against–                                                  Adversary Proceeding No. 07–08276–ash

Nicholas Pasalides
Joseph L. Woods
Mark Velzy
Michiel Boender
Edgewater Design, Inc.
Edgewater Group Architects a/k/a Edgewater Group

Defendant

# SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
# IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: |
|---|
| **Clerk of the Court** |
| **United States Bankruptcy Court** |
| **Southern District of New York** |
| **300 Quarropas Street** |
| **White Plains, NY 10601** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: |
|---|
| **Rosemarie E Matera** |
| **Kurtzman Matera Gurock & Scuderi, LLP** |
| **2 Perlman Drive** |
| **Suite 301** |
| **Spring Valley, NY 10977** |
| **US** |

If you make a motion, your time to answer is governed by Bankruptcy Rule 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| United States Bankruptcy Court Southern District of New York 300 Quarropas Street White Plains, NY 10601 | Room: Courtroom 520, White Plains Office, 300 Quarropas Street, White Plains, NY 10601 |
|---|---|
| | Date and Time: 8/22/0709:40 AM |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 7/16/07                                    Kathleen Farrell–Willoughby

                                                 *Clerk of the Court*

                                                 By: /s/  Lonnie Webb

*Deputy Clerk*

## CERTIFICATE OF SERVICE

I, _____SHERRY KRAMER_____, certify that I am, and at all times during the service
           (name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____JULY 17, 2007_____ by:
       (date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:
Nicholas Pasalides
18 Hilltop Road
Katonah, NY   10536

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
as follows: [Describe briefly]                     (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____July 17, 2007_____           /s/    Sherry KRAMER_____
        Date                                 Signature

| Print Name |  |  |
| --- | --- | --- |
| Sherry Kramer |  |  |
| **Business Address** |  |  |
| Kurtzman Matera Gurock & Scuderi, LLP) 2 Perlman Drive |  |  |
| City | State | Zip |
| Spring Valley | New York | 10977 |

# CERTIFICATE OF SERVICE

I, _____SHERRY KRAMER_____ , certify that I am, and at all times during the service
        (name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____JULY 17, 2007_____ by:
        (date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:

Joseph Woods
218 Grapehollow Road
Homes, New York   12531

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
as follows: [Describe briefly]                                              (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____July 17, 2007_____                    /s/    Sherry KRAMER_____
Date                                                    Signature

| Print Name |||
| Sherry Kramer |||
| Business Address |||
| Kurtzman Matera Gurock & Scuderi, LLP) 2 Perlman Drive |||
| City | State | Zip |
| Spring Valley | New York | 10977 |

# CERTIFICATE OF SERVICE

I, _____SHERRY KRAMER_____, certify that I am, and at all times during the service
(name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____JULY 17, 2007_____ by:
(date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:
Mark Velzy
3740 Wildwood Street
Yorktown Heights, NY   10598

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
as follows: [Describe briefly]                                                                  (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____July 17, 2007_____                          /s/    /s/ Sherry Kramer
Date                                                          Signature

| Print Name |  |  |
| --- | --- | --- |
| Sherry Kramer | | |
| **Business Address** | | |
| Kurtzman Matera Gurock & Scuderi, LLP) 2 Perlman Drive | | |
| City | State | Zip |
| Spring Valley | New York | 10977 |

# CERTIFICATE OF SERVICE

I, _____SHERRY KRAMER_____, certify that I am, and at all times during the service
              (name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____JULY 17, 2007_____ by:
        (date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:

   Michiel Boender
   163 North Main Street
   Port Chester, New York   10573-3368

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
   as follows: [Describe briefly]                     (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____July 17, 2007_____          /s/   /s/ Sherry Kramer
       Date                           Signature

| | | |
|---|---|---|
| *Print Name* | | |
| Sherry Kramer | | |
| *Business Address* | | |
| Kurtzman Matera Gurock & Scuderi, LLP 2 Perlman Drive | | |
| *City* | *State* | *Zip* |
| Spring Valley | New York | 10977 |

# CERTIFICATE OF SERVICE

I, _____SHERRY KRAMER_____, certify that I am, and at all times during the service
(name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____JULY 17, 2007_____ by:
(date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:

Edgewater Design, Inc.
163 North Main Street, Suite 202
Port Chester, NY    10573-3368

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
as follows: [Describe briefly]                                                                     (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____July 17, 2007_____                          /s/      Sherry Kramer_____
Date                                                                            Signature

| Print Name | | |
| Sherry Kramer | | |
| Business Address | | |
| Kurtzman Matera Gurock & Scuderi, LLP | | |
| 2 Perlman Drive | | |
| City | State | Zip |
| Spring Valley | New York | 10977 |

Page 3 of 4

## CERTIFICATE OF SERVICE

I, _____SHERRY KRAMER_____, certify that I am, and at all times during the service
                     (name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____JULY 17, 2007_____ by:
           (date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:
    Edgewater Group Architects a/k/a Edgewater Group
    163 North Main Street, Suite 202
    Port Chester, NY    10573-3368

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
    as follows: [Describe briefly]                                              (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____July 17, 2007_____            /s/    Sherry Kramer
           Date                                  Signature

| Print Name | | |
| Sherry Kramer | | |
| Business Address | | |
| Kurtzman Matera Gurock & Scuderi, LLP 2 Perlman Drive | | |
| City | State | Zip |
| Spring Valley | New York | 10977 |

## CERTIFICATE OF SERVICE

I, _____Sherry Kramer_____, certify that I am, and at all times during the service
(name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____7/17/07_____ by:
(date)

☑ Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:

Officer, Director or Managing Agent
Edgewater Design, Inc.
163 North Main Street, Suite 202
Port Chester, NY  10573-3368

☐ Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

☐ Residence Service: By leaving the process with the following adult at:

☐ Publication: The defendant was served as follows: [Describe briefly]

☐ State Law: The defendant was served pursuant to the laws of the State of _____
as follows: [Describe briefly]                                     (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____7/17/07_____                         /s/    Sherry Kramer
Date                                                      Signature

| Print Name |
| --- |
| Sherry Kramer |

| Business Address |
| --- |
| Kurtzman Matera Gurock & Scuderi, LLP |
| 2 Perlman Drive, Suite 301 |

| City | State | Zip |
| --- | --- | --- |
| Spring Valley | NY | 10977 |

# CERTIFICATE OF SERVICE

I, _____Sherry Kramer_____, certify that I am, and at all times during the service
     (name)
of process was, not less than 18 years of age and not a party to the matter concerning which service of process
was made. I further certify that the service of this summons and a copy of the complaint was made
_____7/17/07_____ by:
     (date)

[✓] Mail service: Regular, first class United States mail, postage fully prepaid, addressed to:
Officer, Director or Managing Agent
Edgewater Group Architects a/k/a Edgewater Group
163 North Main Street, Suite 202
Port Chester, NY  10573-3368

[ ] Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ] Residence Service: By leaving the process with the following adult at:

[ ] Publication: The defendant was served as follows: [Describe briefly]

[ ] State Law: The defendant was served pursuant to the laws of the State of _____
as follows: [Describe briefly]                                         (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____7/17/07_____                    /s/     Sherry Kramer
          Date                                          Signature

| Print Name |  |  |
| --- | --- | --- |
| Sherry Kramer |  |  |
| **Business Address** |  |  |
| Kurtzman Matera Gurock & Scuderi, LLP | | |
| 2 Perlman Drive, Suite 301 | | |
| **City** | **State** | **Zip** |
| Spring Valley | NY | 10977 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re  *Cima Group, Inc*                          :    Chapter _11_

         Debtor.                :    Case No. _05 - 27041 (ASH)_

- - - - - - - - - - - - - - - - - - - - - - -x
*Cima Group, Inc*                                 :
    Plaintiff [proponent],              :
      v.                             : Adv. Proc. No. _07 - 08276_ [Motion for _____ ]
*Nicholas Prisalides, Joseph Word,*
*et al*
*Mark Velzy,* Defendant [respondent].      :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SCHEDULING ORDER

__WARNING__: This is an Order of the Court.  The parties cannot amend this Order by stipulation or otherwise, and the Court will not amend it unless presented with (i) proof of compelling cause beyond the control of the party seeking amendment and (ii) timely application as soon as possible after the party seeking amendment learns of the cause.  __FAILURE TO COMPLY WITH THIS ORDER WILL RESULT IN DISMISSAL OR OTHER SANCTION__.  If delay or other act or omission of your adversary may result in a sanction against you, it is incumbent on you to promptly bring the matter to the Court for relief.

It is hereby ORDERED as follows:

1. All discovery proceedings shall be completed by _December 28, 200 7_.

2. On or before _Jan. 16_, 200_8_ [generally not more than ten days after the deadline to complete discovery] the parties shall file a Joint Pretrial Order in the form prescribed by this Court and shall serve and file trial briefs, if any.  [TAKE NOTICE: The burden is on the plaintiff or proponent to file a Pretrial Order, with or without the opponent's cooperation.  Failure of either party to include witnesses or documents in the Pretrial Order may preclude that party from offering the omitted evidence at the trial.]

3. A final pretrial conference shall be held at 9:40 A.M. on _Jan. 23_, 200_8_ [date to be obtained from chambers, generally not more than one week after date of filing pretrial order], at which time the parties must be prepared to proceed to trial within one week.

4. Plaintiff's [proponent's] attorney shall serve copies of this Scheduling Order on all parties to this adversary proceeding [contested matter] and upon any other parties entitled to notice within five days after the date hereof.

SO ORDERED

Dated:  White Plains, NY
     *August 22, 200 7*

/s/ ____ Adlai S. Hardin, Jr. _____ .
__United States Bankruptcy Judge__

**REICH, REICH & REICH, P.C.**
Co-Counsel for Defendants
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

**STEPHENS, BARONI, REILLY & LEWIS, LLP**
Co-Counsel for Defendants
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
In re:

CIMA Group, Inc.,

                **Debtor.**
-------------------------------------------------------X
CIMA Group, Inc.

                **Plaintiff,**

      -against-

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

                **Defendants.**
-------------------------------------------------------X

**Chapter 11**
**Case No. 05-27041(ASH)**

**Adv. Proc. No.**
**07-08276 (ASH)**

**JURY TRIAL DEMANDED**

## VERIFIED ANSWER

Nicholas Pasalides ("Pasalides"), Joseph Woods ("Woods"), Mark Velzy

("Velzy"), Michiel Boender ("Boender"), Edgwater Design, Inc. ("Edgewater Design")

and Edgewater Group Architects a/k/a Edgewater Group ("Edgewater Group"), as

defendants in the above-captioned Adversary Proceeding, by their attorneys Reich, Reich

& Reich, P.C. and Stephens, Baroni, Reilly & Lewis, LLP, as and for their Answer to the

Verified Complaint, dated July 10, 2007, by CIMA Group, Inc. ("CIMA") against

Woods, Pasalides, Velzy, Boender, Edgewater Design and Edgewater Group

(collectively referred to as "the Defendants") allege and set forth as follows:

## AS TO THE FIRST, FOURTH, SEVENTH, THIRTEENTH, SEVENTEENTH AND TWENTIETH CAUSES OF ACTION, PASALIDES:

1.)     Admits the allegations of the paragraphs of the Complaint numbered 3, 4,

5, 6, 9, 10, 50, 98, 102, 109, 141, 159, 164, 174, 179, 180, 183, 186, 187, 188, 189, 191,

210, 211, 212 and 216.

2.)     Denies knowledge or information sufficient to form a belief as to the

allegations as stated in the paragraphs of the Complaint numbered: 1, 2, 11 through and

including 24, 28, 30, 31, 32, 33, 35 through and including 40, 41 through and including

47, 48, 49, 51 through and including 55, 56 through and including 58, 60 through and

including 62, 63 through and including 71, 72 through and including 77, 78 through and

including 85, 86 through and including 92, 93 through and including 96, 99 through and

including 101, 103, 104, 107, 111, 113 through and including 117, 119, 120, 122, 123,

124, 126, 127, 128, 130, 131, 132, 134, 135, 136, 138, 139, 140, 142, 143, 144, 146, 147,

148, 150, 151, 152, 154, 155, 156, 158, 160, 161, 162, 163, 165 through and including

173, 175 through and including 178, 181 through and including 182, 184 through and

including 185, 190, 192 through and including  197, 198 through and including 209, 214

221, 222, 223, 224, 225 and 226.

3.)     Denies each and every allegation as stated in the paragraphs of the

Complaint numbered 7, 8, 22, 29, 59, 108, 110, 118, 121, 125, 129, 133, 137, 145, 149,

153, 214, 218, 219 and 220.

4.)    As to the allegations in the paragraphs of the Complaint numbered 25, 26 and 27, denies each and every allegation as stated of said paragraphs as same pertain to him and denies knowledge or information sufficient to form a belief as to the allegations as stated to Velzy and Woods.

5.)    As to the allegations in the paragraph of the Complaint numbered 34, admits that CIMA did work for Edgewater Group on one occasion and otherwise denies the allegations as stated of said paragraph.

6.)    As to the allegations in the paragraph of the Complaint numbered 97, admits that Edgewater Group did business with CIMA but denies knowledge and information sufficient to form a belief as to the balance of the allegations as stated of that paragraph.

7.)    As to the allegations in the paragraph of the Complaint numbered 105, admits that Edgewater Group paid Edgewater a certain amount for work done on the Arch Capital project but denies knowledge and information as to the amount.

8.)    As to the allegations in the paragraph of the Complaint numbered 157, admits that he performed work on a Cingular Project in or about 2005 as a consultant for CIMA after his full-time position with CIMA was terminated by him in or about February of 2005 and otherwise denies the allegations as stated of said paragraph.

9.)    As to the allegations in the paragraph of the Complaint numbered 106, denies knowledge or information sufficient to form a belief as to the allegations as stated but admits that Edgewater Group provided a 1099 to Edgewater.

3

10.)     As to the allegations of the paragraph in the Complaint numbered 215, denies the allegations of said paragraph as stated except admits that he was advanced monies but that currently no monies are owed.

11.)     As to the allegations of the paragraph in the Complaint numbered 217, admits that he paid certain funds to CIMA but denies knowledge or information as to the remaining allegations as stated of said paragraph.

12.)     As to the allegations of the paragraphs in the Complaint numbered 227, 228 and 229 respectfully refers to the Court for hearing and determination of all legal issues raised in and by said paragraphs.

13.)     As to the allegations in the First Cause of Action (Equitable Fraud), denies each and every allegation as stated of the paragraphs of the Complaint numbered 232, 232 and 233.

14.)     As to the allegations in the Fourth Cause of Action (Breach of Covenant Good Faith and Fair Dealing), denies each and every allegation as stated of the paragraphs of the Complaint numbered 243, 244 and 245.

15.)     As to the allegations in the Seventh Cause of Action (Tortious Interference with Contractual Relations), denies each and every allegation as stated of the paragraphs of the Complaint numbered 255 and 256.

16.)     As to the allegations in the Thirteenth Cause of Action (Tortious Interference with Business Relations), denies each and every allegation as stated of the paragraphs of the Complaint numbered 273, 274, 275 and 276.

17.)     As to the allegations in the Seventeenth Cause of Action (Unfair Competition), denies each and every allegation as stated of the paragraphs of the Complaint numbered 293, 294, 295, 296, 297, 298 and 299.

18.)     As to the allegations as stated in the Twentieth Cause of Action (Turnover), denies each and every allegation as stated of the paragraphs of the Complaint numbered 317, 318, 319, 320 and 321.

## AS TO THE THIRD, SIXTH, NINTH, FIFTEENTH AND NINETEENTH CAUSE OF ACTION, JOSEPH WOODS:

12.)     Admits the allegations of the paragraph of the Complaint numbered: 3, 4, 5, 6, 9, 38, 98, 101, 102, 157, 159, 161, 179, 180, 183, 185, 191, 204, 206, 210, 211 and 212.

13.)     Denies knowledge or information sufficient to form a belief as to the allegations as stated in the paragraphs of the Complaint numbered: 1, 2, 10 through and including 19, 21, 22, 23, 28, 30 through and including 37, 39 through and including 67, 69 through and including 93, 95, 96, 97, 99, 100, 103, 106, 107, 108 through and including 114, 119, 122, 123, 125, 126, 129, 130, 131, 134, 135, 137, 138, 139, 141, 142, 143, 145,146, 147, 149,  150 through and including 155,  158, 160, 162 through and including 178, 181, 182, 184, 186 through and including 190, 193, 194, 196, 197, 198 through and including 203, 207 through and including 209, 213 through and including 226.

14.)     Denies each and every allegation as stated in the paragraphs of the Complaint numbered: 7, 8, 68, 118, 121, 127, 128, 133, 136, 140, 148 and 195.

15.)     As to the allegations in the paragraph of the Complaint numbered 20,
admits that he was hired in or about 1998 but denies knowledge or information sufficient
to form a belief as to the allegations as stated in the rest of said paragraph.

16.)     As to the allegations in the paragraph of the Complaint numbered 24,
admits doing work with the knowledge and consent of CIMA but denies using CIMA's
staff time or materials.

17.)     As to the allegations in the paragraph of the Complaint numbered 25,
denies knowledge or information sufficient to form a belief as to the allegations as stated
in said paragraph but admits that at a certain time he did not submit time sheets at CIMA.

18.)     As to the allegations in the paragraph of the Complaint numbered 26,
denies each and every allegation as stated of said paragraph except admits that he and
Velzy provided professional services to Edgewater Group in or about May, 2004.

19.)     As to the allegations of the paragraph in the Complaint numbered 27,
denies each and every allegation as stated of said paragraph except admits that he and
Velzy provided professional services to Edgewater Group.

20.)     As to the allegations of the paragraph of the Complaint numbered 29,
denies each and every allegation as stated in said paragraph but admits that Edgewater
was a subcontractor to Edgewater Group on the Arch Capital project.

21.)     As to the allegations of the paragraph of the Complaint numbered 88,
denies knowledge and information with regard to the allegations as stated in said
paragraph but admits tendering his resignation on several occasions.

22.)     As to the allegations of the paragraph of the Complaint numbered 94,
denies knowledge or information with respect to the allegations as stated of said

paragraph but admits that he attended a meeting with personnel from Cingular at the request of Cingular to address a catastrophic problem it was having with regard to the New Hyde Park project.

23.)    As to the allegations of the paragraph of the Complaint numbered 104, denies knowledge or information sufficient to form a belief with respect to the allegations as stated of said paragraph but admits that he and/or Edgewater did work for the Arch Capital project.

24.)    As to the allegations of the paragraph of the Complaint numbered 105, admits the allegations as stated of said paragraph except denies knowledge or information as to the amount of $27,000.

25.)    As to the allegations of the paragraph of the Complaint numbered 115, denies the allegations as stated in said paragraph except admits that he worked on a project that came through Edgewater Group.

26.)    As to the allegations of the paragraph of the Complaint numbered 116, denies the allegations in said paragraph as stated except admits that he worked on a project that came through Edgewater Group.

27.)    As to the allegations of the paragraph of the Complaint numbered 117, denies the allegations in said paragraph as stated except admit that he worked on a project that came through Edgewater Group.

28.)    As to the allegations of the paragraph of the Complaint numbered 120, admits that the services as alleged were performed but with the knowledge and consent of CIMA.

29.)    As to the allegations of the paragraph of the Complaint numbered 124, admits performing services on the Victoria Homes Project as alleged in and by said paragraph but as a CIMA employee and for the benefit of CIMA.

30.)    As to the allegations of the paragraph of the Complaint numbered 132, admits that the services as alleged but were performed with the knowledge and consent of CIMA.

31.)    As to the allegations of the paragraph of the Complaint numbered 144, admits that, as an employee of CIMA, and for the benefit of CIMA, he performed services on the US Mint Project as alleged but otherwise denies knowledge or information sufficient to form a belief as to the allegations as stated in said paragraph.

32.)    As to the allegations of the paragraph of the Complaint numbered 156, admits that he performed services on the Cingular Project as an employee of CIMA and for the benefit of CIMA but otherwise denies knowledge or information sufficient to form a belief as to the allegations as stated in said paragraph.

33.)    As to the allegations of the paragraph of the Complaint numbered 192, denies knowledge or information sufficient to form a belief as to the allegations as stated in said paragraph except admits that agreement proposals were exchanged.

34.)    As to the allegations of the paragraph of the Complaint numbered 205, admits that the alleged time sheets were not completed but same was with the knowledge and consent of CIMA.

35.)    As to the allegations of the paragraphs of the Complaint numbered 227 through and including 229, respectfully refers to the Court for hearing and determination of all legal issues raised in and by said paragraphs.

36.)    As to the allegations of the Third Cause of Action (Equitable Fraud),
denies the allegations of each and every allegation as stated of the paragraphs of the
Complaint numbered 239, 240 and 241.

37.)    As to the Sixth Cause of Action (Breach of the Covenant of Good Faith
and Fair Dealing), denies each and every allegation as stated of the paragraphs of the
Complaint numbered 251, 252 and 253.

38.)    As to the Ninth Cause of Action (Tortious Interference with Contractual
Relations), denies each and every allegation as stated of the paragraphs of the Complaint
numbered 261 and 262.

39.)    As to the Fifteenth Cause of Action (Tortious Interference with Business
Relations), denies each and every allegation as stated of the paragraphs of the Complaint
numbered 283, 284, 285 and 286.

40.)    As to the Nineteenth Cause of Action (Unfair Competition), denies each
and every allegation as stated of the paragraphs of the Complaint numbered 309, 310,
311, 312, 313, 314 and 315.

## AS TO THE SECOND, FIFTH, EIGHTH, FOURTEENTH AND EIGHTEENTH CAUSES OF ACTION, MARK VELZY:

41.)    Admits the allegations of the paragraphs of the Complaint numbered: 3, 4,
5, 6, 9, 10, 38, 42, 50, 98, 99, 102, 115, 116, 117, 119, 159, 161, 179, 180, 181, 183, 184,
185, 186, 188, 189, 191, 196, 198, 200, 201, 203, 210, 211 and 212.

42.)    Denies knowledge or information sufficient to form a belief as to the
allegations as stated of the paragraphs of the Complaint numbered: 1, 2, 11, 12, 14
through and including 22, 24, 25, 28, 30, 31, 32, 33, 36, 39, 40, 41, 43 through and
including 47, 48 through and including 55, 56 through and including 58, 60 through and

including 62, 63 through and including 71, 72 through and including 77, 78 through and including 85, 86 through and including 92, 93 through and including 96, 100, 101, 103, 106 through and including 110, 111 through and including 114, 118, 120, 122, 124, 125, 126, 128, 129, 130, 132, 133, 134, 136, 137, 138, 140 through and including 142, 144 through and including 146, 148 through and including 150, 151 through and including 156, 157, 158, 160,162, 163, 164, 165 through and including 174, 175 through and including 178, 182, 190, 192, 204 through and including 209, 213 through and including 220, 221, 222, 223, , 224 through and including 226.

43.)    Denies the allegations as stated of the paragraphs of the complaint numbered 7, 8, 13, 59, 121, 123, 127, 131, 135, 139, 147, 193, 195, 197, 199 and 202.

44.)    Admits the allegations of the paragraph of the Complaint numbered 23, but alleges that same was known, and condoned by, CIMA.

45.)    As to the allegations of the paragraph of the Complaint numbered 26, denies the allegations of said paragraph as stated, but admits that he and Wood provided professional services to Edgewater Group in or about May, 2004.

46.)    As to the allegations of the paragraph of the Complaint numbered 27, denies each and every allegation of said paragraph as stated but admits that he and Woods performed services for Edgewater Group.

47.)    As to the allegations of the paragraph of the Complaint numbered 29, denies said allegations as stated but admits that Edgewater was a subcontractor to Edgewater Group on the Arch Capital project.

48.)    As to the allegations of the paragraph of the Complaint numbered 34, admits that CIMA did work for Edgewater Group on one occasion and otherwise denies the allegations as stated of said paragraph.

49.)    As to the allegations of the paragraph of the Complaint numbered 35, admits that he assisted Edgewater Group to create the proposal for Arch Capital but denies knowledge or information sufficient to form a belief as to the balance of the allegations as stated of said paragraph.

50.)    As to the allegations of the paragraph of the Complaint numbered 37, admits sending a proposal to Wetmore, but denies knowledge and information as to the balance of the allegations as stated of said paragraph.

51.)    As to the allegations of the paragraph of the Complaint numbered 97, admits that Edgewater Group did business with CIMA but denies knowledge and information sufficient to form a belief as to the balance of the allegations as stated of that paragraph.

52.)    As to the allegations of the paragraph of the Complaint numbered 104, admits that he was hired by Edgewater Group, but denies knowledge and information sufficient to form a belief as the remaining allegations as stated of said paragraph.

53.)    As to the allegations of the paragraph of the Complaint numbered 105, admits the allegations of said paragraph except denies knowledge and information as to the amount alleged in said paragraph.

54.)    As to the allegations of the paragraph of the Complaint numbered 143, admits that he worked on a US Mint project while employed by CIMA and for the benefit

of a CIMA Project but denies knowledge and information as to the dates alleged in said paragraph.

55.)     As to the allegations of the paragraph of the Complaint numbered 187, admits the allegations of said paragraph except denies knowledge and information as to whether there were other methods of payment.

56.)     As to the allegations of the paragraph of the Complaint numbered 194, admits that he had access as alleged but denies knowledge and information sufficient to form a belief as to whether he was aware of all proposals and all clients.

57.)     As to the allegations of the paragraphs of the Complaint numbered 227, 228 and 229, respectfully refers to the Court for hearing and determination of the legal issues raised in and by said paragraphs.

58.)     As to the allegations of the Second Cause of Action (Equitable Fraud), denies each and every allegation as stated of the paragraphs of the Complaint numbered 235, 236 and 237.

59.)     As to the allegations of the Fifth Cause of Action (Breach of Covenant of Good Faith and Fair Dealing), denies each and every allegation as stated of the paragraphs of the Complaint numbered 247, 248 and 249.

60.)     As to the allegations of the Eighth Cause of Action (Tortious Interference with Contractual Relations), denies the each and every allegation as stated of the paragraphs of the Complaint numbered 258 and 259.

61.)     As to the allegations of the Fourteenth Cause of Action (Tortious Interference with Business Relations), denies each and every allegation as stated of the paragraphs of the Complaint numbered 278, 279, 280 and 281.

62.)    As to the allegations of the Eighteenth Cause of Action (Unfair Competition), denies each and every allegation as stated of the paragraphs of the Complaint numbered 301 through and including 307.

## AS TO THE ELEVENTH AND  SIXTEENTH
## CAUSES OF ACTION, EDGEWATER DESIGN, INC.:

63.)    Respectfully refers to the answers contained herein in the paragraphs "1" through "62 " hereinabove of co-defendants Pasalides, Woods and Velzy for its answers to the paragraphs of the Complaint numbered 1 through and including 226.

64.)    As to the "Jurisdiction and Venue" allegations of the paragraphs of the Complaint numbered 227, 228 and 229, respectfully refers to the Court for hearing and determination all of the legal issues raised in and by said paragraphs.

65.)    As to the allegations of the Eleventh Cause of Action (Tortius Interference with Contractual Relations), denies each and every allegation as stated of the paragraphs of the Complaint numbered 270 and 271.

## AS TO THE TENTH CAUSE OF ACTION AGAISNT
## MICHIEL BOENDER AND THE TWELFTH CAUSE
## OF ACTION AGAINST EDGEWATER GROUP ARCHITECTS a/k/a
## EDGEWATER GROUP, BOENDER AND EDGEWATER GROUP

66.)    Admit the allegations of the paragraphs of the Complaint numbered 4, 9, 10, 34, 38, 96, 97, 98, 99, 100, 101, 102, 103, 105, 106, 109, 110, 115, 117, 159 and 161.

67.)    Deny knowledge or information sufficient to form a belief as to the allegations as stated in the paragraphs of the Complaint numbered: 1, 3, 5, 6, 11 through and including 17, 19, 20 through and including 28, 30, 31, 32, 36, 37, 39, 40 through and including 47, 49, 50, 52, 54, 57 through and including 76, 78 through and including 81, 82 and 83 through and including 92, 93 through and including 95, 112, 113, 119 through

and including 128, 131 through and including 139, 140 through and including 150, 151 through and including 158, 160, 162, 163, 164, 165 through and including 185, 186 through and including 197, 198 through and including 212, 213 through and including 226.

68.)    Deny each and every allegation as stated in the paragraphs of the Complaint numbered: 7, 8, 108, 116, 118, 129 and 130.

69.)    As to the allegations in the paragraph of the Complaint numbered 2, admits knowing that at one time CIMA was in the business alleged in said paragraph but otherwise deny knowledge or information sufficient to form a belief as to the allegations as stated of said paragraph.

70.)    As to the allegations in the paragraph of the Complaint numbered 18, admit knowing that Pasalides was hired by CIMA but deny knowledge and information sufficient to form a belief as to the rest of the allegations as stated in said paragraph.

71.)    As to the allegations in the paragraph of the Complaint numbered 29, deny knowledge or information sufficient to form a belief as to the allegations as stated of said paragraph but admit that Defendants Woods and Velzy provided Edgewater Group with engineering services on the Arch Capital project.

72.)    As to the allegations in the paragraph of the Complaint numbered 33, deny knowledge or information sufficient to form a belief as to the allegations as stated of said paragraph but admit that Edgewater Group created a proposal for Arch Capital.

73.)    As to the allegations in the paragraph of the Complaint numbered 35, deny the allegations as stated of said paragraph except admit that Boender on behalf of

Edgewater Group spoke to Pasalides as a colleague to inquire as to how to price a commercial job such as the Arch Capital project.

74.) As to the allegations in the paragraphs of the Complaint numbered 48 and 114 deny knowledge or information sufficient to form a belief as to the truth of the allegations as stated of said paragraph but admit that Pasalides sent two proposals to Edgewater Group for the Victoria Home and New York Presbyterian Hospital projects.

75.) As to the allegations in the paragraph of the Complaint numbered 51, deny knowledge or information sufficient to form a belief as to the allegations of said paragraph as stated but admit to receiving some drawings from Saleh through Velzy and Woods for Arch Capital.

76.) As to the allegations in the paragraphs of the Complaint numbered 53, deny knowledge or information sufficient to form a belief as to the truth of the allegations as stated of said paragraph, except admit that Saleh may have had questions for Edgewater Group on the Arch Capital project.

77.) As to the allegations in the paragraphs of the Complaint numbered 55, deny knowledge or information sufficient to form a belief as to the truth of the allegations as stated of said paragraph, except admit that Saleh may have communicated with Boender regarding some drawings for Arch Capital.

78.) As to the allegations in the paragraphs of the Complaint numbered 56, deny knowledge or information sufficient to form a belief as to the truth of the allegations as stated of said paragraph, except admit that Saleh may have provided some drawings through Velzy and Woods to Edgewater Group for the Arch Capital project.

79.)    As to the allegations in the paragraphs of the Complaint numbered 77, deny knowledge or information sufficient to form a belief as to the truth of the allegations as stated of said paragraph, except admit that One Sound Shore Drive was an Edgewater Group project.

80.)    As to the allegations in the paragraphs of the Complaint numbered 104, deny the allegations as stated of said paragraph, except admit that Edgewater Group engaged Velzy and Woods to provide engineering services on the Arch Capital project.

81.)    As to the allegations in the paragraphs of the Complaint numbered 107, deny each and every allegation as stated of said paragraph, except admit knowing that Velzy and Woods used Saleh as a draftsman.

82.)    As to the allegations in paragraphs of the Complaint numbered 111, deny each and every allegation as stated of said paragraph, except admit that certain invoices directed payment to Defendant Pasalides.

83.)    As to the allegations in the paragraphs of the Complaint numbered 227, 228 and 229, respectfully refer to the Court for hearing and determination of the legal issues raised in and by said paragraphs.

84.)    As to the allegations of the Tenth Cause of Action (Tortious Interference with Contractual Relations) against Boender, Boender denies each and every allegation as stated in the paragraphs of the Complaint numbered 264 and 265.

85.)    As to the Twelfth Cause of Action (Tortious Interference with Contractual Relations) against Edgewater Group, Edgewater Group denies each and every allegation as stated in the paragraphs of the Complaint numbered 270 and 271.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

CIMA Group, Inc. fails to state valid causes of action upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

The Defendants Pasalides, Velzy and Woods while in the employ of CIMA Group, Inc. were employees at will without the benefit of or restrictions of a contract of employment.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

Plaintiff's causes of action are bound by the equitable doctrine of laches and unclean hands.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

The Plaintiff causes of action are, in part, barred by the Statute of Limitations and Statute of Frauds.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

If the Plaintiffs are successful in obtaining a judgment as against Defendants, Pasalides, Velzy and Wood, they are entitled to a satisfaction and offset of monies owed and unpaid.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

That the Bankruptcy Court is an improper forum to hear the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth,

Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth and Nineteenth causes of action

due to the fact that they are "non-core" proceedings.

WHEREFORE, the Defendants respectfully demand judgment dismissing the

Complaint against them and for costs, disbursements, attorneys fees and for such other

relief as to the Court may deem just and proper.

Dated: White Plains, New York
September 10, 2007

REICH, REICH & REICH, P.C.
Co-Counsel for the Defendants

By:_____

Jeffrey A. Reich (JR-7535)
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for the Defendants

By:_____

Stephen R. Lewis (SL-3132)
175 Main Street
White Plains, New York 10601
(914) 761-0300

REICH, REICH & REICH, P.C.
Co-Counsel for Defendant Nicholas Pasalides
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendant Nicholas Pasalides
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

CIMA Group, Inc.,

Chapter 11
Case No. 05-27041(ASH)

Debtor.
--------------------------------------------------------X
CIMA Group, Inc.

Plaintiff,

-against-

Adv. Proc. No.
07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

Defendants.
--------------------------------------------------------X

## VERIFICATION

State of New York        )
County of Westchester    )ss.:

Nicholas Pasalides, being duly sworn deposes and says:

I am one of the Defendants herein and am the President of Edgewater Design, Inc.; I have read the foregoing Verified Answer and know the contents thereof; and assert

that the statements contained made by me as to the causes of action against me individually and against Edgewater Design, Inc. therein are true and accurate to the best of my knowledge, information and belief.

Nicholas Pasalides

Sworn to before me this
12ᵗʰ day of September 2007

JEFFREY A. REICH
Notary Public, State of New York
No. 02RE6044498
Qualified in Westchester County
Commission Expires July 10, 20/₀

REICH, REICH & REICH, P.C.
Co-Counsel for Defendant Joseph Woods
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendant Joseph Woods
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

CIMA Group, Inc.,

                           Debtor.
--------------------------------------------------------X
CIMA Group, Inc.

                          Plaintiff,

        -against-

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

                         Defendants.
--------------------------------------------------------X

Chapter 11
Case No. 05-27041(ASH)

Adv. Proc. No.
07-08276(ASH)

## **VERIFICATION**

State of New York      )
                      )ss.:
County of Westchester  )

      Joseph Woods, being duly sworn deposes and says:

      I am one of the Defendants herein; I have read the foregoing Verified Answer and know the contents thereof; and assert that the statements contained therein by me for the

causes of action against me are true and accurate to the best of my knowledge, information and belief.

Joseph Woods

Sworn to before me this
18th day of September 2007

JEFFREY A. REICH
Notary Public, State of New York
No. 02RE6044498
Qualified in Westchester County
Commission Expires July 10, 201

REICH, REICH & REICH, P.C.
Co-Counsel for Defendant Mark Velzy
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendant Mark Velzy
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

CIMA Group, Inc.,

                                   Debtor.
--------------------------------------------------------X
CIMA Group, Inc.

                               Plaintiff,

                -against-

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

                              Defendants.
--------------------------------------------------------X

Chapter 11
Case No. 05-27041(ASH)

Adv. Proc. No.
07-08276(ASH)

## **VERIFICATION**

State of New York         )
County of Westchester   )ss.:

      Mark Velzy, being duly sworn deposes and says:

      I am one of the Defendants herein; I have read the foregoing Verified Answer and know the contents thereof; and assert that the statements contained therein by me for the

causes of action against me are true and accurate to the best of my knowledge, information and belief.

_C. Mark Velzy_
Mark Velzy

Sworn to before me this
10th day of September 2007

JEFFREY A. REICH
Notary Public, State of New York
No. 02RE6044498
Qualified in Westchester County
Commission Expires July 10, 20 | 0

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants Michiel Boender
and Edgewater Group Architects a/k/a Edgewater Group
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants Michiel Boender
and Edgewater Group Architects a/k/a Edgewater Group
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

CIMA Group, Inc.,                          Chapter 11
                                           Case No. 05-27041(ASH)

                    Debtor.
--------------------------------------------------------X
CIMA Group, Inc.

                    Plaintiff,

                                           Adv. Proc. No.
        -against-                          07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

                    Defendants.
--------------------------------------------------------X

## VERIFICATION

State of New York          )
                           )ss.:
County of Westchester      )

        Michiel Boender, being duly sworn deposes and says:

I am one of the Defendants herein and am the Principal of Edgewater Group Architects a/k/a Edgewater Group; I have read the foregoing Verified Answer and know the contents thereof; and assert that the statements made by me as to the causes of action against me individually and as against Edgewater Group contained therein are true and accurate to the best of my knowledge, information and belief.

By:_____
Michiel Boender

Sworn to before me this
1st day of September 2007

JEFFREY A. REICH
Notary Public, State of New York
No. 02RE6044498
Qualified in Westchester County
Commission Expires July 10, 20__

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

                                         Chapter 11
CIMA Group, Inc.,                     Case No. 05-27041(ASH)

                  Debtor.
--------------------------------------------------------X
CIMA Group, Inc.

                  Plaintiff,

                                Adv. Proc. No.
       -against-                  07-08276 (ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

                 Defendants.
--------------------------------------------------------X

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
COUNTY OF WESTCHESTER    )ss:

      Samara Neal being sworn says: I am not a party to the action, am over 18 years of

age and reside at 18 Garden Street, Chestnut Ridge, New York 10977.

On September 11, 2007, I served true copies of the annexed Verified Answer, by mailing the same in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service located at 175 Main Street, White Plains, New York, addressed to the last-known address of the addressees as indicated below:

Rosemarie E. Matera, Esq.
Kurtzman Matera Gurock & Scuderi, LLP
2 Perlman Drive Suite 301
Spring Valley, NY 10977

Honorable Adlai S. Hardin, Jr.
U.S. Bankruptcy Judge
U.S. Bankruptcy Court
300 Quarropas Street
White Plains, NY 10601

Office of the U.S. Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004

Samara Neal

Sworn to before me this
11th day of September, 2007

JOANNE PRICE
Notary Public, State of New York
No. 01PR6046007
Qualified in Dutchess County
Commission Expires August 7, 20 10

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
Attorneys for Plaintiff
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                              Chapter 11
                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                        Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


CIMA Group, Inc.,

                        Plaintiff,                 Adv. Pro. No. 07-08276(ASH)

            - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                        Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## TRIAL MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

_____Plaintiff, CIMA Group, Inc. ("CIMA") respectfully submits this Memorandum of Law in support

of the causes of action set forth in this adversary proceeding as against defendants, Nicholas

Pasalides ("Pasalides"), Joseph Woods ("Woods"), Mark Velzy ("Velzy"), Michiel Boender

("Boender"), Edgewater Design, Inc. ("Edgewater") and Edgewater Group Architects a/k/a

Edgewater Group ("Edgewater Group") (collectively referred to as the "Defendants").

-1-

The Complaint describes a course of conduct by three key employees of CIMA intended to, with single minded purpose, strip their employer of its business. The documentary evidence, as well as the testimony, clearly depicts the treachery with which they pirated CIMA's resources and its customers.

With respect to Pasalides, monies were loaned to assist this "faithful" and "trusted" employee with the purchase of a new home. While some was repaid, $175,500.00 has simply been ignored. It is abhorrent that creditors have had to fund the enhanced lifestyle of this thankless individual.

## STATEMENT OF FACTS

CIMA respectfully refers the Court to the parties' proposed Joint Pre-Trial order for a statement of the relevant facts.

## ARGUMENT

**1.   Breach of the Covenant of Good Faith and Fair Dealings, Equitable Fraud, Fiduciary Duty**

"A cause of action for breach of fiduciary duty requires: (1) the existence of a duty which defendants owed, based on a relationship of trust and confidence, (2) a breach of that duty by defendants, and (3) that defendants' breach was the proximate cause and cause in fact of plaintiff's loss." Constantin Associates v. Kapetas, 17 Misc. 3d 1137(A), 851 N.Y.S. 2d 68 (2007).

"New York law obligates an employee to be loyal to his employer and prohibits him ' "from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties" '." American Building Maintenance Company of New York v. Acme Property Services, 515 F. Supp. 2d 298 (N.D.N.Y. 2007), citing Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003) (quoting W. Electric Co. v. Brenner, 41 N.Y. 2d 291, 295, 392 N.Y.S. 2d 409, 360 N.E. 2d 1091 (1977) ). The fact that employees do not have formal employment contracts is irrelevant. Pasalides, Woods and Velzy

owed a fiduciary duty of loyalty and good faith to CIMA as a matter of law.  See Louis Capital

Markets, L.P. v. Refco Group Ltd., LLC, 9 Misc. 3d 283, 289, 801 N.Y.S. 2d 490 (2005); American

Building Maintenance Company of New York v. Acme Property Services, id.  ("[E]mployees not

bound by restrictive covenants still have a duty of loyalty to their employer".)

     "As far as the rights of employers are concerned, even where the employment is at-will and

there are no trade-secret problems that would inhibit an employee's right to resign and compete

with his or her employer, so long as the employment relationship subsists, the employee may not

engage in conduct injurious to the employer's business interests in order to secure future

competitive advantage.  Thus, where there was evidence that certain senior employees of an

advertising agency had solicited their employer's clients before they left their employment and

discussed with others of its employees their plans to start a new agency, the jury was entitled to

conclude that the senior employees had pursued a course of conduct to benefit themselves through

destruction of the employer's business in violation of their fiduciary duties of good faith and fair

dealing arising out of their relationship with the employer.  Duane Jones Co. v. Burke, 306 N.Y. 172,

117 N.E. 2d 237 (1954); See also Huebener v. Kenyon & Eckhardt, Inc., 142 A.D. 2d 185, 192, 534

N.Y.S. 2d 952, 957 (1st Dept. 1988).  It made no difference that the senior-employee defendants,

the clients, and the other employees were not contractually bound to the employer; it was enough

that injury had been done to the plaintiff's business, by means rendered unlawful by virtue of the

fact that they breached the implied covenant of good faith and fair dealing.  4A N.Y. Pract.; Com.

Litig. in New York State Courts §64:23 (2d ed.).

     While still employees of CIMA, Pasalides, Woods and Velzy used the services of other

CIMA employees, solicited customers of CIMA for projects CIMA could have performed, created

a competing company (Edgewater), used CIMA facilities, property and resources, appropriated

proprietary information and engaged in dilatory and derisive discussions regarding a shareholders

agreement. Breach of an employee's duty has been upheld on similar conduct, Constantin

Associates v. Kapetas, 17 Misc. 3d 1137(A), 851 N.Y.S. 2d 68 (2007) citing CBS Corp. Vs. Dunsday, 268 A.D. 2d 350, 353 (1st Dept. 2000) "(claim sufficient where plaintiff alleged that employees planned and formed a competing corporation, using confidential information); Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc., 283 A.D. 2d 448, 449 (2d Dept. 2001) (claim sufficient where plaintiff alleged that defendant 'while still in its employ, used its office facilities and equipment to solicit customers for himself' and his associates).  " 'An employee may not use his or her principal's time, facilities or proprietary secrets to build [a] competing business' ". Mega Group Inc. v. Holton, 290 A.D. 2d 673, 675, 736 N.Y.S. 2d 444 (3d Dept. 2002) quoting Chemfab Corp. v. Integrated Lines Technologies, 263 A.D. 2d 788, 790, 693 N.Y.S. 2d 752 (1999).

Obviously, CIMA was damaged.  CIMA is in bankruptcy.  Significant claims exist.  Even if CIMA were unable to prove damage as a result of the breach of fidelity, the former employees may be required to forfeit all monies they received.  American Building Maintenance Company of New York v. Acme Property Services, Inc., 515 F. Supp. 2d at 312, citing Phansalkar v. Andersen Weinroth & Co., L.P., 344 F. 3d at 200 (quoting Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 394 N.Y.S. 2d 626, 363 N.E. 2d 350 (1977).

2.    **Unfair Competition:**

"Under New York common law, 'the essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods'." Precisionflow Technologies, Inc. v. CVD Equipment Corporation, 2007 WL 844893*4 (N.D.N.Y.) citing Forschner Group, Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 408 (2d Cir. 1997).  "An employee's breach of his duty of good faith and fair dealing can [in addition to misappropriation of a trade secret] support a claim, under New York law, for unfair competition.  Such a claim lies where an employee 'misappropriates and exploits confidential information' belonging to his employer in breach of the relationship of trust." Cardiocall v. Serling and EKG Professionals, Inc., 492 F. Supp. 2d 139, 150 (E.D.N.Y. 2007) citing Vision Specialty

-4-

Food Prods., Inc. v. Ultimate Gourmet, LLC., 2001 WL 1507008*5 (S.D.N.Y.)

"While an employee is free to 'compete with his former employer as to matters for which he has been employed. . . he is not free to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty during his employment and before his termination and by the breach of his obligation to use his best efforts in the interest of his employer'." Cardiocall v. Serling and EKG Professionals, Inc., 492 F. Supp. 2d at 149-50, quoting Freedom Calls Foundation v. Bekstel, 2006 WL 845509*17 (E.D.N.Y.).

Pasalides, Woods and Velzy started their competing business while employed by CIMA, worked with CIMA customers and Edgewater Group, utilized CIMA resources and other CIMA employees and misappropriated the specific format of the CIMA proposal. They built their business while ignoring CIMA. The elements of unfair competition clearly exist.

### 3.    Tortuous Interference With Business Relations.

_____ "This tort is 'variously referred to throughout case law as tortuous interference with business advantage, business relations, economic relations, and prospective economic advantage', but has the same elements whatever it is called." Milton Abeles, Inc. v. Farmers Pride, Inc., 2007 WL 2028069*15 (E.D.N.Y.) quoting PPX Entertainment, Inc. v. Audiofidelity Enterprises, Inc., 818 F. 2d 266, 269 (2d Cir. 1987). The required elements are: (1) business relations with a third party; (2) defendant's interference with those business relations' (3) the defendant acted with the sole purpose of harming the plaintiff or that where the defendant acted to advance its own competing interests, used wrongful means; and (4) injury to the business relationship. See, generally, Advanced Global Technology LLC v. Sirius Satellite Radio, Inc., 15 Misc. 3d 776, 809-810, 836 N.Y.S. 2d 807 (2007); American Building Maintenance Company of New York v. Acme Property Services, Inc., 515 F. Supp. 2d at 316; Milton Abeles, Inc. v. Farmers Pride, Inc, id.

"To state a cause of action for tortuous interference with prospective business advantage, it must be alleged that the conduct by defendant that allegedly interfered with plaintiff's prospects

either was undertaken for the sole purpose of harming plaintiff, or that such conduct was wrongful or improper independent of the interference allegedly caused thereby." Advanced Global Technology LLC v. Sirius Satellite Radio, Inc., 15 Misc. 3d at 810, citing Jacobs v. Continuum Health Partners, Inc., 7 A.D. 3d 312, 313, 776 N.Y.S. 2d 279 (1st Dept. 2004) citing Alexander & Alexander of New York, Inc. v. Fritzen, 68 N.Y. 2d 968, 969, 510 N.Y.S. 2d 546, 503 N.E. 2d 102 (1986). Obviously, as stated at Sections 1 and 2 above, the conduct was wrongful. The issue of interference "accords an appropriate level of protection to a plaintiff's interest - by definition not its contact rights - in its expectancy of future benefits:. Precisionflow Technologies, Inc. v. CVD Equipment Corporation, 2007 WL 844893*12 (N.D.N.Y.).

CIMA had customers. CIMA expected future business from those customers. CIMA expected to earn revenue from those customers through the time sheets of Pasalides, Woods and Velzy. CIMA trusted its key employees. To its detriment and to their advantage, those employees, Boender, Edgewater and Edgewater Group wrongfully acted to service CIMA and potential customers.

4.    **Tortuous Inteference With Contract**

"To recover for tortuous interference with contract under New York common law, a plaintiff must establish that the defendant, having knowledge of a contract between the plaintiff and a third party, intentionally induced the third party to breach the contract, causing damages to the plaintiff." Precisionflow Technologies, Inc. v. CVD Equipment Corporation, 2007 WL 844893*16 (N.D.N.Y.), citing Kronas, Inc. v. AVX Corp., 81 N.Y. 2d 90, 94 (1993). The five elements of this cause of action are: "(1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third-party's breach of contract without justification; (4) actual breach of the contract; and (5) damages to plaintiff." American Building Maintenance Company ov New York v. Acme Property Services, Inc., 515 F. Supp 2d 298, 314 (N.D.N.Y. 2002), citing Lama Holding Co. v. Smith Barney Inc., 88 N.Y. 2d 413,

424, 646 N.Y.S. 2d 76, 668 N.E. 2d 1370 (1996).  The third element has been expanded upon to include "intentional inducement of the third party to breach *or otherwise render performance impossible.*"  Italverde Trading Inc. v. Four Bills of Lading, 485 F. Supp. 2d 187, 201-202 (E.D.N.Y. 2007) quoting Kronos Inc. v. AVX Corp., 81 N.Y. 2d at 94.  "New York Courts have held that [c]ausing a plaintiff to breach a contract, by preventing the plaintiff's performance constitutes tortuous interference with a contract, provided that the other elements of the tort are satisfied".  Italverde Trading, Inc. v. Four Bills of Lading, 485 F. Supp. 2d at 203.  Three contracts between CIMA and its customers, AT&T Wireless, New Hyde Park and BAE Systems were taken over by Pasalides, Velzy and Woods.  There is no question that the contracts existed and obviously these three key employees knew it and benefitted from their predatory acts.  Additionally, Pasalides, Velzy and Woods interfered with the performance of contracts by failing, as admitted, to keep time records.

**5.    Unjust Enrichment**

"To establish a claim for unjust enrichment, plaintiff must prove that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution".  Milton Abeles, Inc. v. Farmers Pride, Inc., 2007 WL 2028069*16 (E.D.N.Y.) citing Huntington Dental & Med. Co. v. Minnesota Mining and Mfg. Co., 1998 WL 60954*6 (S.D.N.Y.).  " 'The essence of unjust enrichment is that one party received a benefit at the expense of another'.  A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit. . . [such as] where he is saved an expense.  The unjust enrichment inquiry focuses on the human setting involved and not merely on the transaction in violation."  In re Worldcom, Inc. 371 B.R. 33, 38 (Bankr. S.D.N.Y. 2007) (citations omitted).

Pasalides Velzy and Woods were enriched at CIMA's expense, as was Edgewater.  They used CIMA staff, resources and proprietary information while CIMA employees.  See American

-7-

<u>Building Maintenance Company of New York v. Acme Property Services</u>, 515 F. Supp. 2d at 313.

(Defendants' motion to dismiss denied where Plaintiff alleged that former employees used its staff

and resources for their own side ventures in contravention of their employment obligations).

**6.      Aiding and Abetting a Breach of Fiduciary Duty**

      "A claim for aiding and abetting a breach of fiduciary duty requires '(1) a breach by a

fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the

breach, and (3) that plaintiff suffered damage as a result of the breach'." <u>Louis Capital Markets,

L.P. v. Refco Group Ltd., LLC.,</u> 9 Misc. 3d 283, 286-87 (2005) quoting <u>Kaufman v. Cohen</u>, 307 A.D.

2d 113, 125, 760 N.Y.S. 2d 157 (1st Dept. 2003). " 'Anyone who knowingly participates with a

fiduciary in a breach of trust is liable for the full amount of the damage caused thereby.' " <u>Louis

Capital Markets, L.P. v. Refco Group Ltd., LLC.,</u> 9 Misc. 3d at 187; quoting <u>Wechsler v. Bowman</u>,

285 N.Y. 284, 291, 34 N.E. 2d 322, rehearing denied, 286 N.Y. 582, 34 N.E. 2d 930 (1941). " ' A

person knowingly participates in a breach of fiduciary duty only when he or she provides

"substantial assistance" to the primary violator.' " <u>Louis Capital Markets, L.P. v. Refco Group Ltd.,

LLC., id.</u>, quoting <u>Kaufman v. Cohen</u>, 307 A.D. 2d at 126.

      Boender and Edgewater aided and abetted Pasalides, Woods and Velzy in their breach of

the fiduciary duty owed to their employer - CIMA.  The responses to the Complaint established as

admitted, *inter alia*, that Boender, as principal of Edgewater Group, used Velzy and Woods on Arch

Capital.  Edgewater Group paid Edgewater, not CIMA, for the work done on Arch Capital. Boender

knew that Velzy and Woods used Saleh, a CIMA employee, as a draftsman.  CIMA was damaged

by the loss of revenue.  Boender and Edgewater Group are clearly liable.

**7.      Turnover**

      Pasalides admits that he was loaned $415,500.00 by CIMA.  Pasalides admits that he

repaid some of the $415,500.00.  CIMA is a Chapter 11 debtor.  Pursuant to Section 541(a)(1) of

the United States Bankruptcy Code, property of the estate includes "all legal or equitable interests

of the debtor in property as of the commencement of the case". CIMA is owed $175,500.00 plus interest on the monies loaned to Pasalides.

## **CONCLUSION**

CIMA is entitled to judgment against the Defendants in an amount sufficient to pay all creditors in full. CIMA is entitled to judgment against Pasalides for the unpaid portion of the loan, $175,500.00, plus interest, costs and fees.

Dated: Spring Valley, New York
      March 25, 2008

                                    Respectfully Submitted,
                                    Kurtzman Matera, P.C.

BY:   **/s/ Rosemarie E. Matera**
                         Rosemarie E. Matera (REM-0999)
                         Kurtzman Matera, P.C.
                         Attorneys for Plaintiff
                         2 Perlman Drive
                         Spring Valley, New York 10977
                         (845) 352-8800

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              Chapter 11
                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                            Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                            Plaintiff,

            - against -                             Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                            Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

State of New York             )
County of Rockland            )ss

            **Sherry Kramer**, being duly sworn, deposes and says:

            1.      I am over 18 years of age and am not a party to this action and I reside at
Pomona, New York.

            2.      On March 25, 2008, I served a true copy of the **Pretrial Brief** by facsimile transmission to:

            Stephen Lewis, Esq.                     Jeffrey A. Reich, Esq.
            Facsimile Number 914-683-1323           Facsimile Number 914-949-1604

and having received a printed receipt verifying that said transmission had been sent.

                                                    ___/s/ **Sherry Kramer**_____
                                                    Sherry Kramer

Sworn to before me this
25th day of March, 2008

___/s/ **Karen Stark**_____
Notary Public

Karen Stark
Notary Public in the State of New York
No. 01ST6171140
Qualified in Rockland County
Commission Expires 7/23/2011

Return Date:  June 26, 2008
Return Time:  10:00 a.m.

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                            Chapter 11
                                                                  Case No. 05-27041(ASH)
CIMA Group, Inc.,
                                            Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,
                                            Plaintiff,

                    - against -                                   Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                                            Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**PLEASE TAKE NOTICE** that CIMA Group, Inc., Debtor, Debtor in Possession and Plaintiff

in the above captioned adversary proceeding ("Plaintiff") by and through its attorneys Kurtzman

Matera, P.C., and based upon this Motion for Partial Summary Judgment, Supporting Memorandum

of Law and Statement of Undisputed Facts on file with the Clerk of the United States Bankruptcy

Court, will move before the Honorable Adlai S. Hardin Jr., United States Bankruptcy Judge, at the

United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601, on June

26, 2008 at 10:00 a.m. or as soon thereafter as counsel can be heard, for an order pursuant to

Federal Rule of Bankruptcy Procedure 7056 and Local Rule 7056-1 granting summary judgment

as against Nicholas Pasalides on the Twentieth Cause of Action, and such other and further relief as this Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE**, that a Memorandum of Law and Statement of Undisputed Facts is on file with the Clerk of the Bankruptcy Court on its electronic docket located on the Court's official internet website, www.nysb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE,** that responsive papers, if any, should be filed with the Court and served upon and received by Kurtzman Matera, P.C., Attn: Rosemarie E. Matera, Esq., 664 Chestnut Ridge Road, Spring Valley, New York 10977, no later than June 6, 2008 and shall conform with the Federal Rules of Bankruptcy Procedure.

Dated: Spring Valley, New York
     May 9, 2008

                            Kurtzman Matera, P.C.
                            Attorneys for Debtor, Debtor in Possession and Plaintiff
                            664 Chestnut Ridge Road
                            Spring Valley, NY   10977
                            (845) 352-8800

              By        **/s/ Rosemarie E. Matera**
                            Rosemarie E. Matera (REM-0999)

TO:

Stephen R. Lewis, Esq.
Stephens, Baroni, Reilly & Lewis, LLP
175 Main Street, Suite 800
White Plains, NY 10601

Jeffrey A. Reich, Esq.
Riech, Reich & Reich, PC
175 Main Street, Suite 300
White Plains, NY   10601

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              Chapter 11
                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                        Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                        Plaintiff,


        - against -                                 Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                        Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CERTIFICATION IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT

WILLIAM BUJARSKI, certifies under penalty of perjury as follows:

1.      Annexed hereto as Exhibit "A" is a true and correct copy of pertinent paragraphs of

the Verified Complaint. Reference is specifically made to paragraphs 3, 4, 215 through 219 and 316

through 321.

2.      Annexed hereto as Exhibit "B" is a true and correct copy of the pertinent paragraphs

of the Verified Answer.  Reference is specifically made to paragraphs 1, 10, 11 and 18.

3.      Annexed hereto as Exhibit "C" is a true and correct copy of the Bank of New York

Business Banking Statement, account number 670-9092934 for the period 09/01/00 to 09/29/00,

in the name of CIMA Group, Inc.

4.      Annexed hereto as Exhibit "D" is a true and correct copy of the front and back of

check No. 7019 drawn on a CIMA Group, Inc. account at The Bank of New York in an amount of $65,500.00 and payable to Nicholas Pasalides.

5.     Annexed hereto as Exhibit "E" is a true and correct copy of the wire transfer confirmation from The Bank of New York to CIMA Group, Inc., showing a $350,000.00 transfer to the beneficiary: Carol Pasalides and Nicholas Pasalides.

6.     Annexed hereto as Exhibit "F" is The Bank of New York Business Banking Statement for the period 11/01/00 to 11/30/00 for CIMA Group, Inc., account number 670-9084826 showing a $100,000.00 deposit on 11/14 and a $100,000.00 deposit on 11/28.

7.     Annexed hereto as Exhibit "G" is a true and correct copy of a March 1, 2004 letter from Michael DiNapoli, C.P.A. of Band Rosenbaum & Martin P.C. to William Bujarski and Nicholas Pasalides, signed and acknowledged by Nicholas Pasalides and William Bujarski.

8.     Annexed hereto as Exhibit "H" is a true and correct copy of Form 1099 for the year 2003 to Nicholas Pasalides in an amount of $20,000.00.

9.     Annexed hereto as Exhibit "I" is a true and correct copy of an email from Michael DiNapoli to William Bujarski on August 11, 2005 and a further email on June 13, 2006.

10.     Annexed hereto as Exhibit "J" is a true and correct copy of an August 17, 2005 letter from CIMA Group, Inc. to Nicholas Pasalides.

11.     Annexed hereto as Exhibit "K" is a true and correct copy of a notation from Band Rosenbaum & Martin, P.C. attached to a January 16, 2006 email.

12.     Annexed hereto as Exhibit "L" is a true and correct copy of pages 21 through 24 of a Federal Rule of Bankruptcy Procedure 2004 examination of Nicholas Pasalides conducted on January 22, 2007.

Dated:   Spring Valley, New York
         May 9, 2008

                                             _____/s/ William Bujarski_____
                                             William Bujarski

2

# EXHIBIT "A"

Group") (collectively referred to as the "Defendants") hereby alleges and sets forth as follows:

1.     CIMA is a New York Corporation with an address at 450 Manville Road, Pleasantville, New York 10573.

2.     CIMA is in the business of providing architectural and design services.

3.     CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern District of New York, White Plains.

4.     Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

5.     Woods is a person residing at 218 Grapehollow Road, Homes, NY 12531,

6.     Velzy is a person residing at 3740 Wildwood Street, Yorktown Heights, NY 10598.

7.     Boender is a person residing at 163 North Main Street, Port Chester, New York 10573.

8.     Edgewater is a New York Corporation with an address at 163 N. Main Street, Suite 202, Port Chester, New York.

9.     Edgewater Group is located at 163 N. Main Street, Suite 202, Port Chester, New York.

10.     Boender is a principal of Edgewater Group.

11.     Kathryn C. French is a person residing at 185 Duck Hole Road, Madison, CT. 06443.

12.     Wael Saleh (a/k/a Wael Alesawy) is a person residing at 66 Sky Top Drive, Pleasantville, New York 10570.

2

213.   Pasalides sent an e-mail to Bujarski on February 28, 2005, resigning from CIMA.

214.   Pasalides, Woods and Velzy spoke about forming Edgewater in or about May of 2004.

215.   Pasalides was loaned $415,500.00 by CIMA. *A's adw'd monies but none are owed*

*A* 216.   The funds were transferred as follows:  (i) on July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Nicholas Pasalides in an amount of $350,000.00.

217.   The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00; (ii) on December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00.   *admits pd certain funds to Cima*

218,   Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

219.   Demand has been made of Pasalides for repayment of the $175,500.00.

220.   No portion of the $175,500.00 has been repaid by Pasalides.

221.   No proof of claim was filed by Pasalides.

222.   No proof of claim was filed by Woods.

223.   No proof of claim was filed by Velzy.

224.   CIMA was left with no choice but to file a petition in bankruptcy.

225.   The Schedules which comprise CIMA's petition reflect $250,662.00 in secured debt and $1,673,395.00 in unsecured deft.

226.   Proofs of Claim, without duplication, reflect a total indebtedness of $744,531.42.

22

to begin a business and unfairly compete with CIMA while still employed at CIMA.

312.    Woods was aided in his illegal and improper efforts to direct CIMA's architectural business to himself, Pasalides, Velzy and Edgewater by the knowledge and information acquired from CIMA under false pretenses.

313.    Woods used the confidential disclosures, training and procedures and clients of CIMA and continues to use such information to divert CIMA's business and to develop the business of Edgewater.

314.    The wrongful, intentional and malicious acts of Woods in building the business of Edgewater while employed by CIMA, with the diversion of CIMA information and clients and the use of CIMA employees and procedures, constitutes unlawful competition.

315.    As a direct and proximate result of Woods' unfair competition, CIMA sustained great damage to its business, leading to its bankruptcy, in an amount of $1,500,000.00, the exact amount to be determined at the trial of this action.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
## (TURNOVER)
## (PASALIDES)

316.    CIMA repeats, realleges and reasserts each and every allegation set forth in paragraphs "1" through "315" as if set forth herein at length.

317.    Pasalides is obligated to CIMA in an amount of $175,500.00.

318.    Demand has been made for turnover of $175,500.00 from Pasalides.

319.    Despite due demand, Pasalides has failed and refused to repay the sum of $175,500.00 or any part thereof.

320.    The $175,500.00 receivable is an asset of CIMA and is property of CIMA;s bankruptcy estate.

321.    Pasalides is obligated to pay the sum of $175,500.00 plus interest thereon pursuant to 11 U.S.C. §§ 541 and 542(b).

WHEREFORE, CIMA seeks judgment as follows:

(A)    Against Pasalides on the First, Fourth, Seventh, Thirteenth and Seventeenth Causes of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys' fees, together with statutory interest.

(B)    Against Velzy on the Second, Fifth, Eighth, Fourteenth and Eighteenth Causes of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys' fees, together with statutory interest.

(C)    Against Woods on the Third, Sixth, Ninth, Fifteenth and Nineteenth Causes of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys' fees, together with statutory interest.

(D)    Against Edgewater on the Eleventh and Sixteenth  Causes of Action in an amount of $1,500,000.00 or such amount as is demonstrated at trial plus an appropriate multiple equal to CIMA's actual damages, the costs of the suit herein, including attorneys' fees, together with statutory interest.

(E)    Against Boender on the Tenth Cause of Action in an amount of

# EXHIBIT "B"

& Reich, P.C. and Stephens, Baroni, Reilly & Lewis, LLP, as and for their Answer to the

Verified Complaint, dated July 10, 2007, by CIMA Group, Inc. ("CIMA") against

Woods, Pasalides, Velzy, Boender, Edgewater Design and Edgewater Group

(collectively referred to as "the Defendants") allege and set forth as follows:

### AS TO THE FIRST, FOURTH, SEVENTH, THIRTEENTH, SEVENTEENTH AND TWENTIETH CAUSES OF ACTION, PASALIDES:

1.)    Admits the allegations of the paragraphs of the Complaint numbered 3, 4,

5, 6, 9, 10, 50, 98, 102, 109, 141, 159, 164, 174, 179, 180, 183, 186, 187, 188, 189, 191,

210, 211, 212 and 216.

2.)    Denies knowledge or information sufficient to form a belief as to the

allegations as stated in the paragraphs of the Complaint numbered: 1, 2, 11 through and

including 24, 28, 30, 31, 32, 33, 35 through and including 40, 41 through and including

47, 48, 49, 51 through and including 55, 56 through and including 58, 60 through and

including 62, 63 through and including 71, 72 through and including 77, 78 through and

including 85, 86 through and including 92, 93 through and including 96, 99 through and

including 101, 103, 104, 107, 111, 113 through and including 117, 119, 120, 122, 123,

124, 126, 127, 128, 130, 131, 132, 134, 135, 136, 138, 139, 140, 142, 143, 144, 146, 147,

148, 150, 151, 152, 154, 155, 156, 158, 160, 161, 162, 163, 165 through and including

173, 175 through and including 178, 181 through and including 182, 184 through and

including 185, 190, 192 through and including  197, 198 through and including 209, 214

221, 222, 223, 224, 225 and 226.

3.)    Denies each and every allegation as stated in the paragraphs of the

Complaint numbered 7, 8, 22, 29, 59, 108, 110, 118, 121, 125, 129, 133, 137, 145, 149,

153, 214, 218, 219 and 220.

10.)     As to the allegations of the paragraph in the Complaint numbered 215, denies the allegations of said paragraph as stated except admits that he was advanced monies but that currently no monies are owed.

11.)     As to the allegations of the paragraph in the Complaint numbered 217, admits that he paid certain funds to CIMA but denies knowledge or information as to the remaining allegations as stated of said paragraph.

12.)     As to the allegations of the paragraphs in the Complaint numbered 227, 228 and 229 respectfully refers to the Court for hearing and determination of all legal issues raised in and by said paragraphs.

13.)     As to the allegations in the First Cause of Action (Equitable Fraud), denies each and every allegation as stated of the paragraphs of the Complaint numbered 232, 232 and 233.

14.)     As to the allegations in the Fourth Cause of Action (Breach of Covenant Good Faith and Fair Dealing), denies each and every allegation as stated of the paragraphs of the Complaint numbered 243, 244 and 245.

15.)     As to the allegations in the Seventh Cause of Action (Tortious Interference with Contractual Relations), denies each and every allegation as stated of the paragraphs of the Complaint numbered 255 and 256.

16.)     As to the allegations in the Thirteenth Cause of Action (Tortious Interference with Business Relations), denies each and every allegation as stated of the paragraphs of the Complaint numbered 273, 274, 275 and 276.

17.) As to the allegations in the Seventeenth Cause of Action (Unfair Competition), denies each and every allegation as stated of the paragraphs of the Complaint numbered 293, 294, 295, 296, 297, 298 and 299.

18.) As to the allegations as stated in the Twentieth Cause of Action (Turnover), denies each and every allegation as stated of the paragraphs of the Complaint numbered 317, 318, 319, 320 and 321.

## AS TO THE THIRD, SIXTH, NINTH, FIFTEENTH AND NINETEENTH CAUSE OF ACTION, JOSEPH WOODS:

12.) Admits the allegations of the paragraph of the Complaint numbered: 3, 4, 5, 6, 9, 38, 98, 101, 102, 157, 159, 161, 179, 180, 183, 185, 191, 204, 206, 210, 211 and 212.

13.) Denies knowledge or information sufficient to form a belief as to the allegations as stated in the paragraphs of the Complaint numbered: 1, 2, 10 through and including 19, 21, 22, 23, 28, 30 through and including 37, 39 through and including 67, 69 through and including 93, 95, 96, 97, 99, 100, 103, 106, 107, 108 through and including 114, 119, 122, 123, 125, 126, 129, 130, 131, 134, 135, 137, 138, 139, 141, 142, 143, 145,146, 147, 149,  150 through and including 155,  158, 160, 162 through and including 178, 181, 182, 184, 186 through and including 190, 193, 194, 196, 197, 198 through and including 203, 207 through and including 209, 213 through and including 226.

14.) Denies each and every allegation as stated in the paragraphs of the Complaint numbered: 7, 8, 68, 118, 121, 127, 128, 133, 136, 140, 148 and 195.

# EXHIBIT "C"



**THE BANK OF NEW YORK**

## *Business Banking Statement*

Period:      09/01/00 to 09/29/00
Page:        1 of  1
Enclosures:  0

5391
--7--A

CIMA GROUP INC
2 GANNETT DR
WHITE PLAINS, NY 10604-3404

---

## Summary of Accounts

| Account Type | Account No. | Assets | Loans | Credit Available |
|---|---|---|---|---|
| Investor's Choice | 670-9092934 | 735,165.04 | | |
| **TOTAL** | | 735,165.04 | .00 | .00 |

---

## Investor's Choice

Activity

Account No. 670-9092934

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/01 | **OPENING BALANCE** | | | 384,682.68 |
| 09/07 | BEN:CAROL PASALIDES | 350,000.00- | | 34,682.68 |
| | CASH-REG 000907 | | | |
| 09/07 | FED WIRE TRANSFER DEBIT | 30.00- | | 34,652.68 |
| | FEE | | | |
| 09/22 | DEPOSIT | | 700,000.00 | 734,652.68 |
| 09/29 | INTEREST CREDIT | | 512.36 | 735,165.04 |
| | **TOTAL** | 350,030.00- | 700,512.36 | |
| 09/29 | **CLOSING BALANCE** | | | 735,165.04 |

Interest rates in effect for this account were:
Effective 09/01 thru 09/29 the rate was  1.980%
The Annual Percentage Yield earned this period (through 09/30/00) was 2.00%

---

## Important Information

Please examine and reconcile this statement promptly.
Notice: See reverse side and any inserts for important information.

*Order of Checks Paid:*

In accordance with Bank Policy, checks drawn against your account are generally paid in order of amount, the largest dollar denomination to the smallest dollar denomination.

# EXHIBIT "D"

CIMA GROUP INC.
2 GANNETT DRIVE
WHITE PLAINS, NY 10604

7019

50-235/779
219

PAY TO THE
ORDER OF _Nicholas Paradies_

July 31 20 00

$ 65,500.xx

_Sixty-five Thousand Five Hundred and 00/Cents_ ————— DOLLARS

THE BANK OF NEW YORK
100 CORPORATE PARK DR.
WHITE PLAINS, NY 10604

FOR _Mrs. Marino as Escrow_   LOAN

⑈007019⑈  ⑈:021790235⑈:  ⑈670908488⑈  ⑈000065500000⑈

# EXHIBIT "E"

THE BANK OF NEW ORK

Church St. Station, P.O. Box 11000, NY, NY 10286

ORIGINAL
ADVICE OF DEBIT

WE DEBIT YOUR ACCOUNT NO  6709092934
FOR PAYMENT INDICATED

SAME DAY FUNDS

$350,000.00**

MAIL TO

CIMA GROUP INC
2 GANNETT DR
WHITE PLAINS, NY 10604-3404

BU05135 DATE     SEPTEMBER 07, 2000

OUR REF. (TRN) NO.     FTK0009075878200

PLEASE MENTION OUR REFERENCE NO. (TRN) IN ANY CORRESPONDENCE

ORIGINATOR'S DATE           00/09/07
ORIGINATOR'S REF. NO.

ORDERING BANK:
CORPORATE PARK  #737
1-914-694-4020

BENEFICIARY:
CAROL PASALIDES
NICHOLAS PASALIDES
10 MOSEMAN AVE
YORKTOWN HEIGHTS, NY 10598-9614

DETAILS OF PAYMENT:
/NONE/



RECEIVED
SEP 1 1 2000
CIMA GROUP

The Bank of New York
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
AUTHORIZED SIGNATURE
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX





**THE BANK OF NEW YORK**

### *Business Banking Statement*

Period: 11/01/00 to 11/30/00
Page: 1 of 5
Enclosures: 122

5378
--7--I

CIMA GROUP INC
2 GANNETT DR
WHITE PLAINS, NY 10604-3404

## Summary of Accounts

| Account Type | Account No. | Assets | Loans | Credit Available |
|---|---|---|---|---|
| Commercial Checking | 670-9084826 | 87,431.24 | | |
| **TOTAL** | | 87,431.24 | .00 | .00 |

## Commercial Checking

### Activity

Account No. 670-9084826

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/01 | **OPENING BALANCE** | | | 136,702.23 |
| 11/01 | 382YA 110144A01 ADP | 18,965.52- | | 117,736.71 |
| | TX/FINCL SVC ADP - TAX | | | |
| 11/01 | 15 CHECKS | 17,624.59- | | 100,112.12 |
| 11/02 | 3 CHECKS | 4,162.55- | | 95,949.57 |
| 11/03 | 5 CHECKS | 19,559.75- | | 76,389.82 |
| 11/06 | DEPOSIT | | 1,300.00 ✓ | 77,689.82 |
| 11/06 | 3 CHECKS | 2,865.11- | | 74,824.71 |
| 11/07 | 14 CHECKS | 23,640.24- | | 51,184.47 |
| 11/08 | 11 CHECKS | 8,954.11- | | 42,230.36 |
| 11/09 | 2 CHECKS | 216.42- | | 42,013.94 |
| 11/10 | 2 CHECKS | 26,667.04- | | 15,346.90 |
| 11/13 | 1 CHECK | 77.37- | | 15,269.53 |
| 11/14 | DEPOSIT | | 100,000.00 ✓ | 115,269.53 |
| 11/14 | 1 CHECK | 50.00- | | 115,219.53 |
| 11/15 | 382YA 111546A01 ADP | 17,182.12- | | 98,037.41 |
| | TX/FINCL SVC ADP - TAX | | | |
| 11/15 | 13 CHECKS | 15,471.77- | | 82,565.64 |
| 11/16 | 4 CHECKS | 6,601.23- | | 75,964.41 |
| 11/17 | 4 CHECKS | 5,665.60- | | 70,298.81 |
| 11/20 | 8 CHECKS | 12,105.18- | | 58,193.63 |
| 11/21 | 4 CHECKS | 5,970.34- | | 52,223.29 |
| 11/22 | 4 CHECKS | 4,182.28- | | 48,041.01 |
| 11/24 | 2 CHECKS | 4,850.38- | | 43,190.63 |
| 11/27 | 1 CHECK | 82.01- | | 43,108.62 |
| 11/28 | DEPOSIT | | 100,000.00 ✓ | 143,108.62 |
| 11/28 | 2 CHECKS | 3,396.35- | | 139,712.27 |
| 11/29 | 382YA 112948A01 ADP | 16,027.98- | | 123,684.29 |
| | TX/FINCL SVC ADP - TAX | | | |
| 11/29 | 16 CHECKS | 22,702.61- | | 100,981.68 |
| 11/30 | 7 CHECKS | 13,516.03- | | 87,465.65 |



## Business Banking Statement

Period: 08/01/00 to 08/31/00
Page: 2 of 5

5992
--7--I

**Commercial Checking**
**Continued**

### Activity

Account No. 670-9084826

| Date | Description | Debits | Credits | Balance |
|------|-------------|--------|---------|---------|
| 08/28 | 1 CHECK | 2,087.78- | | 54,575.35 |
| 08/29 | 2 CHECKS | 4,700.49- | | 49,874.86 |
| 08/30 | 6 CHECKS | 4,524.59- | | 45,350.27 |
| 08/31 | 1 CHECK | 200.00- | | 45,150.27 |
| | **TOTAL** | 284,607.85- | 251,926.10 | |
| 08/31 | **CLOSING BALANCE** | | | 45,150.27 |

### Summary of Checks

| Check | Date | Amount | Check | Date | Amount |
|-------|------|--------|-------|------|--------|
| 6994 | 08/08 | 3,028.85 | 7049 | 08/07 | 377.63 |
| 7008* | 08/03 | 34.00 | 7050 | 08/08 | 667.23 |
| 7012* | 08/01 | 176.66 | 7051 | 08/14 | 2,660.00 |
| 7014* | 08/08 | 3,028.85 | 7052 | 08/25 | 246.90 |
| 7018* | 08/08 | 830.12 | 7053 | 08/08 | 2.00 |
| 7019 | 08/01 | 65,500.00 | 7054 | 08/24 | 3,028.85 |
| 7020 | 08/09 | 186.92 | 7055 | 08/10 | 960.00 |
| 7021 | 08/07 | 600.00 | 7056 | 08/10 | 10.00 |
| 7022 | 08/09 | 81.60 | 7057 | 08/10 | 62.63 |
| 7023 | 08/04 | 10,538.37 | 7058 | 08/10 | 5.49 |
| 7024 | 08/08 | 2,235.79 | 7059 | 08/22 | 16.72 |
| 7025 | 08/08 | 164.61 | 7060 | 08/15 | 6.56 |
| 7026 | 08/15 | 7,234.21 | 7061 | 08/14 | 35.58 |
| 7027 | 08/04 | 1,012.85 | 7062 | 08/15 | 10.20 |
| 7028 | 08/07 | 465.00 | 7063 | 08/11 | 841.40 |
| 7029 | 08/07 | 461.76 | 7064 | 08/14 | 600.00 |
| 7030 | 08/07 | 411.12 | 7065 | 08/15 | 28.70 |
| 7031 | 08/07 | 533.75 | 7066 | 08/16 | 77.49 |
| 7032 | 08/11 | 71.95 | 7067 | 08/18 | 13,350.54 |
| 7033 | 08/09 | 136.77 | 7068 | 08/30 | 2,429.71 |
| 7034 | 08/04 | 2,220.79 | 7069 | 08/15 | 44.90 |
| 7035 | 08/04 | 683.92 | 7070 | 08/18 | 39.30 |
| 7036 | 08/04 | 1,530.43 | 7071 | 08/15 | 4,393.66 |
| 7037 | 08/04 | 295.61 | 7072 | 08/15 | 441.95 |
| 7038 | 08/09 | 187.68 | 7073 | 08/14 | 97.41 |
| 7039 | 08/11 | 6,737.79 | 7074 | 08/15 | 250.00 |
| 7040 | 08/09 | 531.62 | 7075 | 08/30 | 75.35 |
| 7041 | 08/14 | 298.90 | 7076 | 08/17 | 563.52 |
| 7042 | 08/04 | 117.91 | 7077 | 08/17 | 402.81 |
| 7043 | 08/07 | 634.90 | 7078 | 08/16 | 290.73 |
| 7044 | 08/08 | 2,261.74 | 7079 | 08/17 | 150.00 |
| 7045 | 08/07 | 14,931.73 | 7080 | 08/17 | 449.95 |
| 7046 | 08/08 | 575.00 | 7081 | 08/14 | 125.35 |
| 7047 | 08/07 | 565.44 | 7082 | 08/15 | 42.17 |
| 7048 | 08/07 | 41.20 | 7083 | 08/15 | 506.58 |

*Indicates skip in check number order.*

# EXHIBIT "G"



# BAND ROSENBAUM & MARTIN P.C.
### CERTIFIED PUBLIC ACCOUNTANTS

Lawrence Martin, CPA
Scott D. Martin, CPA
Larry Holzberg, CPA
Hal B. Martin, CPA

Bernard Rosenbaum, CPA
(1930-1988)
Emile Band, CPA
(1921-1966)

March 1, 2004

Messrs. William Bujarski
and Nicholas Pasalides
Cima Group, Inc.
2 Gannett Drive
White Plains, New York  10604

Dear Bill and Nick:

Enclosed is a copy of Form 1099 issued by Cima Group to Nicholas Pasalides in the amount of $20,000.  As per your instructions, this Form 1099 was prepared by my office to reflect additional compensation that Nick received for 2003 of $20,000 in exchange for an equal reduction in the Promissory Note due to the Company from Mr. Pasalides.

Please keep this for your records and acknowledge that you are in agreement with this treatment for the tax year ended December 31, 2003.  Please forward, therefore, a copy of this letter, signed by you, and mail it back to my office.

Very truly yours,

BAND, ROSENBAUM & MARTIN, P.C.

Michael DiNapoli, C.P.A.

MD/mah
Enc.

Signed and acknowledged:

_____
Nicholas Pasalides

_____
William Bujarski

Dated: _3.5.2004_

26 Burling Lane, New Rochelle, NY 10801   (914) 636-7200   FAX (914) 636-7705

# EXHIBIT "H"

☐ CORRECTED (if checked)

| PAYER'S name, street address, city, state, and ZIP code | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| CIMA GROUP, INC.<br>2 GANNETT DRIVE<br>WHITE PLAINS, NY 10604<br>(914) 694-6666 | $<br>2 Royalties<br>$ | **2003**<br>Form **1099-MISC** | |
| | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | Copy B<br>For Recipient |
| PAYER'S Federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | |
| RECIPIENT'S name<br>NICHOLAS  PASALIDES | 7 Nonemployee compensation<br>$    20000.00 | 8 Substitute payments in lieu of dividends or interest<br>$ | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Street address (including apt. no.)<br>18 HILLTOP ROAD | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| City, state, and ZIP code<br>KATONAH, NY 10536 | 11 | 12 | |
| Account number (optional) | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15 | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**    MV1099M-B          (Keep for your records.)          Department of the Treasury - Internal Revenue Service

**CIMA GROUP.**

2 GANNETT DRIVE • WHITE PLAINS • NEW YORK 10604

WESTCHESTER NY 105
PM
5 MAR
2004

**Michael D'Napoli**
**Band Rosenbaum Martin PC**
**26 Burling Lane**
**New Rochelle, NY 10801**

10801+1234

# EXHIBIT "I"

## Michael DiNapoli

**From:**    William Bujarski - CIMA Group [wbujarski@cima-ae.com]
**Sent:**    Friday, January 13, 2006 11:34 AM
**To:**    Michael DiNapoli
**Subject:** RE: RE CIMA LOAN

Mike,

Please resend this clarifying that it is the Pasalides Loan from CIMA.

Bill

**From:** Michael DiNapoli [mailto:MDiNapoli@brmcpa.com]
**Sent:** Thursday, August 11, 2005 10:06 AM
**To:** Bill Bujarski
**Subject:** RE CIMA LOAN


AMOUNT BORROWED AS FOLLOWS

| | |
|---|---|
| 07/31/2000 CK # 7019   TO ATTY JAMES MARSILO | $65,500.00 |
| WIRE TRANSFER  FROM CIMA BANK A/C  09/07/2000 | 350,000.00 |
| TOTAL | 415,500.00 |
| REPAYMENT NOV 2000 | ( 200,000.00 ) |
| REPAYMENT 12/31/2001 | ( 20,000.00 ) |
| REPAYMENT 12/31/2003 | ( 20,000.00 ) |
| LOAN BALANCE AT 1/1/2004 | 175,500.00 |

# EXHIBIT "J"

# CIMA Group ●

2 Gannett Drive – White Plains, New York 10604 -- Tel: (914) 694-6666 – Fax: (914) 694-4049

17 August 2005

Nicholas Pasalides
18 Hilltop Road
Katonah New York 10536

RE:    2000, CIMA Group to Pasalides Loan

Nick,

With your resignation from CIMA Group earlier this year, one matter remains unresolved. This is the loan CIMA Group extended to you for the purchase of your residence in 2000 in the amount of $415,500 with a current balance of $175,500 still due.

The summary is as follows:

| | | |
|---|---|---|
| 07-31-2000 | Check# 7018 to Atty James Marsilo | $ 65,500.00 |
| 09-07-2000 | Wire Transfer | 350,000.00 |
| | | ---------------- |
| Loan Total | | $415,000.00 |
| 11-2000 | Pasalides Repayment | $200,000.00 |
| 12-31-2001 | Repayment | 20,000.00 |
| 12-31-2003 | Repayment | 20,000.00 |
| | | ---------------- |
| Loan Balance (01-01-2004) | | $175,500.00 |

This amount has been confirmed with our accountants at Band Rosenbaum & Martin.

Please provide us with a schedule of repayment for our review and approval, so this matter can be resolved.

Thank you.

Sincerely,
CIMA Group

William C. Bujarski, AIA
President & CEO

Architects  -  Interior Designers  -  Engineers



# EXHIBIT "K"



# BAND ROSENBAUM & MARTIN P.C.
## CERTIFIED PUBLIC ACCOUNTANTS

Lawrence Martin, CPA
Scott D. Martin, CPA
Larry Holzberg, CPA
Hal B. Martin, CPA

Bernard Rosenbaum, CPA
(1930-1988)
Emile Band, CPA
(1921-1966)

January 16, 2006

To:     William Bujarski
From:   Michael DiNapoli

Re:     Loan to Nicholas Pasalides as reflected on the books and records of CIMA Group, Inc.

### FUNDS BORROWED AS FOLLOWS:

| | | |
|---|---|---:|
| 07/31/2000 CHECK #7019 TO ATTORNEY JAMES MARSILO | $ | 65,500.00 |
| WIRE TRANSFER FROM CIMA BANK A/C ON 09/07/2000 | | 350,000.00 |
| TOTAL PASALIDES LOAN | $ | 415,500.00 |

### LOAN REPAYMENTS:

| | | |
|---|---|---:|
| 11/2000 | $ | ( 200,000.00 ) |
| 12/31/2001 | | ( 20,000.00 ) |
| 12/31/2003 | | ( 20,000.00 ) |
| LOAN BALANCE AT 1/1/2004 | $ | 175,500.00* |

*NO ACTIVITY 2004 AND 2005

**Maryann Hoffman**

**From:** Maryann Hoffman
**Sent:** Monday, January 16, 2006 11:41 AM
**To:** 'wbujarski@cima-ae.com'



BAND ROSENBAUM & MARTIN P.C.
CERTIFIED PUBLIC ACCOUNTANTS

rtin, CPA
in, CPA
z, CPA
, CPA

nbaum, CPA

PA


January 16, 2006

To:    William Bujarski
From:  Michael DiNapoli

Re:    Loan to Nicholas Pasalides as reflected on the books and records of CIMA Group, Inc.

FUNDS BORROWED AS FOLLOWS:

07/31/2000 CHECK #7019 TO
    ATTORNEY JAMES MARSILO.................................................. $    65,500.00
WIRE TRANSFER FROM CIMA BANK
    A/C ON 09/07/2000............................................................       350,000.00

      TOTAL PASALIDES LOAN....................................... $   415,500.00

LOAN REPAYMENTS:

11/2000.............................................................................
12/31/2001........................................................................ $  ( 200,000.00 )
12/31/2003........................................................................      (  20,000.00 )
                                                        (  20,000.00 )

      LOAN BALANCE AT 1/1/2004.................................... $   175,500.00*

*NO ACTIVITY 2004 AND 2005

11/5/2007

# EXHIBIT "L"

NICHOLAS PASALIDES

something would come in, and then it would be another

three, four weeks or three, four paychecks, and just

kind of carried on like that.

    Q    So, by the time you left in February of

2005, were you owed money from Cima for salary?

    A    Yes.

    Q    How much?

    A    Off the top of my head, probably about

a $130,000.

    Q    Was any of that paid back?

    A    No.

    Q    It's still owed to you now?

    A    Yes.

    Q    Did there come a time that you borrowed

any money from Cima?

    A    I borrowed money from Mr. Bujarski, and

not from Cima.

        MR. GUROCK:  Please mark this.

        (Whereupon, Cima Group letter dated

8/17/05 was marked Pasalides Exhibit 3 for

identification, as of this date.)

    Q    Mr. Pasalides, I'm going to show you a

document we've marked as Pasalides 3 for

identification, which is a copy of a letter from Cima

NICHOLAS PASALIDES

Group, dated August 17, 2005 from Mr. Bujarski.  Have
you ever seen this before?

A        No, I have not seen it.

Q        In this document, Mr. Bujarski is
saying there is a loan balance as of January 1st of
2004 due, he says, to Cima, in the sum of $175,500.
That's not correct according to yourself; correct?

A        No.  You've asked me if I have seen
that, and the answer to that is I did not see that.

Q        I know that.  My question is the
number, $175,500 that Mr. Bujarski claimed you owed
to Cima; is that incorrect?

A        I do not owe Cima.  I owe Mr. Bujarski.

Q        Did you borrow money from Mr. Bujarski,
personally?

A        I borrowed monies from Mr. Bujarski,
where that monies came from, I do not know.

Q        Do you still owe Mr. Bujarski?

A        Yes, I do.

Q        How much do you owe him?

A        About $170,000, off the top of my head.

Q        Is there any documentation between the
two of you that evidences the loan?

A        No.  Not that I can recall.

23

NICHOLAS PASALIDES

1

2      Q      Was there initially money that was lent

3 to you, in order for you to purchase your residence?

4      A      Yes.

5      Q      And do you remember how much the

6 original amount that was loaned to you was?

7      A      Off the top of my head, I would like to

8 say, about $220,000, around there.

9      Q      It wasn't $415,500 to start?

10     A      $415,000 of which a hundred and

11 something thousand dollars was paid back.

12            It was a very short period of loan, of

13 which my second house was being sold.  The moment it

14 was sold, I gave Mr. Bujarski money.

15     Q      So at this time, it's your testimony,

16 you owe Mr. Bujarski personally approximately a

17 hundred and $170,000?

18     A      Right.

19     Q      When was the last time you made any

20 type of payment or repayment towards the amount due?

21     A      Probably in 2000 and -- I would say

22 2003 or 2004.  I'm not a hundred percent sure.

23     Q      According to what I have, you tell me

24 if this is correct or not; I have that you were

25 loaned initially about $415,000, that you repaid

24

NICHOLAS PASALIDES

1

2  $200,000 shortly after that.  You repaid $20,000 on

3  December 31st, 2001 and you repaid an additional

4  $20,000 on December 31st, 2003?

5      A      That could be right.  I can't remember

6  off the top of my head.

7      Q      Do you know someone by the name of Wael

8  Saleh?

9      A      Yes.

10     Q      Who is Wael Saleh?

11     A      He was an employee at Cima Group.

12     Q      What, if any, management responsibility

13  or oversite did you have, with respect to Mr. Saleh?

14     A      I had oversite with all the employees

15  at Cima Group.  Mr. Saleh was one of those employees.

16     Q      What did Mr. Saleh do for Cima?

17     A      He was a draftsman/project manager, if

18  you wish.

19     Q      Did you ever have any discussions with

20  Mr. Bujarski about doing work on the side, while you

21  were at Cima?

22     A      No.

23     Q      Do you know if Mr. Woods had any

24  agreement or had any discussions with Mr. Bujarski

25  about doing work on the side?

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 05-27041(ASH) |
| CIMA Group, Inc., | |
|         Debtor. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

        Plaintiff,

       - against -              Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

CIMA Group, Inc., Debtor, Debtor in Possession and Plaintiff herein ("CIMA" or "Plaintiff"), by and through its counsel, Kurtzman Matera, P.C., respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment on the Twentieth Cause of Action as set forth in the Complaint filed with the United States Bankruptcy Court on July 10, 2007, commenced for the purpose of recovering $175,500.00 from defendant, Nicholas Pasalides ("Pasalides"), the amount remaining from an original loan of $415,500.00 made via two transfers, the first on July 31, 2000 to attorney James Maisilo by check number 7018 in an amount of $65,500.00 and the second, a wire transfer of $350,000.00 made on September 7, 2000 to Pasalides from CIMA Bank of New York, utilizing account, No. 670 9092934, pursuant to Section 542(b) of the United States

Bankruptcy Code ("Bankruptcy Code").

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to its Statement of Undisputed Facts.  For ease of reference, the pertinent facts are set forth as follows:

1.    CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern District of New York.

2.    Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

3.    Pasalides was hired by CIMA in 1993.

4.    Pasalides was loaned $415,500.00 by CIMA.

5.    The funds were transferred to Pasalides as follows: (i) On July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Pasalides in an amount of $350,000.00.

6.    The wire transfer was from a CIMA account, number 670-9092934, maintained at the Bank of New York.

7.    The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00 deposited to CIMA account No. 670-9084826; (ii) on December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00.

8.    Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

9.    Demand has been made of Pasalides for repayment of the $175,500.00.

10.    No portion of the $175,500.00 has been repaid by Pasalides.

11.    On March 1, 2004, a letter was sent to William Bujarski and Pasalides stating that:

> Enclosed is a copy of Form 1099 issued by Cima Group to Nicholas Pasalides in the amount of $20,000.00.  As per your instructions, this Form 1099 was prepared by my office to reflect additional compensation that Nick received for 2003 of $20,000.00 in exchange for an equal reduction in the Promissory Note due to the Company

2

from Mr. Pasalides.

Please keep this for your records and acknowledge that you are in agreement with this treatment for the tax year ended December 31, 2003. Please forward, therefore, a copy of this letter, signed by you, and mail it back to my office. ("March 1, 2004 Letter")

12.    The March 1, 2004 Letter was signed and acknowledged by Pasalides and William Bujarski.

13.    At a Federal Rule of Bankruptcy Procedure 2004 examination, Pasalides testified that: (i) he "borrowed monies from Mr. Bujarski"; (ii) he did not know where the monies came from; and (iii) admitted to owing "[a]bout $170,000 off the top of the my head".

14.    In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 215, stating "Pasalides was loaned $415,500.00 by CIMA, admitted that he was advanced monies but stated that currently no monies are owed.

15.    In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 217 stating "[t]he funds [$415,500.00] were repaid in part, by Pasalides as follows: (i) In November, 2000, an amount of $200,000.00; (ii) On December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00", admitted that "he paid certain funds to CIMA".

16.    The funds were loaned to Pasalides to enable him to purchase his home at 18 Hilltop Road,  Katonah, New York 10536.

Pasalides, despite his convenient and contradictory misstatements, has by his own hand and sworn testimony acknowledged the loan, acknowledged a partial repayment and acknowledged an outstanding indebtedness.  The estate should not bear an unjust burden while Pasalides is enriched.

3

**ARGUMENT**

**FUNDS ARE DUE AND OWING FROM PASALIDES TO CIMA**

**I.     The Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, states that summary judgment should be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law of the action determines what facts are material. Golden Pacific Bancorp v. Federal Deposit Insurance Corporation, 375 F.3d 196, 200 (2d Cir. 2004). A "genuine issue" exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party". Id. "When the movant demonstrates through competent evidence that no material facts are genuinely in dispute, the non-movant must set forth specific facts showing that there is a genuine issue for trial." Western World Ins. Co. V. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted). See also Celotex Corp. V. Catrett, 477 U.S. 317, 323-325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be "viewed in the light most favorable to the party opposing the motion." Terminate Control Corp. V. Horowitz, 28 F.3d 1335, 1352 (2d Cir. 1994) (citations omitted). Furthermore, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). See generally In re Worldcom, Inc., 2006 WL 280797, 4 (Bankr. S.D.N.Y.).

**II.     Property of the Estate and Turnover**

The commencement of a case under Section 301, 302 or 303 creates an estate. The property comprising the estate is defined in Section 541(a). "Such estate is comprised of . . . all

legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a)(i); <u>Collier on Bankruptcy</u>, Fifteenth Edition Revised, Vol. 5, ¶54.04. Under Section 542(b), when property of the estate is a debt "matured, payable on demand, or payable on order", the entity owing such amount "shall pay such debt to . . . the trustee." <u>Id</u>. At ¶542.03; 11 U.S.C. §542(b); <u>See also In re Mid-Island Hospital</u>, 254 B.R. 71, 74 (E.D.N.Y. 2000) ("A turnover proceeding may be brought by the debtor or trustee to recover property of the estate that is being held by another").[1]

CIMA has demanded a turnover of monies owed to it by Pasalides.. Repayment should be no further delayed.

### CONCLUSION

The facts demonstrate the existence of a pre-petition obligation from Pasalides to CIMA in an amount of $175,500.00. The $175,500.00 represents monies due and owing on a $415,500.00 loan from CIMA to Pasalides. Given that Pasalides' conduct has been knowingly and intentionally wrongful, an award of attorneys' fees and costs is warranted.

Dated: Spring Valley, New York
     May 9, 2008

                                Kurtzman Matera, P.C.
                                Attorneys for Debtor, Debtor in Possession and Plaintiff
                                664 Chestnut Ridge Road
                                Spring Valley, NY  10977
                                (845) 352-8800

                  By     **/s/ Rosemarie E. Matera**
                            Rosemarie E. Matera (REM-0999)

---

[1] Pasalides has, in his Verified Answer and at a conference, raised the Statute of Frauds as a defense to repayment of the $175,500.00. CIMA reserves its right to respond to this argument if included in opposing papers.

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    Chapter 11
                                                          Case No. 05-27041(ASH)
CIMA Group, Inc.,

                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                              Plaintiff,

              - against -                                  Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                              Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Bankruptcy Rule 7056-1, CIMA Group, Inc., sets forth the following undisputed facts:[1]

1.     CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern District of New York.

2.     Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

3.     Pasalides was hired by CIMA in 1993.

4.     Pasalides was loaned $415,500.00 by CIMA.

_____

[1]   The terms herein shall have the meanings ascribed to them in the Memorandum of Law In Support of Motion For Partial Summary Judgment.

5.     The funds were transferred to Pasalides as follows: (i) On July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Pasalides in an amount of $350,000.00.

6.     The wire transfer was from a CIMA account, number 670-9092934, maintained at the Bank of New York.

7.     The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00 deposited to CIMA account No. 670-9084826; (ii) on December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00.

8.     Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

9.     Demand has been made of Pasalides for repayment of the $175,500.00.

10.     No portion of the $175,500.00 has been repaid by Pasalides.

11.     On March 1, 2004, a letter was sent to William Bujarski and Pasalides stating that:

> Enclosed is a copy of Form 1099 issued by Cima Group to Nicholas Pasalides in the amount of $20,000.00. As per your instructions, this Form 1099 was prepared by my office to reflect additional compensation that Nick received for 2003 of $20,000.00 in exchange for an equal reduction in the Promissory Note due to the Company from Mr. Pasalides.
>
> Please keep this for your records and acknowledge that you are in agreement with this treatment for the tax year ended December 31, 2003. Please forward, therefore, a copy of this letter, signed by you, and mail it back to my office. ("March 1, 2004 Letter")

12.     The March 1, 2004 Letter was signed and acknowledged by Pasalides and William Bujarski.

13.     At a Federal Rule of Bankruptcy Procedure 2004 examination, Pasalides testified that: (i) he "borrowed monies from Mr. Bujarski"; (ii) he did not know where the monies came from; and (iii) admitted to owing "[a]bout $170,000 off the top of the my head".

14.     In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 215, stating "Pasalides was loaned $415,500.00 by CIMA, admitted that he was

advanced monies but stated that currently no monies are owed.

15.    In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 217 stating "[t]he funds [$415,500.00] were repaid in part, by Pasalides as follows: (i) In November, 2000, an amount of $200,000.00; (ii) On December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00", admitted that "he paid certain funds to CIMA".

16.    The funds were loaned to Pasalides to enable him to purchase his home at 18 Hilltop Road,  Katonah, New York 10536.

Dated:  Spring Valley, New York
        May 9, 2008

Kurtzman Matera, P.C.
Attorneys for Debtor, Debtor in Possession and Plaintiff
664 Chestnut Ridge Road
Spring Valley, NY   10977
(845) 352-8800


By      /s/ Rosemarie E. Matera
        Rosemarie E. Matera (REM-0999)

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    Chapter 11
                                                          Case No. 05-27041(ASH)
CIMA Group, Inc.,
                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,
                              Plaintiff,

          - against -                                     Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                              Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Bankruptcy Rule 7056-1, CIMA Group, Inc., sets forth the following

undisputed facts:[1]

1.      CIMA filed a voluntary petition for relief under Chapter 11 of the United States

Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern

District of New York.

2.      Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

3.      Pasalides was hired by CIMA in 1993.

4.      Pasalides was loaned $415,500.00 by CIMA.

---

[1]   The terms herein shall have the meanings ascribed to them in the Memorandum of
Law In Support of Motion For Partial Summary Judgment.

5.    The funds were transferred to Pasalides as follows: (i) On July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Pasalides in an amount of $350,000.00.

6.    The wire transfer was from a CIMA account, number 670-9092934, maintained at the Bank of New York.

7.    The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00 deposited to CIMA account No. 670-9084826; (ii) on December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00.

8.    Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

9.    Demand has been made of Pasalides for repayment of the $175,500.00.

10.    No portion of the $175,500.00 has been repaid by Pasalides.

11.    On March 1, 2004, a letter was sent to William Bujarski and Pasalides stating that:

> Enclosed is a copy of Form 1099 issued by Cima Group to Nicholas Pasalides in the amount of $20,000.00.  As per your instructions, this Form 1099 was prepared by my office to reflect additional compensation that Nick received for 2003 of $20,000.00 in exchange for an equal reduction in the Promissory Note due to the Company from Mr. Pasalides.
>
> Please keep this for your records and acknowledge that you are in agreement with this treatment for the tax year ended December 31, 2003.  Please forward, therefore, a copy of this letter, signed by you, and mail it back to my office.  ("March 1, 2004 Letter")

12.    The March 1, 2004 Letter was signed and acknowledged by Pasalides and William Bujarski.

13.    At a Federal Rule of Bankruptcy Procedure 2004 examination, Pasalides testified that: (i) he "borrowed monies from Mr. Bujarski"; (ii) he did not know where the monies came from; and (iii) admitted to owing "[a]bout $170,000 off the top of the my head".

14.    In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 215, stating "Pasalides was loaned $415,500.00 by CIMA, admitted that he was

advanced monies but stated that currently no monies are owed.

15.     In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 217 stating "[t]he funds [$415,500.00] were repaid in part, by Pasalides as follows: (i) In November, 2000, an amount of $200,000.00; (ii) On December 31, 2001, an amount of $20,000.00; (iii) on December 31, 2003, an amount of $20,000.00", admitted that "he paid certain funds to CIMA".

16.     The funds were loaned to Pasalides to enable him to purchase his home at 18 Hilltop Road, Katonah, New York 10536.

Dated:  Spring Valley, New York
        May 9, 2008

> Kurtzman Matera, P.C.
> Attorneys for Debtor, Debtor in Possession and Plaintiff
> 664 Chestnut Ridge Road
> Spring Valley, NY   10977
> (845) 352-8800
>
> By     **/s/ Rosemarie E. Matera**
>        Rosemarie E. Matera (REM-0999)

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                    Chapter 11
                                                          Case No. 05-27041(ASH)
CIMA Group, Inc.,

                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


CIMA Group, Inc.,

                              Plaintiff,                  Adv. Pro. No. 07-08276(ASH)

              - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                              Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF MOTION FOR WITHDRAWAL OF THE REFERENCE**
**AND APPROVAL OF THE STIPULATION WITHDRAWING THE REFERENCE**


**PLEASE TAKE NOTICE** that CIMA Group, Inc., Debtor, Debtor in Possession and Plaintiff

in the above captioned adversary proceeding by and through its attorneys Kurtzman Matera, P.C.,

and based upon an Application and Stipulation Withdrawing the Reference on file with the Clerk

of the United States Bankruptcy Court, will move at the United States District Court, 300 Quarropas

Street, White Plains, New York 10601, on June 30, 2008 at 10:00 a.m. or as soon thereafter as

counsel can be heard, for an order pursuant to 28 U.S.C. §157(e) and Federal Rule of Bankruptcy

-1-

Procedure 9015(b) withdrawing the reference of Adversary Proceeding No. 07-08276(ASH), and

such other and further relief as this Court deems just and proper.

      **PLEASE TAKE FURTHER NOTICE** that responsive papers, if any, should be filed with the

Court and served upon and received by Kurtzman Matera, P.C., Attn: Rosemarie E. Matera, Esq.,

664 Chestnut Ridge Road, Spring Valley, New York 10977, no later Than June 23, 2008 and shall

conform with the Federal Rules of Bankruptcy Procedure.

Dated: Spring Valley, New York
      May 15, 2008

                            Kurtzman Matera, P.C.
                            Attorneys for Debtor, Debtor in Possession and Plaintiff
                            664 Chestnut Ridge Road
                            Spring Valley, NY   10977
                            (845) 352-8800

            By     **/s/ Rosemarie E. Matera**_____
                      Rosemarie E. Matera (REM-0999)

TO:

Stephen R. Lewis, Esq.
Stephens, Baroni, Reilly & Lewis, LLP
175 Main Street, Suite 800
White Plains, NY 10601

Jeffrey A. Reich, Esq.
Riech, Reich & Reich, PC
175 Main Street, Suite 300
White Plains, NY   10601

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                    Chapter 11
                                                          Case No. 05-27041(ASH)
CIMA Group, Inc.,

                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


CIMA Group, Inc.,

                              Plaintiff,                  Adv. Pro. No. 07-08276(ASH)

              - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                              Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### APPLICATION FOR WITHDRAWAL OF THE REFERENCE
### AND APPROVAL OF THE STIPULATION WITHDRAWING THE REFERENCE


CIMA Group, Inc., Debtor, Debtor in Possession and Plaintiff in the above captioned

adversary proceeding ("CIMA") by and through its attorneys Kurtzman Matera, P.C., respectfully

submits this Application for Withdrawal of the Reference and Approval of the Stipulation pursuant

to 28 U.S.C. §157(e) and Federal Rule of Bankruptcy Procedure 9015(b) and sets forth as follows:

        1.      CIMA filed a voluntary petition for relief under Chapter 11 of the United States

Bankruptcy Code ("Bankruptcy Code") on December 13, 2005.


-1-

2.    CIMA filed a complaint ("Complaint") against Nicholas Pasalides, Joseph Woods, Mark Velzy, Michiel Boender and Edgewater Design, Inc., Edgewater Group Architects a/k/a Edgewater Group (collectively "Defendants") on July 10, 2007, commencing Adversary Proceeding No. 07-08276.

3.    The Complaint alleges causes of action including, *inter alia*, equitable fraud and breach of covenant of good faith and fair dealing which arose in accordance with, and under the laws and practice of the State of New York ("New York Causes of Action").

4.    The New York Causes of Action are not core proceedings under 28 U.S.C. §157.

5.    In the answers ("Answers") filed by the Defendants, consent is not offered to a determination of the New York Causes of Action by the Bankruptcy Court.

6.    The Defendants have not, since the filing of their Answers, consented to a determination of the New York Causes of Action by the Bankruptcy Court.

7.    The Complaint also alleges a cause of action for turnover against defendant, Nicholas Pasalides ("Turnover Cause of Action").

8.    The Bankruptcy Court has agreed to retain jurisdiction to hear and decide any dispositive motions concerning the Turnover Cause of Action.  A motion for summary judgment on the Turnover Cause of Action is presently returnable before the Bankruptcy Court on June 26, 2008.

9.    The Bankruptcy Court set March 3, 2006 as the last day to file proofs of claim.

10.    The Defendants have not filed proofs of claim with the Clerk of the Bankruptcy Court.

11.    The Defendants timely demanded a jury trial in their Answers; and

12.    Pursuant to 28 U.S.C. §157(e), the right to a jury trial applies to the Complaint.

13.    28 U.S.C. §157(e) allows the bankruptcy judge to conduct a jury trial only "with the express consent of all the parties".

14.    In accordance with Federal Rule of Bankruptcy Procedure 9015(b), no statement of consent to having a jury trial conducted by the bankruptcy judge has been jointly or separately filed by the parties.

15.    A Stipulation and Order Withdrawing the Reference which incorporates each of the representations set forth herein has been executed by the parties and is annexed hereto as Exhibit "A".

**WHEREFORE,** it is respectfully requested that the Motion seeking a withdrawal of the reference be granted, the Stipulation be "so ordered" by this Court and such other and further relief be granted as is just and proper.

Dated: Spring Valley, New York
       May 15, 2008

               Kurtzman Matera, P.C.
               Attorneys for Debtor, Debtor in Possession and Plaintiff
               664 Chestnut Ridge Road
               Spring Valley, NY   10977
               (845) 352-8800

By      **/s/ Rosemarie E. Matera**
               Rosemarie E. Matera (REM-0999)

TO:

Stephen R. Lewis, Esq.
Stephens, Baroni, Reilly & Lewis, LLP
175 Main Street, Suite 800
White Plains, NY 10601

Jeffrey A. Reich, Esq.
Riech, Reich & Reich, PC
175 Main Street, Suite 300
White Plains, NY   10601

# EXHIBIT "A"

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                              Chapter 11
                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                            Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                            Plaintiff,

            - against -                             Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                            Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STIPULATION AND ORDER
## WITHDRAWING THE REFERENCE

This Stipulation and Order Withdrawing the Reference ("Stipulation") is made by and between CIMA Group, Inc. ("CIMA"), the debtor and debtor in possession herein and plaintiff in Adversary Proceeding No. 07-08276 ("Adversary Proceeding") by and through its attorney, Kurtzman Matera, P.C. and Nicholas Pasalides, Joseph Woods, Mark Velzy, Michiel Boender, Edgewater Design, Inc., and Edgewater Group Architects a/k/a Edgewater Group, defendants

-1-

(collectively "Defendants") in the Adversary Proceeding, by and through their attorneys, Reich, Reich & Reich, P.C. and Stephens, Baroni, Reilly & Lewis, LLP.

**WHEREAS**, CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") on December 13, 2005; and

**WHEREAS**, CIMA filed a complaint ("Complaint") against the Defendants on July 10, 2007, commencing the Adversary Proceeding; and

**WHEREAS**, the Complaint alleges causes of action including, *inter alia*, equitable fraud and breach of covenant of good faith and fair dealing which arose in accordance with, and under the laws and practice of the State of New York ("New York Causes of Action"); and

**WHEREAS**, the New York Causes of Action are not core proceedings under 28 U.S.C. §157; and

**WHEREAS**, in the answers ("Answers") filed by the Defendants, consent is not offered to a determination of the New York Causes of Action by the Bankruptcy Court; and

**WHEREAS**, the Defendants have not, since the filing of their Answers, consented to a determination of the New York Causes of Action by the Bankruptcy Court; and

**WHEREAS**, the Complaint also alleges a cause of action for turnover against defendant, Nicholas Pasalides ("Turnover Cause of Action"); and

**WHEREAS**, the Bankruptcy Court will retain jurisdiction to hear and decide any dispositive motions concerning the Turnover Cause of Action; and

**WHEREAS**, the Bankruptcy Court set March 3, 2006 as the last day to file proofs of claim; and

**WHEREAS**, the Defendants have not filed proofs of claim with the Clerk of the Bankruptcy Court; and

**WHEREAS**, the Defendants timely demanded a jury trial in their Answers; and

-2-

**WHEREAS**, pursuant to 28 U.S.C. §157(e), the right to a jury trial applies to the Complaint; and

**WHEREAS**, 28 U.S.C. §157(e) allows the bankruptcy judge to conduct a jury trial only "with the express consent of all the parties"; and

**WHEREAS**, in accordance with Federal Rule of Bankruptcy Procedure 9015(b), no statement of consent to having a jury trial conducted by the bankruptcy judge has been jointly or separately filed by the parties.

**NOW, THEREFORE**, in consideration of the premises herein, the parties hereby stipulate and agree as follows:

1.    The reference as it concerns the Adversary Proceeding be and the same hereby is withdrawn.

2.    The Bankruptcy Court will retain jurisdiction to hear and decide dispositive motions concerning the Turnover Cause of Action.

3.    The Clerk of the Bankruptcy Court shall convey the record of the Adversary Proceeding to the Clerk of the United States District Court.

4.    A notation shall be placed on the docket of the Adversary Proceeding, as such record is maintained by the Clerk of the Bankruptcy Court, indicating that the reference has been withdrawn.

Dated: Spring Valley, New York
April _28_, 2008

Rosemarie E. Matera
Kurtzman Matera, P.C.
Attorneys for Debtor and Plaintiff
664 Chestnut Ridge Road
Spring Valley, New York 10977
(845) 352-8800

-3-

Dated: White Plains, New York
     April _93_ , 2008

                                 Jeffrey Reich, Esq.
                                 Reich, Reich & Reich, P.C.
                                 Attorneys for Defendants
                                 175 Main Street, Suite 300
                                 White Plains, New York 10601

Dated: White Plains, New York
     April _2 3_ , 2008

                                 Stephen R. Lewis, Esq.
                                 Stephens, Baroni, Reilly & Lewis, LLP
                                 Attorneys for Defendants
                                 175 Main Street, Suite 800
                                 White Plains, New York 10601

Dated: White Plains, New York
     April _____, 2008

                                   _____
                                 United States Bankruptcy Judge

Dated: White Plains, New York
     April _____, 2008

                                   _____
                                 United States District Court Judge

-4-

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    Chapter 11
                                                          Case No. 05-27041(ASH)
CIMA Group, Inc.,

                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CIMA Group, Inc.,

                              Plaintiff,

              - against -                                  Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,


                              Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF SERVICE

State of New York          )
County of Rockland         )ss

        **Sherry Kramer**, being duly sworn, deposes and says:

        1.      I am over 18 years of age and am not a party to this action and I reside at
Pomona, New York.

        2.      On May 15, 2008, I served a true copy of the **Notice of Motion for Withdrawal of the Reference
and Approval of the Stipulation Withdrawing the Reference** by depositing the same via
First Class Mail in a sealed envelope with postage prepaid thereon, in a post-office or official depository of the
U.S. Postal Service within the State of New York, addressed to:

| | | |
|---|---|---|
| Jeffrey A. Reich, Esq. | Stephen R. Lewis, Esq. | Office of U.S. Trustee |
| Reich, Reich & Reich, PC | Stephens, Baroni, Reilly & Lewis, LLP | 33 Whitehall Street |
| 175 Main Street, Suite 300 | 175 Main Street, Suite 800 | New York, NY 10004 |
| White Plains, NY 10601 | White Plains, NY   10601 | |

                                               ___/s/ **Sherry Kramer**_____
                                               Sherry Kramer

Sworn to before me this
15th day of May, 2008

    __/s/ **Donna B. Paz**_____
Notary Public

Donna B. Paz
Notary Public, State of New York
No. 01PA5066620
Qualified in Rockland County
Commission Expires September 30, 2010

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants
175 Main Street, Suite 300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants
175 Main Street, Suite 800
White Plains, New York 10601
(914) 683-5185
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

CIMA Group, Inc.,

                                    Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CIMA Group, Inc.,

                                    Plaintiff,

                - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                                    Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11
Case No. 05-27041(ASH)

Adv. Proc. No.
07-08276(ASH)

## MEMORANDUM OF LAW IN OPPOSITION
## TO MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

The Debtor in possession CIMA Group, Inc. ("CIMA"), by its President and sole shareholder, William J. Bujarski ("Burjarski") brought this adversary proceeding as against the named Defendants seeking monetary damages for a host of New York State based causes of action, which the Debtor/Plaintiff acknowledges are not core proceedings under 28 U.S.C. §157. CIMA, by its counsel, has moved this Court to withdraw the reference and approve the Stipulation signed on behalf of the parties with the further understanding that the Bankruptcy Court would retain jurisdiction to hear and decide dispositive motions concerning the Plaintiff's Twentieth Cause of Action, the so called "Turnover" cause of action. The Plaintiff now moves the Court for summary judgment as to that cause of action.

### Statement of Facts

Nicholas Pasalides ("Pasalides") was hired by Bujarski in 1993. Despite the fact that Bujarski had other interests, including his work as a police officer and detective for the Cold Springs Police Department, CIMA, P.C. and CIMA were successful enterprises for years. Bujarski and Pasalides formed a close working relationship. When Pasalides needed monies in the year 2000 to cover a potential bridge loan regarding the purchase and sale of his home, Bujarski agreed to provide him the money. Pasalides believes there was no written agreement, the terms of repayment were never memorialized or agreed upon. Bujarski lent the money to Pasalides through CIMA. By the end of the year 2000, Pasalides had repaid Bujarski $200,000, and at his direction, those monies were deposited into a CIMA account of which Bujarski was 100% shareholder. In 2001 and 2003, an additional $20,000 (total $40,000) was credited back to Bujarski in lieu of compensation to Pasalides from CIMA.

As the attached Affidavit of Pasalides further attests, the loan was between William Bujarski and Nicholas Pasalides. (See Pasalides, Affidavit dated June 6, 2008 attached hereto as Exhibit A).

At his Federal Rules of Bankruptcy §2004 deposition held on January 29, 2007, Pasalides testified as to the circumstances of the loan:

> Q. Did there come a time that you borrowed any money from Cima?
>
> A. I borrowed money from Mr. Bujarski, and not from Cima.
>
> MR. GUROCK: Please mark this.
> (Whereupon, Cima Group letter dated 8/17/05 was marked Pasalides Exhibit 3 for identification, as of this date.)
>
> Q. Mr. Pasalides, I'm going to show you a document we've marked as Pasalides 3 for identification, which is a copy of a letter from Cima Group, dated August 17, 2005 from Mr. Bujarski. Have you ever seen this before?
>
> A. No, I have not seen it.
>
> Q. In this document, Mr. Bujarski is saying there is a loan balance as of January 1st of 2004 due, he says, to Cima, in the sum of $175,500. That's not correct according to yourself; correct?
>
> A. No. You've asked me if I have seen that, and the answer to that is I did not see that.
>
> Q. I know that. My question is the number, $175,500 that Mr. Bujarski claimed you owed to Cima; is that incorrect?
>
> A. I do not owe Cima. I owe Mr. Bujarski.
>
> Q. Did you borrow money from Mr. Bujarski, personally?
>
> A. I borrowed monies from Mr. Bujarski, where that monies came from, I do not know.
>
> Q. Do you still owe Mr. Bujarski?
>
> A. Yes, I do.
>
> Q. How much do you owe him?

A. About $170,000, off the top of my head.

Q. Is there any documentation between the two of you that evidences the loan?

A. No. Not that I can recall.

Q. Was there initially money that was lent to you, in order for you to purchase your residence?

A. Yes.

Q. And do you remember how much the original amount that was loaned to you was?

A. Off the top of my head, I would like to say, about $220,000, around there.

Q. It wasn't $415,500 to start?

A. $415,000 of which a hundred and something thousand dollars was paid back. It was a very short period of loan, of which my second house was being sold. The moment it was sold, I gave Mr. Bujarski money.

Q. So at this time, it's your testimony, you owe Mr. Bujarski personally approximately a hundred and $170,000?

A. Right.

Q. When was the last time you made any type of payment or repayment towards the amount due?

A. Probably in 2000 and - - I would say 2003 or 2004. I'm not a hundred percent sure.

Q. According to what I have, you tell me if this is correct or not; I have that you were loaned initially about $415,000, that you repaid $200,000 shortly after that. You repaid $20,000 on December 31st, 2001 and you repaid an additional $20,000 on December 31st, 2003?

A. That could be right. I can't remember off the top of my head.

(See deposition of Nicholas Pasalides, p. 21 line 15 through p. 24 line 6, pertinent pages of the

deposition attached hereto as Exhibit B)

## The Plaintiff's Motion and Its Submitted Statement of Uncontested Facts

In the Plaintiff's motion (Memorandum of Law p. 2) CIMA sets forth its Statement of Facts[1] and states:

> "Plaintiff respectfully refers the Court to its Statement of Undisputed Facts. For ease of reference, the pertinent facts are set forth as follows:
>
> 4. Pasalides was loaned $415,500 by CIMA
>
> ...
>
> 8. Pasalides owes $175,000 of the loaned amount of $415,500
>
> 9. Demand has been made of Pasalides for repayment of $175,500
>
> 10. No portion of the $175,500 has been repaid by Pasalides
>
> ..."

This factual recitation is at best misleading to the Court as those factual assertions were not part of the Statement of Undisputed Facts set forth in the Joint Pre-Trial Order and are not undisputed facts. Rather, they were factual assertions set forth and designated as "Plaintiff's Contentions of Facts". (See Pre-Trial Order, p. 2, ¶¶ 137, 139, 140, 141, pertinent pages of the Joint Pre-Trial Order are attached hereto as Exhibit C).

Similarly in its Statement of Facts outlined in its Memorandum of Law, the Plaintiff states at paragraph 14:

> In his Verified Answer, Pasalides, in response to the allegation in the Complaint numbered 215, stating "Pasalides was loaned $415,000 by CIMA, admitted that he was advanced monies but stated that currently no monies are owed, (Plaintiff's Memorandum of Law in support of summary judgment motion, p. 3).

---

[1] Pursuant to Local Rules of the Bankruptcy Court, Plaintiff's counsel submits to this Court a Statement of Undisputed Facts and represents that these are "undisputed facts". They are not. See paragraphs 4, 8, 9 and 10. These are contested facts, listed at paragraphs 137, 139, 140 and 141 of the Joint Pre-trial Order designated not as undisputed facts, but Plaintiff's version of the facts. See pertinent pages of the Joint Pre-trial Order attached hereto as Exhibit C.

In paragraph 10 of his Verified Answer, Nicholas Pasalides stated:

> 10. As to the allegation of the paragraph in the Complaint numbered 215, denies the allegations of said paragraph as stated except admits that he was advanced monies but that currently no monies are owed. (See Exhibit B attached to Plaintiff's Motion for Summary Judgment).

At page 3 of the Plaintiff's Memorandum of Law, it states at paragraph 15, that Pasalides in responding to the Complaint, paragraph 217, in his Verified Answer admitted "he paid certain funds to CIMA". This is only partially accurate. In actuality, at paragraph 11 of his Verified Answer, the Defendant stated in response to the allegations:

> 11. As to the allegations of the paragraph in the Complaint numbered 217, [he] admits that he paid certain funds to CIMA but denies knowledge of information as to the remaining allegations as stated... (See Exhibit B attached to Plaintiff's Motion for Summary Judgment.)

## ARGUMENT

### POINT I

### STANDARD OF REVIEW FOR SUMMARY JUDGMENT

The standard of review on a motion for summary judgment is well established. Summary judgment is appropriate where the movant proves that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law ." Fed. R.Civ.P.56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510 (1986). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. Id. at 248, 106 S.Ct. at 2510. Similarly, a factual dispute is only material if, under controlling substantive law, it would affect the outcome of the suit. Id. at 248, 106 S.Ct.2510.

Once the moving party has carried its burden, the party opposing summary judgment must show more than "some metaphysical doubt as to the material facts." Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations of its pleadings. Celotex Corp. v. Catrett, 477 U.S. 319, 321, 106 S.Ct. 2548, 2552 (1986).

It is well settled under New York State law that a motion for summary judgment may only be granted if, upon all the papers and proofs submitted, a cause of action or affirmative defense is sufficiently established to warrant the court, as a matter of law, to direct judgment in favor of the moving party. See Zuckerman v. City of New York, 49 N.Y.2d 557, 404 N.E.2d 718, 427 N.Y.S.2d 595 (1980). The "drastic remedy" of summary judgment should not be granted where there is any doubt as to the existence of factual issues. See Glick & Dolleck, Inc. v. Tri-Pac Export Corp., 22 N.Y.2d 439, 441, 239 N.E.2d 725, 726, 293 N.Y.S.2d 93, 94 (1968), Sillman v. 20th Century Fox Film Corp., 3 N.Y.2d 395, 404, 144 N.E.2d 387, 392, 165 N.Y.S.2d 498, 505 (1957). As the New York Appellate Division, Second Department has held, "[s]ummary judgment is a drastic remedy which should not be granted where, ..., there is any doubt as to the existence of triable issues of facts." Midland Mortgage Corp. v. 52nd Street Owners Corp., 106 A.D.2d 376, 482 N.Y.S.2d 507 (2d Dept. 1984).

Moreover, it is not proper for a Court to grant a motion for summary judgment where the parties present disputed versions of the facts such that a finder of fact could reasonably resolve a point in favor of the opposing party and the alleged fact constitutes a meritorious claim or a disputed fact. See Nassau Trust Co. v. Montrose Concrete Products Corp., 56 N.Y.2d 175, 436 N.E.2d 1265, 451 N.Y.S.2d 663 (1982), EBC Amro Asset Mgmt. Ltd. v. Kaiser, 256 A.D.2d 161, 681 N.Y.S.2d 539, 540  (1st Dept. 1998).  It has repeatedly been held that on a motion for

summary judgment the role of the Court is limited to searching the record for triable issues of fact, and not resolving them. See <u>Freeman Lumber Co. v. AC Dutton Lumber Corp.</u>, 220 A.D.2d 641, 632 N.Y.S.2d 965, 966 (2d Dept. 1995).

On a motion for summary judgment the Court should accept as true the evidence submitted by the non-moving party and must view the evidence presented in the light most favorable to the party opposing the motion. <u>Lemonda v. Sutton</u>, 268 A.D.2d 383, 384, 702 N.Y.S.2d 275, 276 (1st Dept. 2000), <u>Henderson v. New York</u>, 178 A.D.2d 129, 576 N.Y.S.2d 562, 564 (1st Dept. 1991), <u>Weiss v. Garfield</u>, 21 A.D.2d 156,158, 249 N.Y.S.2d 458, 461 (3d Dept. 1964) [the Court must accept as true the non-movant's evidence and any evidence presented by the movant which is favorable to the party opposing the motion]. Accordingly, a party opposing summary judgment will defeat the motion by demonstrating a factual issue requiring resolution at trial. See <u>Sommer v. Federal Signal Corp.</u>, 79 N.Y.2d 540, 593 N.E.2d 1365, 1371, 583 N.Y.S.2d 957, 963 (1992) [where different conclusions can reasonably be drawn from the facts, the motion should be denied.], <u>Federal Ins. Co. v. Automatic Burglar Alarm Corp.</u>, 208 A.D.2d 495, 555, 617 N.Y.S.2d 53 (2d Dept. 1994) [non-moving party's allegations regarding facts were sufficient to raise issues of fact sufficient to overcome the motion for summary judgment.].

**POINT II**

**<u>THE FACTUAL ISSUES</u>**

Despite CIMA's wrongful inclusion in their Statement of Uncontroverted Facts, that: (¶ 4) "Pasalides was loaned $415,000 by CIMA", that fact is controverted and has never been admitted by Pasalides. In his Verified Answer, at paragraph 10 in response to that same allegation in the Complaint at paragraph 215, it was denied. (See Exhibits A and B attached to Plaintiff's summary judgment motion, Verified Complaint and Verified Answer.)

In his Federal Bankruptcy Rule Section 2004 deposition, Pasalides pointedly clarified that issue and gave testimony that the monies that were borrowed were between himself and William Bujarski. He repeatedly told the examiner, "I borrowed money from Mr. Bujarski and not from CIMA"; "I do not owe CIMA. I owe Bujarski"; "I borrowed monies from Mr. Bujarski..." See Deposition of Nicholas Pasalides, p. 21 line 15 through p. 24 line 6 (pertinent pages of the deposition attached hereto as Exhibit B).

In the negotiated Joint Pre-Trial Order, the factual contention that "Pasalides was loaned $415,000 by CIMA" was not set forth as an undisputed fact. This is demonstrated in that the assertion is included in the Plaintiff's contention of facts. (See pertinent pages of the Joint Pre-Trial Order attached hereto as Exhibit C.)

In his Affidavit dated June 6, 2008 submitted in opposition to the application for summary judgment, Pasalides again avers that the loan is and always was between Bujarski and Pasalides personally. (See Pasalides June 8, 2008 Affidavit attached hereto as Exhibit A, ¶¶ 2 and 12.)

While it is true that monies to finance the loan were paid through CIMA, the company which William Bujarski solely owned and controlled, and that Pasalides' repayment in 2000 was deposited to CIMA, it was at the direction of Bujarski to deposit it back into the CIMA accounts. (Pasalides Affidavit attached hereto as Exhibit A, ¶ 4.)

The fact that repayment was deposited in CIMA accounts does not resolve the factual controversy in favor of the Plaintiff. As this Court has already seen, William Bujarski utilized CIMA funds in ways that would benefit him personally. Nothing is clearer in that regard than his initial listing in the Bankruptcy Petition of numerous employees having "accounts receivable" to CIMA designated as loans, which by his own admission were in lieu of salary.

When this Court confronted Bujarski initially with this fact, the Petition was amended, but although he has represented to the Court that amended W-2s were prepared and issued, no

signed and dated W-2s have ever been received by Pasalides or the other Defendant employees

of CIMA. (See Pasalides Affidavit attached hereto as Exhibit A at ¶ 11.)

At his pre-trial deposition held on February 13, 2008, Mr. Bujarski stated the following:

> Q. I'd like to direct your attention to page three of the continuation sheet, Schedule B, the personal property listed on the Bankruptcy Petition. Do you see paragraph 16 where it say, "Account receivable?"
>
> A. I see it.
>
> Q. Do you see where it lists Nicholas Pasalides as $201,095.60 in Accounts Receivable?
>
> A. I see that.
>
> Q. And below that, Mark Velzy, $42,328.56.
>
> A. I see that.
>
> Q. And Joe Woods, $29,303.64.
>
> A. I see that also.
>
> Q. What are the Accounts Receivable that you reference for Joe Woods in that amount? What is that?
>
> A. To my recollection, that was money that was loaned Joe Woods which turned out to be in lieu of salary.
>
> Q. Which turned out to be (sic) lieu of salary?
>
> A. Yes.
>
> Q. How did that turn out to be in lieu of salary.
>
> A. Because originally the checks were issued as loans to help them while we were having financial issues. They were issued as loans and the same for all three. They were reported as income and their W 2's were amended and sent to them.
>
> Q. Who issued the checks?
>
> A. CIMA Inc. originally.
>
> Q. Who authorized the checks?

A. Who authorized them?

Q. Yes.

A. I did.

(See deposition of William Bujarski, p. 63 line 25 through p. 65 line 9, pertinent pages of the

deposition attached hereto as Exhibit D); and

Q. When you say, "Money in lieu of salary," a loan in lieu of salary?

A. Right. Mr. Woods, Mr. Velzy and Mr. Pasalides, at the time some money was provided them, and I don't remember how the accounting was done, to assist them in the fact they weren't necessarily taking a paycheck at a given time.

Q. Well, did you write the check?

A. I don't know if I wrote the check. I, more than likely, signed the check.

Q. Did you put it down in the check portion memo as a loan?

A. I believe so.

Q. When you did that, what was your purpose in writing the word loan on the check?

A. Because we could not pay them their full salary that week.

Q. So, in fact, the loan was really for compensation for the work they had performed?

A. Right, and that was amended thereafter.

Q. When you say, "Right, and that was amended thereafter," when was it amended thereafter?

A. Spring of 2006. I believe it was the Spring of 2006. A new W 2 was issued to reflect those as income rather than a loan.

Q. To whom was the W 2 issued in the spring of 2006?

A. Each of the individuals.

Q. How was it issued to them?

A. As a W 2.

(See deposition of William Bujarski, p. 66 line 12 through p.67 line 17, pertinent pages of the

deposition attached hereto as Exhibit D.)

Q. You said in the spring of 2006 new W 2's were issued. Who issued those W 2's?

A. To be best of my recollection it was the accounting firm.

Q. Where would they have been sent?

A. Again, to the best of my knowledge, it was sent to three individuals.

Q. If the three individuals didn't receive them would you have any understanding or explanation as to why?

A. No, I would have no knowledge. My understanding was it was amended and that it was reflected as income rather than a loan.

Q. But your Tax Return wasn't amended because you didn't file; correct?

(See deposition of William Bujarski, p. 70 lines 1 through 15, pertinent page of the

deposition attached hereto as Exhibit D.)

Q. So, after you listed this as an Account Receivable, a loan payable by Mr. Velzy, a determination was made by you that in actuality it's income and a W 2 has it be (sic) amended and issued to Mr. Velzy.

A. And that's what was done, correct.

Q. Do you know of your own knowledge, as you sit her (sic) today, whether or not Mr. Velzy was mailed another W 2?

A. To the best of my knowledge, I was under the belief that he was.

Q. When you say, "To the best of my knowledge, I was under the belief that he was," what do you mean? What sources of information - -

A. To the best of my recollection, I saw W 2's that were subsequently issued with their names on it.

Q. Were those W 2's provided by your accountant to you?

A. Copies were.

Q. And did you send those to Mr. Velzy, Mr. Woods or Mr. Pasalides?

A. No, I did not.

Q. Do you know of your own knowledge, whether or not your accountant ever sent them?

A. Specifically, no, I do not.

Q. Did you ever make inquiries, say to your account, Joe or Tom, are you sending these to Mr. Velzy, Mr. Woods and Mr. Pasalides?

A. I don't believe I asked him specifically, no.

Q. So, as you sit here now, you have no way of knowing for certain whether or not those W 2's have ever been sent to those individuals?

A. Absolute certainty, no, I do not.

Q. And the income that was earned by these folks back then was income that should have been paid by CIMA Group; is that correct?

A. That's correct.

Q. And CIMA Group has also a responsibility for it's employees to pay taxes?

A. That's correct.

Q. And were the taxes on this income paid by CIMA Group at the time that you were writing these checks?

A. I do not know. On these when it was a loan?

(See deposition of William Bujarski, p. 74 line 3 through p.75 line 24, pertinent pages of the deposition attached hereto as Exhibit D.)

Despite this Court's directive to do so, Bujarski has failed to produce his personal income tax returns, copies of the signed and dated, amended W-2s reflecting that they have been distributed to the employees, and the appropriate federal tax filings for CIMA and CIMA P.C. for the years 2005, 2006 and 2007. This coupled with his manipulation of CIMA funds for his own personal benefit, supports the Defendant Pasalides' position that any loan is owed to Bujarski.

In the letter exhibit (Exhibit G attached to Plaintiff's motion), there is reference of CIMA retaining $20,000 of earned incomes to satisfy a "Promissory Note". As the June 6th Affidavit of Nicholas Pasalides asserts, if that Promissory Note were to be produced, it would be between Nicholas Pasalides and William Bujarski, not CIMA Group. (See Exhibit A attached hereto, Pasalides Affidavit, ¶ 9.) No Promissory Note between CIMA Group and Nicholas Pasalides has ever been produced as part of the production requests in this case.

Furthermore, the terms of the repayment of the loan are controverted. Although Nicholas Pasalides indicated those terms were never defined or specifically delineated, and that Bujarski informed him that the loan in Bujarski's discretion could be forgiven, Bujarski in his deposition testimony given on March 12, 2008 indicated that there was specific agreement of a repayment schedule over a ten year period.

> Q. What year was it that Nick Pasalides came in and spoke to you?
>
> A. Again, to the best of my recollection, it would have been somewhere around the spring of 2000.
>
> Q. And what did he say to you? What specific conversation did he say to you regarding those monies?
>
> A. He was in the process of acquiring a residence and he had a shortfall from his - - I believe it was from the ability to sell his existing house, and also a general shortfall of cash.
>
> Q. Is that called a bridge loan? Did you ever hear that expression?
>
> A. I guess so. I'm not a financial person.

(See deposition transcript of William Bujarski, p. 376 line 22 through p. 377 line 16, pertinent

pages of the deposition, attached hereto as Exhibit E.)

Q. Now, you list here a repayment on 12/31/2001. What was the circumstances of that repayment?

A. Mr. Pasalides repaid the loan to the tune of $20,000 dollars a year as part of his profit sharing.

Q. Was this something that you had discussed with him?

A. Yes.

Q. When did the discussion occur?

A. Initially when he had requested the money.

Q. What was the discussion?  Tell me exactly what was said.

A. The discussion was that he would repay it from his profits of the company, okay, based upon the annual profit, 20,000 dollars a year.

Q. Well, was the 200,000 dollars profits?

A. No. The 200,000 dollars, to my knowledge, was money he had received from the sale of his original home.
…

Q. Was there any written agreement between you and Mr. Pasalides?

A. We commenced an agreement, but we never formalized it.

Q. So there was no written agreement?

A. No, purely verbal.

Q. And was your understanding that the repayment of these monies would take more than one year?

A. My understanding was that it would take multiple years.

Q. And it was never reduced to writing?

A. No, it was not.

(See deposition transcript of William Bujarski, p. 380 line 12 through 381 line 8, and p. 381 line 19

through p. 382 line 7, pertinent pages of the deposition, attached hereto as Exhibit E attached

hereto.)

> Q. Did you ever discuss with Mr. Pasalides what would happen if he didn't have the money?
>
> A. While in my employment, while he was employed with me - -
>
> Q. No, I'm talking about in 2000.
>
> A. I'm saying during the employment, we said that we would defer it to another year while he was employed by us. And if we had to extend it, we would extend it.
>
> Q. When you say we, who else was speaking besides you?
>
> A. Myself and Mr. Pasalides.
>
> Q. Okay. Only you were saying that, because Mr. Pasalides wouldn't be talking as far as - - withdrawn.
> What did you say to Mr. Pasalides about these monies, if in fact they weren't available?
>
> A. We had a discussion. It was based on a projection of approximately ten years. And what we said was that if we came to a year while he was employed by CIMA we would hold it over to the next year and compensate it. It would be compensated in the following year from the profits.
>
> Q. And was there any discussion about if Mr. Pasalides wasn't employed by CIMA?
>
> A. No, it was always reflected on his employment.
>
> Q. Any other discussions that you remember regarding the terms or conditions of repayment?
>
> A. Well, basically it was due and we would work within the company to have it repaid.
>
> Q. Other than that conversation that you had in 2000?
>
> A. Not that I can recall.

Q. Did you ever discuss forgiveness of these monies?

A. No.

(See deposition transcript of William Bujarski, p. 383 line 24 through p. 385 line 12, pertinent pages of the deposition, attached hereto as Exhibit E.)

## CONCLUSION

The facts of this case demonstrate a genuine and material issue as to whether these monies are owed to CIMA or William Bujarski. Furthermore, the Defendant has raised as an affirmative defense that he is entitled to setoff of any monies that are the subject of a judgment against him on this Turnover issue in light of his claim for unpaid salaries.

As such, it is respectfully submitted that this motion for summary judgment should be denied, and that this matter should be tried by the District Court along with the other Causes of Action set forth in this adversary proceeding.

Dated: White Plains, New York
June 6, 2008

Respectfully submitted,

STEPHENS, BARONI, REILLY
& LEWIS, LLP

By: _____
STEPHEN R. LEWIS, ESQ. (SL-3132)

REICH, REICH & REICH, P.C.

By: _____
JEFFREY A. RIECH, ESQ. (JR-7535)

# LIST OF EXHIBITS

**EXHIBIT A -** AFFIDAVIT OF NICHOLAS PASALIDES

**EXHIBIT B -** DEPOSITION TRANSCRIPT PAGES OF
NICHOLAS PASALIDES DATED 1/22/2007

**EXHIBIT C -** JOINT PRE-TRIAL ORDER (PERTINENT PAGES)

**EXHIBIT D -** DEPOSITION TRANSCRIPT PAGES OF
WILLIAM BUJARSKI DATED 2/13/2008

**EXHIBIT E -** DEPOSITION TRANSCRIPT PAGES OF
WILLIAM BUJARSKI DATED 3/12/2008

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

|  |  |
|---|---|
| CIMA Group, Inc., | Chapter 11<br>Case No. 05-27041(ASH) |

Debtor.
--------------------------------------------------------X
CIMA Group, Inc.

Plaintiff,

-against-

Adv. Proc. No.
07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

Defendants.
--------------------------------------------------------X

### AFFIDAVIT OF NICHOLAS PASALIDES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

STATE OF NEW YORK     }
                                         } SS:
COUNTY OF WESTCHESTER}

Nicholas Pasalides being duly sworn under the penalties of perjury states the following:

1

1.)     I make this submission in support of my attorney's memorandum of law in opposition to the plaintiff's motion for summary judgment against me ("Motion").   I have personal knowledge of the facts surrounding this matter.

2.)     I borrowed the funds that are the subject of the Motion from William Bujarski, personally (hereinafter referred to as "Bill" or "Bujarski").   Bill and I were good friends and he knew that in or about the summer of 2000 I was in the process of buying a new home.   I told him that my wife and I were having difficulty selling our home and that I would be unable to close on the purchase of my new house prior to our receipt of the sale proceeds from the sale of my old house.   My friend, Bill, offered to loan me $415,000.00 to enable me to close title on my new house.   I told him that I could pay him $200,000.00 when I closed on my old home.

3.)     I closed title on my old home and paid the $200,000.00 I had promised I would pay Bill in or about November, 2000.

4.)     At his direction these monies were deposited into a CIMA account.

5.)     I do not recall ever having executed a promissory note or any other writing memorializing the loan.

6.)     The only communication I had with Bill from my receipt of the monies through 2004, as to the balance I owed to him, was that he said I could pay it from my bonuses at CIMA and that he may forgive it entirely.   This substantially differs from his testimony as to terms of repayment (see paragraph "10" of this affidavit).

7.)     At some point Bill asked me if I would be interested in offsetting my loan to him by a portion of my employment bonus.   He explained to me that I would not have any personal tax consequences from the offset and therefore it was in my interest to agree to the transaction. My accountant at that time, Michael DiNapoli, C.P.A., was also the accountant for CIMA Group,

2

Inc. and, upon information and belief, for Bujarski, personally.  I do not know much about accounting but said I was agreeable especially if the offset would be advantageous to me tax wise.  These transactions apparently were done on December 31, 2001 and December 31, 2003. The irony is that I now see that contrary to what I was told, I paid taxes on the $20,000.00.

8.)    I do not remember ever being issued the "1099-MISC" annexed to the Motion as Exhibit G but I have checked my 2003 tax return and the $20,000.00 (which I never received) was declared as income on my return.

9.)    I do not remember signing or reading the letter annexed to the motion for summary judgment as Exhibit G.  However, I do acknowledge that it bears my signature.  The letter refers to a "Promissory Note due to the Company from Mr. Pasalides."  I am unaware of any such document.   If there is any document evidencing the loan it would be a promissory note from William Bujarski to Nicholas Pasalides not from CIMA.

10.)    As to the letter dated August 17, 2005 annexed to Plaintiff's Motion as Exhibit J, I do not recall ever receiving it.  The letter states "please provide us with a schedule of repayment for our review and approval, so this matter can be resolved."  This letter at least substantiates my understanding with Bill that the funds due him would be paid over a period of time and not "on demand."  Bill's testimony at his deposition materially differs from my understanding of an agreement but supports the fact that the loan was to be paid over time.  He testified to the following:

"Q.    What did you say to Mr. Pasalides about these monies, if in fact they weren't available?

A. We had a discussion.  It was based on a projection of approximately ten years. And what we said was that if we came to a year while he was employed by

3

CIMA we would hold it over to the next year and compensate it. It would be compensated in the following year from the profits." (See page 384 of the deposition transcript annexed to the memorandum of law as Exhibit E).

11.)     I am still owed more than $85,000.00 in unpaid wages from Bujarski's company, CIMA. This is without including the tax implications that I may suffer as a result of Bujarski not paying appropriate payroll taxes on his so called "loans" in lieu of salary to his employees, and his not having yet issued a revised W-2 to me, Mr. Woods or Mr. Velzy.

12.)     The monies which are the subject of the so called "Turnover" cause of action are monies not owed to CIMA but to Bujarski.

13.)     Bujarski however used CIMA as his "personal piggy bank." This has already been demonstrated to this Court by his fraudulent characterization of income as loans in CIMA's bankruptcy petition and in its financial records which will unquestionably have dire consequences not only to me but other CIMA employees as well; all occasioned by Bujarski's fraudulent manipulation and desire to save himself from the payment of payroll withholding taxes.

Nicholas Pasalides

Sworn to before me on
June 6, 2008

NOTARY PUBLIC

STEPHEN R. LEWIS
Notary Public, State of New York
No. 4718916
Qualified in Westchester County
Commission Expires March 30, 2014

4

1

2  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - - - - -x

4  In re:                                    Case No.
                                             05-27041
5  CIMA GROUP, INC.,

6
   - - - - - - - - - - - - - - - - - - - - - -x
7

8
                              January 22, 2007
9                             10:14 a.m.

10

11          EXAMINATION BEFORE TRIAL of Witness,

12  NICHOLAS PASALIDES, taken pursuant to Order, held at

13  the offices of 2 Perlman Drive, Spring Valley, New

14  York, before a Notary Public within and for the State

15  of New York.

16

17

18

19                        *    *    *

20

21

22

23                SANDY SAUNDERS REPORTING
                    254 South Main Street
                        Second Floor
24               New City, New York 10956
                     (845) 634-7561

25

```
 1

 2     A P P E A R A N C E S:

 3

           KURTZMAN MATERA GUROCK & SCUDERI, LLP
 4         Attorneys for Debtor
           2 Perlman Drive
 5         Spring Valley, New York  10977

 6         BY:  HOWARD GUROCK, ESQ.

 7

           REISCH, REISCH, REISCH P.C.
 8         Attorneys for Witness
           175 Main Street
 9         Suite 300
           White Plains, NY  10601
10
           BY:  JEFFREY REISCH, ESQ.
11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Also Present:  William Bujarski
25
```

```
 1                    NICHOLAS PASALIDES
 2    N I C H O L A S   P A S A L I D E S, the Witness
 3    herein, having been first duly sworn by Esther Katz,
 4    a Notary Public of the State of New York, was
 5    examined and testified as follows:
 6              THE REPORTER:  Would you please state your
 7    name?
 8              THE WITNESS:   Nicholas Pasalides.
 9              THE REPORTER:  What is your address,
10    please?
11              THE WITNESS: 18 Hilltop Road, Katonah, New
12    York 10536.
13    EXAMINATION BY
14    MR. GUROCK:
15       Q     Good morning, Mr. Pasalides.  My name
16    is Howard Gurock.  I'm with Kurzman, Matera, Gurock
17    Scuderi, and we represent Cima group in this 2004
18    Proceeding.  This is proceeding whereby we seek
19    information in order to ascertain whether or not a
20    cause of action may exist.
21              I'm going to be asking questions this
22    morning.  If there's anything that I ask you that you
23    don't understand, please tell me that you don't
24    understand the question and I'll try and rephrase it.
25              If there's anything that you need to
```

```
 1                        NICHOLAS PASALIDES
 2    something would come in, and then it would be another
 3    three, four weeks or three, four paychecks, and just
 4    kind of carried on like that.
 5            Q       So, by the time you left in February of
 6    2005, were you owed money from Cima for salary?
 7            A       Yes.
 8            Q       How much?
 9            A       Off the top of my head, probably about
10    a $130,000.
11            Q       Was any of that paid back?
12            A       No.
13            Q       It's still owed to you now?
14            A       Yes.
15            Q       Did there come a time that you borrowed
16    any money from Cima?
17            A       I borrowed money from Mr. Bujarski, and
18    not from Cima.
19                    MR. GUROCK:  Please mark this.
20                    (Whereupon, Cima Group letter dated
21    8/17/05 was marked Pasalides Exhibit 3 for
22    identification, as of this date.)
23            Q       Mr. Pasalides, I'm going to show you a
24    document we've marked as Pasalides 3 for
25    identification, which is a copy of a letter from Cima
```

```
 1                    NICHOLAS PASALIDES
 2    Group, dated August 17, 2005 from Mr. Bujarski.  Have
 3    you ever seen this before?
 4          A     No, I have not seen it.
 5          Q     In this document, Mr. Bujarski is
 6    saying there is a loan balance as of January 1st of
 7    2004 due, he says, to Cima, in the sum of $175,500.
 8    That's not correct according to yourself; correct?
 9          A     No.  You've asked me if I have seen
10    that, and the answer to that is I did not see that.
11          Q     I know that.  My question is the
12    number, $175,500 that Mr. Bujarski claimed you owed
13    to Cima; is that incorrect?
14          A     I do not owe Cima.  I owe Mr. Bujarski.
15          Q     Did you borrow money from Mr. Bujarski,
16    personally?
17          A     I borrowed monies from Mr. Bujarski,
18    where that monies came from, I do not know.
19          Q     Do you still owe Mr. Bujarski?
20          A     Yes, I do.
21          Q     How much do you owe him?
22          A     About $170,000, off the top of my head.
23          Q     Is there any documentation between the
24    two of you that evidences the loan?
25          A     No.  Not that I can recall.
```

```
 1                    NICHOLAS PASALIDES
 2          Q       Was there initially money that was lent
 3     to you, in order for you to purchase your residence?
 4          A       Yes.
 5          Q       And do you remember how much the
 6     original amount that was loaned to you was?
 7          A       Off the top of my head, I would like to
 8     say, about $220,000, around there.
 9          Q       It wasn't $415,500 to start?
10          A       $415,000 of which a hundred and
11     something thousand dollars was paid back.
12                  It was a very short period of loan, of
13     which my second house was being sold.  The moment it
14     was sold, I gave Mr. Bujarski money.
15          Q       So at this time, it's your testimony,
16     you owe Mr. Bujarski personally approximately a
17     hundred and $170,000?
18          A       Right.
19          Q       When was the last time you made any
20     type of payment or repayment towards the amount due?
21          A       Probably in 2000 and -- I would say
22     2003 or 2004.  I'm not a hundred percent sure.
23          Q       According to what I have, you tell me
24     if this is correct or not; I have that you were
25     loaned initially about $415,000, that you repaid
```

1       NICHOLAS PASALIDES

2  $200,000 shortly after that.  You repaid $20,000 on

3  December 31st, 2001 and you repaid an additional

4  $20,000 on December 31st, 2003?

5       A       That could be right.  I can't remember

6  off the top of my head.

7       Q       Do you know someone by the name of Wael

8  Saleh?

9       A       Yes.

10      Q       Who is Wael Saleh?

11      A       He was an employee at Cima Group.

12      Q       What, if any, management responsibility

13  or oversite did you have, with respect to Mr. Saleh?

14      A       I had oversite with all the employees

15  at Cima Group.  Mr. Saleh was one of those employees.

16      Q       What did Mr. Saleh do for Cima?

17      A       He was a draftsman/project manager, if

18  you wish.

19      Q       Did you ever have any discussions with

20  Mr. Bujarski about doing work on the side, while you

21  were at Cima?

22      A       No.

23      Q       Do you know if Mr. Woods had any

24  agreement or had any discussions with Mr. Bujarski

25  about doing work on the side?

1

2                              C E R T I F I C A T E

3     STATE OF NEW YORK    )
                           :   SS:
4     COUNTY OF ROCKLAND   )

5

6        I, ESTHER KATZ, a Shorthand Reporter and Notary

7     Public within and for the State of New York, do

8     hereby certify:

9        THAT NICHOLAS PASALIDES, the witness whose

10    testimony is hereinbefore set forth, was duly sworn

11    by me; and

12       THAT the within transcript is a true record of

13    the testimony given by said witness.

14       I further certify that I am not related, either

15    by blood or marriage, to any of the parties to this

16    action; and

17       THAT I am in no way interested in the outcome of

18    this matter.

19

20

21                          _Esther Katz_

22                            ESTHER KATZ

23

24    Dated:   February 7, 2007

25

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              Chapter 11
                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


CIMA Group, Inc.,

                              Plaintiff,            Adversary
                                                    Proceeding
          - against -                               07-08276

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                              Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT PRE-TRIAL ORDER

plus interest since at least August, 2005, plus attorneys' fees and costs.

**Defendants**: refer the Court to paragraph number four of the section entitled "Defendant's issues of law" as to whether plaintiffs' failure to articulate its damages in discovery and in the pre-trial order precludes the relevant cause of action and to the Defendant's request for permission to file a motion to dismiss the Complaint on the basis that Plaintiff has failed to specify its damages in discovery and/or in the pre-trial order on all causes of action except the "Twentieth Cause of Action – Turnover."

D.     **Undisputed Facts:**

1.     CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern District of New York, White Plains.

2.     Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

3.     Woods is a person residing at 218 Grapehollow Road, Homes, NY 12531,

4.     Velzy is a person residing at 3740 Wildwood Street, Yorktown Heights, NY 10598.

5.     Edgewater Group is located at 163 N. Main Street, Suite 202, Port Chester, New York.

6.     Boender is a principal of Edgewater Group.

7.     Pasalides was hired by CIMA in 1993.

8.     Woods was hired by CIMA in 1998.

9.     Edgewater was a subcontractor to Edgewater Group on the Arch Capital project.

10.     Woods provided Edgewater Group with services on the Arch Capital project.

11.       Velzy provided Edgewater Group with services on the Arch Capital project.

12.       Edgewater Group had previously utilized the services of CIMA for one job in the 1990's.

13.       CBK Engineering, Inc. is a corporation of which Velzy is the principal.

14.       On or about August 1, 2004, there was a verbal communication from Velzy to Bujarski tendering Velzy's resignation from CIMA.

15.       Mr. Tsilifidis was not a client of CIMA.

16.       Saleh communicated with Boender.

17.       One Soundshore Drive was an Edgewater Group project.

18.       Woods tendered his resignation from CIMA on several occasions.

19.       Edgewater Group, by and through its principal, Boender, knew of CIMA since 1993 or 1994.

20.       Edgewater Group did one job with CIMA in the 1990's.

21.       Boender knew Pasalides prior to the time he began to work for CIMA.

22.       Boender met Velzy in 2004.

23.       Boender met Velzy when he needed assistance for electrical and mechanical engineering on the Arch Capital project.

24.       Boender met Woods when he met Velzy.

25.       Boender was introduced to Velzy and Woods by Pasalides.

26.       Pasalides represented to Boender that Velzy and Woods were working on their own.

27.       Edgewater Group did work for Arch Capital and hired Edgewater.

28.       Edgewater Group used Velzy and Woods on the Arch Capital project.

29.       The address on the 1099 for the $27,000.00 paid by Edgewater Group to

Edgewater was that of Pasalides, 18 Hilltop Road, Katonah, NY.

30. Boender knew that Velzy and Woods used Saleh as a draftsman.

31. Services were performed by Woods for Edgewater Group in 2004.

32. Services were performed by Saleh for Edgewater Group in 2004.

33. Services were performed by Velzy for Edgewater Group in 2004.

34. Velzy performed services on the Arch Capital project in 2004-2005 while employed by CIMA.

35. Woods performed services on the Victoria Homes Project in 2004-2005 while employed by CIMA.

36. Pasalides performed services on the Tsilifides Project in 2004-2005 while employed by CIMA.

37. Pasalides performed services on the Cingular Project in 2004-2005 while employed by CIMA.

38. The Arch Capital Project was not a project of CIMA.

39. The One Soundshore Drive Project was not a project of CIMA.

40. The Tsilifidis Project was not a project of CIMA.

41. CIMA received no revenue from the Tsilifidis Project.

42. Edgewater is owned one-third each by Velzy, Woods and Pasalides.

43. Edgewater was incorporated in July of 2004.

44. Edgewater was formed while Velzy was employed by CIMA

45. Edgewater was formed while Pasalides was employed by CIMA.

46. Velzy was employed by CIMA beginning in or about 1997.

47. Velzy supervised up to five people while employed at CIMA.

48. Velzy's duties at CIMA included the preparation and submission of

proposals for work for clients.

49.     CIMA billed its clients either by a lump sum amount or on an hourly basis.

50.     Time sheets were filled out at CIMA regardless of how a project was billed.

51.     The requirement that time sheets be filled out at CIMA was a company wide rule.

52.     Discussions were had between Velzy, Woods, Pasalides and Bujarski regarding Velzy, Woods and Pasalides becoming partners in CIMA.

53.     Shareholders Agreement Proposals were exchanged.

54.     Velzy had access to proposals and was aware of the clients of CIMA.

55.     Velzy did work for Regional News Network through CBK Engineering.

56.     CBK Engineering was paid by Regional News Network for the work done by Velzy.

57.     Velzy did work for Bet Am Shalom while employed at CIMA.

58.     Woods was responsible for approximately five employees while employed by CIMA.

59.     Woods, for a large period of time, did not complete his time sheets.

60.     There was a lot of chiding at CIMA for the failure to submit time sheets.

61.     Pasalides is the President of Edgewater.

62.     Velzy is Vice President of Edgewater.

63.     Woods is the Treasurer of Edgewater.

64.     The funds were transferred as follows:  (i) on July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Nicholas Pasalides in an amount of $350,000.00.

E.          **Plaintiff's Contention of Facts:**

1.      CIMA was at one time in the business of providing architectural and design services.

2.      Velzy was hired as a mechanical engineer for CIMA on February 18, 1997.

3.      Gross receipts for CIMA were, as follows:

(i)      1992          $1,326,451.00
(ii)     1993          $1,059,535.00
(iii)    1994          $1,057,130.00
(iv)     1995          $1,019,986.00
(v)      1996          $1,126,635.00
(vi)     1997          $1,391,943.00
(vii)    1998          $2,198,107.00
(viii)   1999          $4,004,261.00
(ix)     2000          $5,490,556.00
(x)      2001          $6,622,400.00
(xi)     2002          $4,096,864.00
(xii)    2003          $2,351,500.00

4.      In the Spring of 2004, or earlier, Pasalides while still employed by CIMA, commenced doing residential work for his own enrichment using CIMA staff.  CIMA was not reimbursed for staff time or materials.

5.      In the Spring of 2004, or earlier, Velzy or CBK Engineering, Inc., while still employed by CIMA,  commenced doing work for his own enrichment using CIMA staff.  CIMA was not reimbursed for staff time or materials.

6.      In the Spring of 2004, or earlier, Woods while still employed by CIMA, commenced doing work for his own enrichment using CIMA staff.  CIMA was not reimbursed for staff time or materials.

7.      On or about April 1, 2004, Velzy, Woods and Pasalides stoppedcompleting

132.    Woods, for a large period of time, did not complete his time sheets.

133.    Woods continued to work for CIMA until at least February 8, 2005.

134.    Woods tendered his final resignation by e-mail to Bujarski, copied to Pasalides, on February 8, 2005.

135.    Pasalides sent an e-mail to Bujarski on February 28, 2005, resigning from CIMA.

136.    Pasalides, Woods and Velzy spoke about forming Edgewater in or about May of 2004.

137.    Pasalides was loaned $415,500.00 by CIMA.

138.    The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00; (ii) on December 31, 2001, an amount of $20,000.00; (Iii) on December 31, 2003, an amount of $20,000.00.

139.    Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

140.    Demand has been made of Pasalides for repayment of the $175,500.00.

141.    No portion of the $175,500.00 has been repaid by Pasalides.

142.    No proof of claim was filed by Pasalides.

143.    No proof of claim was filed by Woods.

144.    No proof of claim was filed by Velzy.

145.    The Schedules which comprise CIMA's petition reflect $250,662.00 in secured debt and $1,673,395.00 in unsecured deft.

146.    Proofs of Claim, without duplication, reflect a total indebtedness of $744,531.42.

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

CIMA Group, Inc.,

                        Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                        Plaintiff,

            - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                        Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11
Case No. 05-27041(ASH)

Adversary
Proceeding
07-08276

## JOINT PRE-TRIAL ORDER

plus interest since at least August, 2005, plus attorneys' fees and costs.

**Defendants**: refer the Court to paragraph number four of the section entitled "Defendant's issues of law" as to whether plaintiffs' failure to articulate its damages in discovery and in the pre-trial order precludes the relevant cause of action and to the Defendant's request for permission to file a motion to dismiss the Complaint on the basis that Plaintiff has failed to specify its damages in discovery and/or in the pre-trial order on all causes of action except the "Twentieth Cause of Action – Turnover."

D.    **Undisputed Facts:**

1.    CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 15, 2005, with the United States Bankruptcy Court for the Southern District of New York, White Plains.

2.    Pasalides is a person residing at 18 Hilltop Road, Katonah, New York 10536.

3.    Woods is a person residing at 218 Grapehollow Road, Homes, NY 12531,

4.    Velzy is a person residing at 3740 Wildwood Street, Yorktown Heights, NY 10598.

5.    Edgewater Group is located at 163 N. Main Street, Suite 202, Port Chester, New York.

6.    Boender is a principal of Edgewater Group.

7.    Pasalides was hired by CIMA in 1993.

8.    Woods was hired by CIMA in 1998.

9.    Edgewater was a subcontractor to Edgewater Group on the Arch Capital project.

10.    Woods provided Edgewater Group with services on the Arch Capital project.

11.      Velzy provided Edgewater Group with services on the Arch Capital project.

12.      Edgewater Group had previously utilized the services of CIMA for one job in the 1990's.

13.      CBK Engineering, Inc. is a corporation of which Velzy is the principal.

14.      On or about August 1, 2004, there was a verbal communication from Velzy to Bujarski tendering Velzy's resignation from CIMA.

15.      Mr. Tsilifidis was not a client of CIMA.

16.      Saleh communicated with Boender.

17.      One Soundshore Drive was an Edgewater Group project.

18.      Woods tendered his resignation from CIMA on several occasions.

19.      Edgewater Group, by and through its principal, Boender, knew of CIMA since 1993 or 1994.

20.      Edgewater Group did one job with CIMA in the 1990's.

21.      Boender knew Pasalides prior to the time he began to work for CIMA.

22.      Boender met Velzy in 2004.

23.      Boender met Velzy when he needed assistance for electrical and mechanical engineering on the Arch Capital project.

24.      Boender met Woods when he met Velzy.

25.      Boender was introduced to Velzy and Woods by Pasalides.

26.      Pasalides represented to Boender that Velzy and Woods were working on their own.

27.      Edgewater Group did work for Arch Capital and hired Edgewater.

28.      Edgewater Group used Velzy and Woods on the Arch Capital project.

29.      The address on the 1099 for the $27,000.00 paid by Edgewater Group to

Edgewater was that of Pasalides, 18 Hilltop Road, Katonah, NY.

30.    Boender knew that Velzy and Woods used Saleh as a draftsman.

31.    Services were performed by Woods for Edgewater Group in 2004.

32.    Services were performed by Saleh for Edgewater Group in 2004.

33.    Services were performed by Velzy for Edgewater Group in 2004.

34.    Velzy performed services on the Arch Capital project in 2004-2005 while employed by CIMA.

35.    Woods performed services on the Victoria Homes Project in 2004-2005 while employed by CIMA.

36.    Pasalides performed services on the Tsilifides Project in 2004-2005 while employed by CIMA.

37.    Pasalides performed services on the Cingular Project in 2004-2005 while employed by CIMA.

38.    The Arch Capital Project was not a project of CIMA.

39.    The One Soundshore Drive Project was not a project of CIMA.

40.    The Tsilifidis Project was not a project of CIMA.

41.    CIMA received no revenue from the Tsilifidis Project.

42.    Edgewater is owned one-third each by Velzy, Woods and Pasalides.

43.    Edgewater was incorporated in July of 2004.

44.    Edgewater was formed while Velzy was employed by CIMA

45.    Edgewater was formed while Pasalides was employed by CIMA.

46.    Velzy was employed by CIMA beginning in or about 1997.

47.    Velzy supervised up to five people while employed at CIMA.

48.    Velzy's duties at CIMA included the preparation and submission of

proposals for work for clients.

49.  CIMA billed its clients either by a lump sum amount or on an hourly basis.

50.  Time sheets were filled out at CIMA regardless of how a project was billed.

51.  The requirement that time sheets be filled out at CIMA was a company wide rule.

52.  Discussions were had between Velzy, Woods, Pasalides and Bujarski regarding Velzy, Woods and Pasalides becoming partners in CIMA.

53.  Shareholders Agreement Proposals were exchanged.

54.  Velzy had access to proposals and was aware of the clients of CIMA.

55.  Velzy did work for Regional News Network through CBK Engineering.

56.  CBK Engineering was paid by Regional News Network for the work done by Velzy.

57.  Velzy did work for Bet Am Shalom while employed at CIMA.

58.  Woods was responsible for approximately five employees while employed by CIMA.

59.  Woods, for a large period of time, did not complete his time sheets.

60.  There was a lot of chiding at CIMA for the failure to submit time sheets.

61.  Pasalides is the President of Edgewater.

62.  Velzy is Vice President of Edgewater.

63.  Woods is the Treasurer of Edgewater.

64.  The funds were transferred as follows:  (i) on July 31, 2000 by check number 7018 to attorney James Marsilo in an amount of $65,500.00; and (ii) on September 7, 2000 by wire transfer to an account of Nicholas Pasalides in an amount of $350,000.00.

E.          **Plaintiff's Contention of Facts:**

1.    CIMA was at one time in the business of providing architectural and design services.

2.    Velzy was hired as a mechanical engineer for CIMA on February 18, 1997.

3.    Gross receipts for CIMA were, as follows:

| (i) | 1992 | $1,326,451.00 |
|------|------|---------------|
| (ii) | 1993 | $1,059,535.00 |
| (iii) | 1994 | $1,057,130.00 |
| (iv) | 1995 | $1,019,986.00 |
| (v) | 1996 | $1,126,635.00 |
| (vi) | 1997 | $1,391,943.00 |
| (vii) | 1998 | $2,198,107.00 |
| (viii) | 1999 | $4,004,261.00 |
| (ix) | 2000 | $5,490,556.00 |
| (x) | 2001 | $6,622,400.00 |
| (xi) | 2002 | $4,096,864.00 |
| (xii) | 2003 | $2,351,500.00 |

4.    In the Spring of 2004, or earlier, Pasalides while still employed by CIMA, commenced doing residential work for his own enrichment using CIMA staff. CIMA was not reimbursed for staff time or materials.

5.    In the Spring of 2004, or earlier, Velzy or CBK Engineering, Inc., while still employed by CIMA, commenced doing work for his own enrichment using CIMA staff. CIMA was not reimbursed for staff time or materials.

6.    In the Spring of 2004, or earlier, Woods while still employed by CIMA, commenced doing work for his own enrichment using CIMA staff. CIMA was not reimbursed for staff time or materials.

7.    On or about April 1, 2004, Velzy, Woods and Pasalides stoppedcompleting

132.    Woods, for a large period of time, did not complete his time sheets.

133.    Woods continued to work for CIMA until at least February 8, 2005.

134.    Woods tendered his final resignation by e-mail to Bujarski, copied to Pasalides, on February 8, 2005.

135.    Pasalides sent an e-mail to Bujarski on February 28, 2005, resigning from CIMA.

136.    Pasalides, Woods and Velzy spoke about forming Edgewater in or about May of 2004.

137.    Pasalides was loaned $415,500.00 by CIMA.

138.    The funds were repaid, in part, by Pasalides as follows: (i) in November, 2000, an amount of $200,000.00; (ii) on December 31, 2001, an amount of $20,000.00; (Iii) on December 31, 2003, an amount of $20,000.00.

139.    Pasalides owes $175,500.00 of the loaned amount of $415,500.00.

140.    Demand has been made of Pasalides for repayment of the $175,500.00.

141.    No portion of the $175,500.00 has been repaid by Pasalides.

142.    No proof of claim was filed by Pasalides.

143.    No proof of claim was filed by Woods.

144.    No proof of claim was filed by Velzy.

145.    The Schedules which comprise CIMA's petition reflect $250,662.00 in secured debt and $1,673,395.00 in unsecured deft.

146.    Proofs of Claim, without duplication, reflect a total indebtedness of $744,531.42.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

In re:

CIMA Group, Inc.,                                    O R I G I N A L

        Debtor.
--------------------------------------------------X
CIMA Group, Inc.,

                Chapter 11
                Case No. 05-27041(ASH)

           Plaintiff,

      -against-

Nicholas Pasalides, Joseph Woods, Mark Velzy,

Michael Boender and Edgewater Design, Inc.,

Edgewater Group Architects a/k/a Edgewater Group,

           Defendants.
--------------------------------------------------X

                Stephens, Baroni,
                Reilly & Lewis, LLP
                175 Main Street
                White Plains, New York

                March 12, 2008
                10:25 a.m.

CONTINUED DEPOSITION OF PLAINTIFF, BY WILLIAM

BUJARSKI, pursuant to Notice, taken at the above

place, date and time, before Lori Deskin, a Notary

Public within and for the State of New York.

Page 347

1
2      A P P E A R A N C E S :
3
4    KURTZMAN, MATERA, GUROCK & SCUDERI, LLP
         Attorneys for Plaintiff
5         2 Perlman Drive
           Spring Valley, New York 10977
6    BY: ROSEMARIE E. MATERA, ESQ.
7
8    STEPHENS, BARONI, REILLY & LEWIS, LLP
         Attorneys for Defendants
9         175 Main Street
           White Plains, New York 10601
10   BY: STEPHEN R. LEWIS, ESQ.
11
12
13   ALSO PRESENT:
14   NICHOLAS PASALIDES
15
16
17
18
19
20
21
22       DOUGLASS REPORTING COMPANY
23            914 426-2400
24
25

Page 348

1
2    S T I P U L A T I O N S :
3
4        IT IS HEREBY STIPULATED AND AGREED by and
5    between the attorneys for the respective parties
6    hereto, that this examination may be sworn to before
7    any Notary Public.
8
9        IT IS FURTHER STIPULATED AND AGREED, that
10   the filing and certification of the said deposition
11   shall be waived.
12
13       IT IS FURTHER STIPULATED AND AGREED, that
14   all objections to questions, except as to the form
15   of the question shall be reserved for the time of
16   trial.
17
18
19
20
21
22
23
24
25

Page 349

1                Bujarski
2        MR. LEWIS: It's 10:30 I'd like to
3    continue the deposition that was scheduled
4    for 10 o'clock.
5        WILLIAM BUJARSKI, a Witness for the Plaintiff
6    herein, having been first duly sworn by Lori Deskin,
7    a Notary Public for the State of New York, was
8    examined and testified as follows:
9    EXAMINATION BY MR. LEWIS:
10       Q.  Mr. Bujarski, good morning.
11       A.  Good morning.
12       Q.  Same ground rules, okay?
13       A.  Okay.  I just ask one thing.
14       Q.  Sure.
15       A.  That I be allowed to finish answering
16   the questions sometimes.
17       Q.  Oh, you're always allowed to answer the
18   questions, and I didn't believe that I cut you off
19   at any time.  I think that what you're referring
20   to is, two or three questions later, you may have
21   come up with a different issue.  And in that
22   circumstance, it's not really relevant to the
23   prior answer.  But if you --
24       A.  That wasn't the circumstances.  But,
25   okay.

Page 350

1                Bujarski
2        Q.  All right.  Well, the record speaks for
3    itself.  It's very precise and specific.  And if
4    you're not done with an answer, just indicate that
5    to me and I'd be happy to allow you to finish your
6    answer.  Do you understand?
7        A.  I understand.
8        Q.  Does that quell your concerns?
9        A.  For the moment, yes.
10       Q.  Well, there's nothing more I can do
11   other than say that.
12       Mr. Bujarski, yesterday or when we last
13   met, we had gotten up to Exhibit U, which was the
14   balance sheet for CIMA Group, PC that ended as of
15   December 31, 2005.  Do you remember that?
16       A.  Yes, I do.
17       Q.  Now, based upon my request for document
18   production, I had requested financials for CIMA
19   Group, Inc. and its affiliate CIMA Group, PC for
20   the period of 2000 through 2005.
21       Why is it that you only provided me with
22   a balance sheet detail ending December 31, 2005
23   which has information going from January 1, 2004
24   through 2005?  What happened to January 1, 2000
25   through December 31, 2003?  Where is that

Page 375

Bujarski

1
2  A. I can't swear to that because I did not
3  find it. I did not look for that and I did not
4  find it.
5     Q. Any reason why you didn't look for it?
6     A. I believe we were providing up to
7  December 31, 2005.
8     Q. I believe that the request was to the
9  present, and this was served in 2007.
10    A. I didn't provide it.
11       MR. LEWIS: I'd ask that that period for
12    January through 2006 when you say it was
13    discontinued, be provided for CIMA Group,
14    Inc. and its affiliate CIMA Group, PC.
15       (Production request indexed.)
16    Q. Okay. We had spoken the first day of
17 deposition about the subject of the adversary
18 proceeding having to do with a purported loan to
19 Nicholas Pasalides by you; is that right?
20    A. That's correct.
21    Q. And I believe there were certain
22 documents that were identified, which were
23 previously identified as Exhibit F, having to do
24 with that subject, correct?
25    A. That's correct.

Page 376

Bujarski

1
2     Q. Now, I think you told us that upon your
3  review of Exhibit F, there was one document that
4  was missing; something about an accountant's
5  letter. Do you recall that?
6        Can you look at there? Are there any
7  records that you have, any writings that you have
8  reflective of that purported loan, other than what
9  is in your hands?
10    A. There's that one letter missing.
11    Q. Okay.
12    A. Which you're right, I did not provide
13 that. I will.
14    Q. So the only reason you didn't provide it
15 to me since then is that you just forgot the
16 request?
17    A. Actually, I believe it is in our copy
18 packet. I don't know why it's not in here.
19       MS. MATERA: I have it, so I will make
20    sure you get it.
21       MR. LEWIS: Okay.
22    Q. Now, the circumstance of this loan
23 occurred in what year?
24       MR. LEWIS: Withdrawn.
25    Q. What year was it that Nick Pasalides

Page 377

Bujarski

1
2  came in and spoke to you?
3     A. Again, to the best of my recollection,
4  it would have been somewhere around the spring of
5  2000.
6     Q. And what did he say to you? What
7  specific conversation did he say to you regarding
8  those monies?
9     A. He was in the process of acquiring a
10 residence and he had a shortfall from his -- I
11 believe it was from the ability to sell his
12 existing house, and also a general shortfall of
13 cash.
14    Q. Is that called a bridge loan? Did you
15 ever hear that expression?
16    A. I guess so. I'm not a financial person.
17    Q. Okay. So the shortfall; we'll use your
18 terminology. How much money did he request that
19 you provide to him?
20    A. Actually, he didn't ask for a specific
21 amount. I believe he gave me a generalization.
22 And then as he needed it, we provided the request.
23    Q. Okay. So did you write him any monies
24 in 2000?
25    A. From the record and from my

Page 378

Bujarski

1
2  recollection --
3     Q. You can look at F. It's the second
4  page.
5     A. Well, actually, I'm looking at page 1 of
6  F. There was a check issued by the company to an
7  attorney. And, again, to my best recollection,
8  that was a --
9     Q. -- down payment?
10    A. A down payment or a deposit.
11    Q. How much was that for?
12    A. 65,500.
13    Q. And what was the date?
14    A. It indicates here as July 31, 2000. I
15 believe that's right.
16    Q. Is a copy of that check there?
17    A. Yes.
18    Q. Who signed it?
19    A. I did.
20    Q. And that's for that 63 and change,
21 right?
22       MS. MATERA: 65.
23    Q. 65 and change?
24    A. 65,5.
25    Q. Now, there were additional monies in

Page 379

Bujarski

1
2  2000 that is the subject of your claim?
3      A. Yes. There was a wire transfer that was
4  made on the 7th of September of 2000.
5      Q. And who authorized that?
6      A. It would have had to have been myself.
7      Q. And was that based upon his request to
8  you?
9      A. Yes, it was.
10     Q. How much was that wire transfer?
11     A. 350,000 dollars.
12     Q. Any other monies that were given to
13 Mr. Pasalides that are the subject of your claim,
14 besides those two specific amounts?
15     A. In this matter, this was the amount.
16     Q. Okay. In that same year was there any
17 repayment of those monies to you by Mr. Pasalides?
18     A. Yes.
19     Q. How much did he repay, and when?
20     A. In November of 2000 he made a repayment
21 of 200,000 dollars.
22     Q. And who did he make the payment to?
23     A. To CIMA Group.
24     Q. Where was it deposited?
25     A. CIMA Group.

Page 380

Bujarski

1
2      Q. And that same year, 2000, were there any
3  additional monies that were paid by him?
4      A. No.
5      Q. So the monies which are the subject of
6  your claim were issued on July 31st and September
7  7th in the total amount of 415,000 dollars. And
8  by November of 2000, Mr. Pasalides had paid
9  200,000 to CIMA Group; is that right?
10     A. Yes. I believe that was predicated on
11 his sale of his original house.
12     Q. Now, you list here a repayment on
13 12/31/2001. What was the circumstances of that
14 repayment?
15     A. Mr. Pasalides repaid the loan to the
16 tune of 20,000 dollars a year as part of his
17 profit sharing.
18     Q. Was this something that you had
19 discussed with him?
20     A. Yes.
21     Q. When did the discussion occur?
22     A. Initially when he had requested the
23 money.
24     Q. What was the discussion? Tell me
25 exactly what was said.

Page 381

Bujarski

1
2      A. The discussion was that he would repay
3  it from his profits of the company, okay, based
4  upon the annual profit, 20,000 dollars a year.
5      Q. Well, was the 200,000 dollars profits?
6      A. No. The 200,000 dollars, to my
7  knowledge, was money he had received in the sale
8  of his original home.
9      Q. So he paid you cash, 200,000 dollars by
10 cash -- I mean, a check of 200,000 dollars which
11 had nothing to do with his salary, bonus,
12 disbursements, compensation with CIMA Group? This
13 was Nick Pasalides' money paid to either you or
14 CIMA Group in November of 2000 in the total amount
15 of 200,000 dollars, right?
16     A. He had indicated he would reduce the
17 amount by any money left over from the sale of his
18 residence.
19     Q. Was there any written agreement between
20 you and Mr. Pasalides?
21     A. We commenced an agreement but we never
22 formalized it.
23     Q. So there was no written agreement?
24     A. No, purely verbal.
25     Q. And was your understanding that the

Page 382

Bujarski

1
2  repayment of those monies would take more than one
3  year?
4      A. My understanding was that it would take
5  multiple years.
6      Q. And it was never reduced to writing?
7      A. No, it was not.
8      Q. Other than what you're told me, were
9  there ever any other discussions regarding the
10 terms of these monies?
11     A. No, just the ongoing conversation about
12 how it was repaid annually.
13     Q. And was it repaid annually?
14     A. On or about the 31st of December 2001
15 20,000 dollars was deducted from Mr. Pasalides.
16     Q. Who did that?
17     A. It would have been a calculation within
18 the office. I'm not sure exactly how. And it
19 would have been reflected in a check given to
20 Mr. Pasalides as part of his profit sharing.
21     Q. It would have been given to
22 Mr. Pasalides?
23     A. No. What happened was it would have
24 been deducted and then the check would have been
25 reduced by that amount.

Page 383

Bujarski

1     Bujarski
2    Q.  So these were monies that never made its
3  way into the hands, pockets, bank accounts, of
4  Nicholas Pasalides, correct?  He was never in
5  physical possession of the 20,000 dollars; is that
6  right?
7    A.  That's correct.
8    Q.  And you indicate on that sheet there was
9  another deduction in 2003?
10    A.  Yes.  Again, on or around December 31st
11  of 2003, there was another 20,000 dollar
12  deduction.  And I believe that's also referenced
13  in the letter that we're missing.
14    Q.  So, again, those monies were never in
15  his physical possession at any time?  This would
16  have been a deduction by CIMA Group?
17    A.  It would have been internal accounting,
18  yes.
19    Q.  So the answer is he never physically
20  received those monies and then turned around and
21  wrote a check or endorsed a check to CIMA Group to
22  reflect that December 2003 payment; is that right?
23    A.  That's correct, yes.
24    Q.  Did you ever discuss with Mr. Pasalides
25  what would happen if he didn't have the money?

Page 384

Bujarski

1     Bujarski
2    A.  While in my employment, while he was
3  employed with me --
4    Q.  No, I'm talking about in 2000.
5    A.  I'm saying during the employment, we
6  said that we would defer it to another year while
7  he was employed by us.  And if we had to extend
8  it, we would extend it.
9    Q.  When you say we, who else was speaking
10  besides you?
11    A.  Myself and Mr. Pasalides.
12    Q.  Okay.  Only you were saying that,
13  because Mr. Pasalides wouldn't be talking as far
14  as -- withdrawn.
15    What did you say to Mr. Pasalides about
16  these monies, if in fact they weren't available?
17    A.  We had a discussion.  It was based on a
18  projection of approximately ten years.  And what
19  we said was that if we came to a year while he was
20  employed by CIMA we would hold it over to the next
21  year and compensate it.  It would be compensated
22  in the following year from the profits.
23    Q.  And was there any discussion about if
24  Mr. Pasalides wasn't employed by CIMA?
25    A.  No, it was always reflected on his

Page 385

Bujarski

1     Bujarski
2  employment.
3    Q.  Any other discussions that you remember
4  regarding the terms or conditions of repayment?
5    A.  Well, basically it was due and we would
6  work within the company to have it repaid.
7    Q.  Other than that conversation that you
8  had in 2000?
9    A.  Not that I can recall.
10    Q.  Did you ever discuss forgiveness of
11  these monies?
12    A.  No.
13    Q.  Did you ever say to him in words or
14  substance, Nick, if you don't have the money,
15  don't worry about it?
16    A.  No, I didn't have that -- I couldn't do
17  that.
18    Q.  Why couldn't you do that?
19    A.  It was a corporate debt.  It wasn't an
20  individual debt.
21    Q.  Who's the 100 percent holder of CIMA
22  Group, Inc. as of 2000?
23    A.  I was.
24    Q.  Who was the Grand Poohbah of CIMA, Inc.
25  in 2000?

Page 386

Bujarski

1     Bujarski
2    A.  I was.
3    Q.  Who made the decisions for CIMA Group,
4  Inc. in 2000?
5    A.  I did.
6    Q.  Who could make a determination like
7  that, if you chose to make one of those
8  determinations?
9    A.  If I chose to make a determination, it
10  would have been me.
11    Q.  Did you ever have a conversation with
12  his wife regarding these monies?
13    A.  Not that I recall, no.
14    Q.  Did you have a good relationship with
15  Mr. Pasalides' wife?
16    A.  Carol Pasalides?
17    Q.  Yes.
18    A.  Yes.  I always had a good relationship
19  with Mr. Pasalides and Mrs. Pasalides.
20    Q.  Did you socialize with them?
21    A.  Yes, we did.
22    Q.  One of the requests that was made to you
23  was for financial statements for CIMA and its
24  affiliates for the years 2000 through the present.
25    (Defendant's Exhibit V, CIMA Group, Inc.

REICH, REICH & REICH, P.C.
Co-Counsel for Defendants
175 Main Street, Suite #300
White Plains, New York 10601
(914) 949-2126
By: Jeffrey A. Reich (JR-7535)

STEPHENS, BARONI, REILLY & LEWIS, LLP
Co-Counsel for Defendants
175 Main Street
White Plains, New York 10601
(914) 761-0300
By: Stephen R. Lewis, Esq. (SL-3132)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:

CIMA Group, Inc.,                                              Chapter 11
                                                               Case No. 05-27041(ASH)

                              Debtor.
------------------------------------------------------X
CIMA Group, Inc.

                              Plaintiff,

        -against-                                              Adv. Proc. No.
                                                               07-08276 (ASH)
Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group.

                              Defendants.
------------------------------------------------------X

STATE OF NEW YORK          )
COUNTY OF WESTCHESTER      )ss:

        Samara Neal being sworn says: I am not a party to the action, am over 18 years of

age and reside at 18 Garden Street, Chestnut Ridge, New York 10977.

On June 6, 2008, I served true copies of a Memorandum of Law in Opposition to Motion for Summary Judgment (Document #10), by mailing the same in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service located at 175 Main Street, White Plains, New York, addressed to the last-known address of the addressees as indicated below:

>Rosemarie E. Matera, Esq.
>Kurtzman Matera Gurock & Scuderi, LLP
>2 Perlman Drive Suite 301
>Spring Valley, NY 10977
>
>Honorable Adlai S. Hardin, Jr.
>U.S. Bankruptcy Judge
>U.S. Bankruptcy Court
>300 Quarropas Street
>White Plains, NY 10601
>
>Office of the U.S. Trustee
>33 Whitehall Street, 21st Floor
>New York, NY 10004
>
>Nicholas Pasalides
>Edgewater Design, Inc.
>19 Hilltop Road
>Katonah, NY 10536

Samara Neal

Sworn to before me this
6th day of June, 2008

LAWRENCE R. REICH
Notary Public, State of New York
No. 60-8525385
Qualified in Westchester County
Commission Expires September 30, 20__

JS 44C/SDNY
REV. 12/2005

# BRIEANT

**CIVIL COVER SHEET**

## 08 CIV. 5143

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

*08 CV 5143 CLPLMS*

| PLAINTIFFS | DEFENDANTS |
|---|---|
| CIMA GROUP, INC. | NICHOLAS PASALIDES, JOSEPH WOODS, MARK VELZY, MICHIEL BOENDER AND EDGEWATER DESIGN, INC., EDGEWATER GROUP ARCHITECTS AKA ~~EDGEWATER GROUP~~ |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| KURTZMAN MATERA, P.C.<br>664 Chestnut Ridge Road, Spring Valley, NY 10977<br>~~(845) 352-8800~~ | ROSEMARIE E. MATERA, ESQ.   *Jeffrey A. Reich 175 Main St - WP, NY 10601 (914) 949-2126* |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

WITHDRAWAL OF REFERENCE

*JUL - 1 2008*

Has this or a similar case been previously filed in SDNY at any time? No [X]  Yes [ ]  Judge Previously Assigned

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*  NATURE OF SUIT

### ACTIONS UNDER STATUTES

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**TORTS**

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[X] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 HIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 864 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC.
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

**ACTIONS UNDER STATUTES**

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE _____ DOCKET NUMBER_____

Check YES only if demanded in complaint
JURY DEMAND: [ ] YES [ ] NO

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

*(SEE REVERSE)*

| (PLACE AN x IN ONE BOX ONLY) | ORIGIN | |
|---|---|---|

☒ 1 Original Proceeding   ☐ 2a. Removed from State Court   ☐ 2b. Removed from State Court AND at least one party is a pro se litigant   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from (Specify District)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge Judgment

| (PLACE AN x IN ONE BOX ONLY) | BASIS OF JURISDICTION | IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441) |
|---|---|---|

☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☒ 3 FEDERAL QUESTION (U.S. NOT A PARTY)   ☐ 4 DIVERSITY

## CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

CIMA Group, Inc. - 450 Manville Road, Pleasantville, New York  10573

*(WESTCHESTER COUNTY)*

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Nicholas Pasalides - 18 Hilltop Road, Katonah, NY  10536
Joseph L. Woods - 218 Grapehollow Road, Homes, NY  12531
Mark Velzy - 3740 Wildwood Street, Yorktown Heights, NY  10598
Michiel Boender - 163 North Main Street, Port Chester, NY  10573
Edgewater Design, Inc. - 163 North Main Street, Suite 202, Port Chester, NY  10573
Edgewater Group Architects a/k/a Edgewater Group, 163 North Main Street, Suite 202, Port Chester, NY  10573
*(WESTCHESTER COUNTY)*

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☒ WHITE PLAINS   ☐ FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

DATE 5/31/08   SIGNATURE OF ATTORNEY OF RECORD   ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo. 1 Yr. 86 )
RECEIPT #   Attorney Bar Code # REM-0999

Magistrate Judge is to be designated by the Clerk of the Court. .

Magistrate Judge _____ SMITH _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Return Date:  June 26, 2008
Return Time:  10:00 a.m.

Rosemarie E. Matera (REM-0999)
Attorneys for Debtor and Debtor in Possession
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

CIMA Group, Inc.,

                            Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMA Group, Inc.,

                           Plaintiff,

          - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                       Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11
Case No. 05-27041(ASH)

Adv. Pro. No. 07-08276(ASH)

**STATEMENT OF DEBTOR IN RESPONSE
TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**TO:  HONORABLE ADLAI S. HARDIN, JR.
      UNITED STATES BANKRUPTCY JUDGE**

       CIMA Group, Inc., the debtor and debtor in possession herein ("CIMA") by and through its

counsel, Kurtzman Matera, P.C., submits this Statement In Response to The Opposition of Nicholas

Pasalides ("Pasalides") to the request that he be directed to turnover to CIMA $175,500.00 of funds

remaining from an admitted bridge loan.  Upon all the papers and proofs submitted, this Court is

unquestionably warranted, as a matter of law, to direct judgment in favor of the moving party.

       In bullet point format, it is respectfully set forth as follows:

- Pasalides was hired by William Bujarski ("Bujarski") in 1993.

- Pasalides was an employee of CIMA.

- Pasalides was buying a new home in the summer of 2000.

- Pasalides was loaned $415,500.00 as a bridge loan.

- The sum of $350,000.00 was wire transferred from CIMA account 670-9092934 on September 7, 2000 to Pasalides.

- A check in an amount of $65,500.00 was written on CIMA account No. 670-9084826 to Pasalides on July 31, 2000.

- Pasalides repaid $200,000.00 to CIMA when he closed on his old home.

- The $200,000.00 repayment by Pasalides was deposited into CIMA account 670-9084826 by means of a $100,000.00 deposit on November 14, 2000 and a second $100,000.00 deposit on November 28, 2000.

- A repayment of $20,000.00 was credited on December 31, 2001.

- A repayment of $20,000.00 was credited on December 31, 2003.

- Pasalides was issued a 1099-MISC from CIMA for 2003 in an amount of $20,000.00.

- Pasalides included the 2003 1099 MISC issued by CIMA on his 2003 tax return.

- Pasalides signed a letter acknowledging the debt to CIMA.

- Pasalides has failed and refused to repay the $175,500.00.

## DISCUSSION

The Opposition to the Summary Judgment Motion ("Opposition") consists of sound and fury without significance.  The money was loaned by CIMA.  The money is owed to CIMA.

Pasalides tells us that he was hired "by Bujarski in 1993".  Opposition at p. 2.  Pasalides worked for <u>CIMA</u> for more than a dozen years.  The loan he was graciously given he also tells us was "from Bujarski".  The money came from <u>CIMA</u>.  Pasalides repaid a portion of the funds to

2

CIMA, he was issued a 1099 from CIMA and signed a letter noting his obligation to CIMA. To the same extent Pasalides was hired "by Bujarski" the loan was "from Bujarski". Bujarski hired Pasalides as a CIMA employee. Bujarski caused CIMA to loan Pasalides $415,500.00 so he could buy his new home before selling the old home. The logic is apparent. The facts are clear.

## CONCLUSION

The issue of setoff, like every issued raised in this matter by Pasalides and the other Defendants at each status conference is a red herring. In the fairytale, Hansel & Gretel, the evil stepmother twice leads Hansel and Gretel into the forest. On the first occasion, Hansel tosses pebbles behind him so that he and his sister can find their way home. On the second occasion, he tosses breadcrumbs. When Hansel seeks to return home with Gretel, he cannot find the breadcrumbs, they have been eaten by the animals of the forest. Hansel and Gretel are lost. Pasalides, et al, have at every status conference since the commencement of the adversary proceeding, thrown pebbles for this Court to follow. The pebbles are not to lead the Court home, or by analogy, to the truth, but to shroud the truth as justice goes astray. The notion of "setoff" is another misdirected trail. This time, however, Pasalides is scattering breadcrumbs hoping desperately the Court never comes home. Assuming, *arguendo*, there is some right of setoff, in no way does that alter Pasalides' obligation. Do not let justice vanish into the forest.

WHEREFORE, it is respectfully requested that this Court grant the Motion of CIMA for summary judgment.

Dated: Spring Valley, New York
      June 20, 2008

                          Respectfully submitted,

                          **/s/ Rosemarie E. Matera**_____
                          Rosemarie E. Matera, Esq.
                          Kurtzman Matera, P.C.
                          Attorneys for Debtor and Debtor in Possession
                          664 Chestnut Ridge Road
                          Spring Valley, New York   10977
                          (845) 352-8800

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
2 Perlman Drive
Spring Valley, New York 10977
845-352-8800


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                              Chapter 11
                                                                    Case No. 05-27041(ASH)
CIMA Group, Inc.,

                                    Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CIMA Group, Inc.,

                                    Plaintiff,


            - against -                                             Adv. Pro. No. 07-08276(ASH)

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,


                                    Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AFFIDAVIT OF SERVICE**

State of New York            )
County of Rockland           )ss


     **Sherry Kramer**, being duly sworn, deposes and says:


    1.    I am over 18 years of age and am not a party to this action and I reside at Pomona, New York.


    2.    On June 20, 2008, I served a true copy of the **Statement of Debtor in Response to Opposition to Motion for Summary Judgment** by depositing the same via First Class Mail in a sealed envelope with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to:

|  |  |
|---|---|
| Jeffrey A. Reich, Esq. | Stephen R. Lewis, Esq. |
| Reich, Reich & Reich, PC | Stephens, Baroni, Reilly & Lewis, LLP |
| 175 Main Street, Suite 300 | 175 Main Street, Suite 800 |
| White Plains, NY 10601 | White Plains, NY   10601 |


_____

Sherry Kramer

Sworn to before me this
20th day of June, 2008


_____

Notary Public

Donna B. Paz
Notary Public, State of New York
No. 01PA5066620
Qualified in Rockland County
Commission Expires September 30, 2010

Rosemarie E. Matera (REM-0999)
Kurtzman Matera, P.C.
664 Chestnut Ridge Road
Spring Valley, New York 10977
845-352-8800

08CV5143 (CLB)(LMS)

ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x

In re:                                          Chapter 11
                                                Case No. 05-27041(ASH)

CIMA Group, Inc.,

                        Debtor.
--------------------------------x


CIMA Group, Inc.,

                Plaintiff,                       Adv. Pro. No. 07-08276(ASH)

        - against -

Nicholas Pasalides, Joseph Woods,
Mark Velzy, Michiel Boender and
Edgewater Design, Inc., Edgewater
Group Architects a/k/a Edgewater Group,

                Defendants
--------------------------------x

### STIPULATION AND ORDER
### WITHDRAWING THE REFERENCE

        This Stipulation and Order Withdrawing the Reference ("Stipulation") is made by and

between CIMA Group, Inc. ("CIMA"), the debtor and debtor in possession herein and plaintiff in

Adversary Proceeding No. 07-08276 ("Adversary Proceeding") by and through its attorney,

Kurtzman Matera, P.C. and Nicholas Pasalides, Joseph Woods, Mark Velzy, Michiel Boender,

Edgewater Design, Inc., and Edgewater Group Architects a/k/a Edgewater Group, defendants

-1-

From: KURTZMAM MATERA, P.C.    Case 7:08-cv-05143-CS-LMS 845 352 8865 Document 5-37    Filed 07/08/2008    Page 2 of 4    #002  P.003/005

06/25/2008  08:18    #002  P.003/005

(collectively "Defendants") in the Adversary Proceeding, by and through their attorneys, Reich, Reich & Reich, P.C. and Stephens, Baroni, Reilly & Lewis, LLP.

**WHEREAS**, CIMA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") on December 13, 2005; and

**WHEREAS**, CIMA filed a complaint ("Complaint") against the Defendants on July 10, 2007, commencing the Adversary Proceeding; and

**WHEREAS**, the Complaint alleges causes of action including, *inter alia*, equitable fraud and breach of covenant of good faith and fair dealing which arose in accordance with, and under the laws and practice of the State of New York ("New York Causes of Action"); and

**WHEREAS**, the New York Causes of Action are not core proceedings under 28 U.S.C. §157; and

**WHEREAS**, in the answers ("Answers") filed by the Defendants, consent is not offered to a determination of the New York Causes of Action by the Bankruptcy Court; and

**WHEREAS**, the Defendants have not, since the filing of their Answers, consented to a determination of the New York Causes of Action by the Bankruptcy Court; and

**WHEREAS**, the Complaint also alleges a cause of action for turnover against defendant, Nicholas Pasalides ("Turnover Cause of Action"); and

**WHEREAS**, the Bankruptcy Court will retain jurisdiction to hear and decide any dispositive motions concerning the Turnover Cause of Action; and

**WHEREAS**, the Bankruptcy Court set March 3, 2006 as the last day to file proofs of claim; and

**WHEREAS**, the Defendants have not filed proofs of claim with the Clerk of the Bankruptcy Court; and

**WHEREAS**, the Defendants timely demanded a jury trial in their Answers; and

-2-

**WHEREAS**, pursuant to 28 U.S.C. §157(e), the right to a jury trial applies to the Complaint; and

**WHEREAS**, 28 U.S.C. §157(e) allows the bankruptcy judge to conduct a jury trial only "with the express consent of all the parties"; and

**WHEREAS**, in accordance with Federal Rule of Bankruptcy Procedure 9015(b), no statement of consent to having a jury trial conducted by the bankruptcy judge has been jointly or separately filed by the parties.

**NOW, THEREFORE**, in consideration of the premises herein, the parties hereby stipulate and agree as follows:

1.    The reference as it concerns the Adversary Proceeding be and the same hereby is withdrawn.

2.    The Bankruptcy Court will retain jurisdiction to hear and decide dispositive motions concerning the Turnover Cause of Action.

3.    The Clerk of the Bankruptcy Court shall convey the record of the Adversary Proceeding to the Clerk of the United States District Court.

4.    A notation shall be placed on the docket of the Adversary Proceeding, as such record is maintained by the Clerk of the Bankruptcy Court, indicating that the reference has been withdrawn.

Dated: Spring Valley, New York
        April _28_, 2008

Rosemarie E. Matera
Kurtzman Matera, P.C.
Attorneys for Debtor and Plaintiff
664 Chestnut Ridge Road
Spring Valley, New York 10977
(845) 352-8800

-3-

Dated: White Plains, New York
April 23, 2008

Jeffrey Reich, Esq.
Reich, Reich & Reich, P.C.
Attorneys for Defendants
175 Main Street, Suite 300
White Plains, New York 10601

Dated: White Plains, New York
April 23, 2008

Stephen R. Lewis, Esq.
Stephens, Baroni, Reilly & Lewis, LLP
Attorneys for Defendants
175 Main Street, Suite 800
White Plains, New York 10601

Dated: White Plains, New York
April ____, 2008

So ORDERED:

Dated: White Plains, New York
April ____, 2008
June 27, 2008

United States Bankruptcy Judge

United States District Court Judge

-4-